**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CITIGROUP INC. SHAREHOLDER DERIVATIVE LITIGATION | Lead Case No. 1:20-cv-09438 (AJN)<br><br>JURY TRIAL DEMANDED |

**VERIFIED CONSOLIDATED**
**<u>SHAREHOLDER DERIVATIVE COMPLAINT</u>**

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ...........................................................................1

II.     JURISDICTION AND VENUE .....................................................................8

III.    PARTIES .......................................................................................................9

        A.      Plaintiffs ...........................................................................................9

        B.      Nominal Defendant ...........................................................................9

        C.      Defendants .......................................................................................10

                1.      Current Director and Officer Defendants ................................11

                2.      Former Director Defendants ....................................................16

IV.     DEFENDANTS WERE DUTY-BOUND TO OVERSEE CITIGROUP'S MOST
        IMPORTANT ACTIVITIES AND ENSURE ITS LEGAL AND REGULATORY
        COMPLIANCE................................................................................................17

        A.      Defendants' General Fiduciary Duties as Corporate Directors ............17

        B.      Defendants' Specific Duties as Members of Board Committees Expressly
                Charged with Overseeing and Monitoring Citigroup's Internal Controls, Risk-
                Management, and Regulatory Compliance ...........................................20

                1.      Duties of the Audit Committee ................................................22

                2.      Duties of the Risk Management Committee ..............................24

                3.      Duties of the Ethics, Conduct and Culture Committee .............25

                4.      Duties of the Nomination, Governance and Public Affairs Committee ....25

                5.      Duties of the Operations and Technology Committee ...............26

                6.      Duties of the Personnel and Compensation Committee .............26

        C.      Defendants' Specific Duties as Directors of a Systemically-Important Banking
                Institution. .......................................................................................27

        D.      Defendants Repeatedly Acknowledged that Oversight of Internal Controls, Risk-
                Management, and Regulatory Compliance Was a Critical Board Function ..........30

V.      DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES TO CITIGROUP,
        RESULTING IN MASSIVE HARM TO THE COMPANY ............................33

        A.      Defendants Were Unquestionably Aware of The Urgent Need to Reform
                Citigroup's Internal Controls and Risk-Management Systems ............33

1.      Even Before the Financial Crisis, Citigroup's Deficient Internal Controls and Risk-Management Systems Were the Subject of Intense Regulatory Scrutiny ................................................................................33

2.      Citigroup's Deficient Internal Controls and Risk-Management Systems Led to a Near-Death Experience for the Company During the 2007–2009 Financial Crisis ........................................................................37

3.      Citigroup Endured an Incessant Succession of Post-Crisis Government Actions as a Result of the Board's Continued Failure to Implement and Maintain Enterprise-Wide Internal Controls and Risk-Management Systems. ...............................................................................40

    i.     April 2012: The OCC Issues a Consent Order Identifying "*critical deficiencies*" in Citibank's Compliance Systems and Numerous "*internal control weaknesses*" ........................................... 42

    ii.    August 2012: The FDIC and California Department of Financial Institutions Issue a Consent Order Requiring Banamex USA "*to increase its oversight of the affairs of the Bank*" ................................ 44

    iii.   March 2013: The Federal Reserve Issues a Consent Order Finding "*Citigroup lacked effective systems of governance and internal controls*" ............................................................... 44

    iv.   November 2014: The CFTC Issues a Consent Order Imposing a *$310 Million* Fine and Finding *"internal controls and supervisory failures at Citibank"* ............................................................... 46

    v.    November 2014: The OCC Issues a Consent Order Imposing a *$350 Million* Fine and Identifying "*deficiencies in [Citibank's] wholesale foreign exchange business*" .................................. 47

    vi.   November 2014:  The FCA Issues a Final Notice Imposing a *$358 Million* Fine and Criticizing Citibank for "*failing to take reasonable care to organize and control its affairs responsibly and effectively with adequate risk management systems*" .................................. 48

    vii.  November 2014: FINRA Imposes a *$15 Million* Fine Finding Citigroup's Investment Bank "*failed to adequately supervise equity research analysts' compliance with its policies and deter violations of FINRA rules and the federal securities laws*" ...................................... 49

    viii.  May 2015: The Federal Reserve Issues a Consent Order Imposing a *$342 Million* Fine and Finding "*Citigroup lacked adequate firm-wide governance, risk management, compliance and audit procedures*" .... 50

    ix.   July 2015:  CFPB Issues a Consent Order Imposing a *$35 Million* Fine and Ordering Citibank to Pay *$700 Million* in Restitution ................. 51

    x.    July 2015:  OCC Issues a Consent Order Imposing a *$35 Million* Fine and Finding Citibank had "*failed to implement appropriate controls*" 52

xi.   July 2015: FDIC and California Department of Business Oversight Issue a Joint Order Imposing a *$140 Million* Fine for Failing to Comply with the Previous August 2, 2012 Consent Order .................................. 53

xii.   May 2016: CFTC Issues Two Separate Consent Orders Imposing *$425 Million* in Fines and Ordering Implementation of Certain Internal Controls ............................................................................................. 54

xiii.   January 2017: SEC Issues Cease and Desist Order Imposing an *$18 Million* Fine and Finding Citigroup's Investment Bank "*either did not have adequate policies and procedures in place…or failed to implement the policies and procedures that were in place*" ............... 55

xiv.   May 2017: DOJ Enters Non-Prosecution Agreement Requiring Forfeiture of *$97 Million* and Criticizing Citigroup's Cooperation During the Investigation ...................................................................... 56

xv.   December 2017: OCC Issues a Consent Order Imposing a *$70 Million* Fine and Finding Citigroup Remained "*in violation of the 2012 Consent Order*" .................................................................................. 57

B.   During the Relevant Period, Defendants Continued to Consciously Disregard the Need to Reform Citigroup's Internal Controls and Risk-Management Systems ... 58

1.   During the Relevant Period, Regulators Continue to Pressure Citigroup's Leaders to Prioritize Reform and Issue Additional Orders Resulting from the Board's Continuing Failure ............................................................. 58

i.   October 2019:  The OCC Issues a Consent Order Imposing a *$30 Million* Fine for Citibank's "*deficient processes and controls*" Concerning Other Real Estate Owned (OREO) Accounting .............. 59

ii.   November 2019: The Bank of England Imposes a *$56.6 Million* Fine on Citigroup After Finding it "*failed to ensure that systems and controls supporting their regulatory reporting framework were designed, implemented, and operating effectively*" ............................................... 60

iii.   January 17, 2020:  The OCC issues a Consent Order Imposing an approximate *$18 Million* Fine for Citibank's "*pattern or practice of violations*" of the Flood Disaster Protection Act ................................. 61

iv.   September 24, 2020: The CFTC Issues a Consent Order Assessing a *$4.5 Million* Fine and Finding that "*Citi did not maintain adequate internal controls*" with Respect to Data Preservation ......................... 61

2.   In August 2020, Corbat Circulated a Firm-Wide Memorandum Conceding that the Board has Failed to Prioritize Compliance or Take Action to Achieve the Necessary Reforms. ....................................................... 63

3.   The Day After Corbat's Internal *Mea Culpa*, Citigroup's Deficient Internal Controls Cause the Company to Inadvertently Pay $900 Million of Its Own Money to Creditors of Revlon, Inc. .................................................. 64

C.     The Federal Reserve and OCC Impose a New *$400 Million* Penalty on Citigroup and Reveal the Extent of Defendants' Failure to Fulfill Their Fiduciary Duties...66

     1.     The October 7, 2020 Federal Reserve Cease and Desist Order ................67

     2.     The October 7, 2020 OCC Consent Orders ................................69

D.     Corbat and Other Citigroup Executives Confess Publicly That, After All These Years, Citigroup Remains at Square One. ..........................................72

E.     Citigroup Suffers Massive Harm as a Result of the Board Oversight Failures Resulting in Regulatory Rebuke ..........................................................75

VI.     DEFENDANTS VIOLATED SECTION 10(B) OF THE EXCHANGE ACT AND BREACHED THEIR FIDUCIARY DUTIES BY KNOWINGLY OR RECKLESSLY ISSUING MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD ..........................................................................77

     A.     Defendants Caused Citigroup to Conduct a Massive Stock Repurchase Program 77

     B.     In Connection with the Share Repurchases, Defendants Issued Materially False and Misleading Statements ..................................................80

     1.     False Statements Regarding Citigroup's Regulatory Compliance............80

     2.     False Statements in Citigroup's Public Filings.........................86

     C.     In Repurchasing Stock, Citigroup Relied on Defendants' False and Misleading Statements ..............................................................97

     D.     Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrines Apply to Defendants' Misrepresentations .......................................99

     E.     Defendants' Misstatements and Omissions Damaged Citigroup........................100

     1.     Analyst Reports Following Revelations of the Fraud Attest That it Caused a Decline in Citigroup's Share Price.......................................102

VII.     DEFENDANTS MAINTAINED THEIR BOARD POSITIONS AND PREVENTED APPROPRIATE USE OF THE SHAREHOLDER FRANCHISE BY ISSUING FALSE AND MISLEADING PROXY STATEMENTS AND VIOLATING SECTION 14(A) OF THE EXCHANGE ACT ..................................................................104

     A.     Defendants Caused Citigroup to Issue Materially False and Misleading Statements In the 2018 Proxy ..........................................104

     B.     Defendants Caused Citigroup to Issue Materially False and Misleading Statements In the 2019 Proxy ..........................................112

     C.     Defendants Caused Citigroup to Issue Materially False and Misleading Statements in the 2020 Proxy ..........................................119

VIII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ....................................126

     A.   Corbat Faces a Substantial Likelihood of Liability and Is Not Independent .......131

     B.   Costello Faces a Substantial Likelihood of Liability .............................................133

     C.   Dailey Faces a Substantial Likelihood of Liability...............................................134

     D.   Desoer Faces a Substantial Likelihood of Liability and Is Not Independent ......135

     E.   Dugan Faces a Substantial Likelihood of Liability...............................................136

     F.   Fraser Faces a Substantial Likelihood of Liability and Is Not Independent........137

     G.   Hennes Faces a Substantial Likelihood of Liability .............................................139

     H.   Henry Faces a Substantial Likelihood of Liability ...............................................139

     I.   Ireland Faces a Substantial Likelihood of Liability..............................................140

     J.   Jacobs Faces a Substantial Likelihood of Liability...............................................141

     K.   James Faces a Substantial Likelihood of Liability ...............................................142

     L.   Reiner Faces a Substantial Likelihood of Liability...............................................143

     M.   Taylor Faces a Substantial Likelihood of Liability...............................................144

     N.   Turley Faces a Substantial Likelihood of Liability...............................................145

     O.   Wright Faces a Substantial Likelihood of Liability...............................................146

     P.   Wynaendts Faces a Substantial Likelihood of Liability .......................................147

     Q.   Zedillo Faces a Substantial Likelihood of Liability..............................................148

IX.   CLAIMS AGAINST DEFENDANTS.............................................................................149

X.   PRAYER FOR RELIEF ................................................................................................156

XI.   JURY DEMAND .............................................................................................................157

Co-Lead Plaintiffs Employees' Retirement System of the State of Rhode Island ("Rhode Island") and The Employee Retirement System of the City of Providence ("Providence" and, together with Rhode Island, "Plaintiffs"), by and through their undersigned attorneys, submit this Verified Consolidated Shareholder Derivative Complaint (the "Complaint") against the Defendants named herein. The allegations of this Complaint are made upon Plaintiffs' knowledge as to themselves and, as to all other matters, upon information and belief, including undersigned counsel's investigation of publicly-available information.

## I.    <u>NATURE OF THE ACTION</u>

1.    This is a derivative action brought for the benefit of Citigroup Inc. ("Citigroup" or the "Company") and its shareholders.

2.    Through this action, Plaintiffs seek to hold Defendants—who are current and former members of the Citigroup board of directors (the "Board") (and, in some cases, also officers of the Company)—accountable for their conscious disregard, over many years, of their responsibility to ensure Citigroup's compliance with regulatory standards and orders mandating enterprise-wide reforms to the Company's internal controls and risk-management systems. Defendants' failures have caused Citigroup to incur substantial harm, including, most recently, a $400 million penalty imposed by federal regulators in October 2020.

3.    Citigroup is a systemically-important financial institution that operates globally through thousands of subsidiaries, facilitates nearly $4 trillion in financial flows daily, and acknowledges that it is among the "largest and most complex" firms in the world. Citigroup's massive size is the result of decades of relentless M&A activity, during which Citigroup and its predecessors acquired hundreds of different banks and other financial companies. As Citigroup expanded, however, its leaders failed to integrate their many acquisitions into a coherent whole,

never unifying or modernizing the combined Company's internal controls and risk-management systems.  According to prominent banking analyst Meredith Whitney, "it was never a priority of the company to invest [in integration]" and, as a result, Citigroup became "a gobbledygook of companies that were never integrated."  The Company's various "businesses didn't communicate with each other.  There were dozens of technology systems and dozens of financial ledgers."

4.      Citigroup's failure to integrate and modernize its internal controls led to a near-death experience during the financial crisis of 2007–2009, when the Company teetered on the brink of collapse and was saved only with the aid of nearly $500 billion worth of government money and guarantees—the largest bank bailout in United States history.  The National Commission on the Causes of the Financial Crisis in the United States concluded in its final Inquiry Report (the "Financial Crisis Report") that "***Citigroup had two key problems: a lack of effective enterprise-wide management to monitor and control risks and a lack of proper infrastructure and internal controls[.]***"[1]

5.      In the wake of the crisis, Citigroup and its peers rightly faced significant new scrutiny from regulators in the United States and abroad.  The Company's principal regulators made clear that establishing enterprise-wide risk management systems, including the necessary infrastructure to monitor and manage risks throughout the Company, was a Board-level responsibility.  The Federal Reserve, for example, promulgated regulations requiring the Board to establish and oversee a "global risk-management framework" that is "commensurate with [Citigroup's] structure, risk profile, complexity, activities, and size[.]"

6.      Thus, for Citigroup's Board, reforming the Company's internal controls and risk-management systems, and ensuring its regulatory compliance, should have been "mission critical"

---

[1] All emphasis herein is added unless otherwise noted.

priorities.  Yet, even after the crisis, the Board never took action to integrate and modernize the Company's internal controls and risk-management systems.  The Board failed to act even as government authorities spent the ensuing decade repeatedly admonishing Citigroup's senior leadership, including CEO and director Defendant Michael Corbat ("Corbat"), to give priority to overhauling the Company's internal systems.  They did so both privately and through more than a dozen significant post-crisis regulatory actions, including:

- A 2012 Consent Order issued by the Office of the Comptroller of the Currency (the "OCC") finding that Citigroup's largest subsidiary, Citibank, N.A. ("Citibank"), had "***internal control weaknesses***" spanning "***multiple areas of the bank***" resulting in an "***inability to assess and monitor client relationships on a bank-wide basis***," and requiring the Company to establish "***enterprise-wide***" internal controls;

- A 2013 Consent Order issued by the Federal Reserve finding that "***Citigroup lacked effective systems of governance and internal controls***" and requiring the Company to implement a "***firmwide compliance risk management program designed to identify and manage compliance risks across the consolidated organization***[.]";

- A 2015 Consent Order issued by the Federal Reserve again finding that "***Citigroup lacked adequate firm-wide governance, risk management, compliance and audit policies and procedures***" and requiring Citigroup to make substantial improvements to its "***oversight, internal controls, compliance, risk management and audit programs[.]***"; and

- A 2017 Consent Order issued by the OCC imposing a $70 million fine on the Company and finding that the Company still had failed to undertake necessary reforms and was "***in violation of the 2012 Consent Order***."

7.      At the beginning of 2018, it seemed that Citigroup's Board might finally be poised to turn over a new leaf.  In the wake of the OCC's 2017 Order criticizing the Company for its continued non-compliance, a Citigroup spokesperson publicly stated that the Company was "***committed to taking all necessary and appropriate steps to remedy the concerns identified by the OCC***."  From the beginning of 2018 through the present (the "Relevant Period"), the Board actively promoted this story.  In public statement after public statement—including in the Company's annual reports and proxy statements intended to secure Defendants' reelections as directors—the Board told shareholders and the public that Citigroup and its leaders appreciated the need for risk-management and oversight reforms, acknowledged the Board's responsibility to achieve those reforms, and represented that Citigroup and the Board were prioritizing and implementing the necessary remediations.

8.      In April 2018, for example, Citigroup's then-Chairman Defendant Michael O'Neil ("O'Neil") claimed that the risk-management issues at the Company were "***in the past***" because the Board had made "***great progress***" in remediating the Company's deficiencies.  A year later, in April 2019, O'Neil's successor as Chairman, Defendant John C. Dugan ("Dugan") likewise stated that "***Citi has made tremendous progress on what I describe as the existential regulatory issues***" and claimed that "***Citi has really [a] best-in-class record***" with its regulators.  In the Company's annual proxy statements during the Relevant Period, the Board asserted, *inter alia*, that "***Citi is active in ensuring its governance practices are at the leading edge of best practices***."

9.      But the Board's story was false.  In fact, the Board was not prioritizing compliance and Citigroup's internal controls and risk-management systems remained horribly deficient.

10.      In October 2019, the OCC issued a new Consent Order admonishing Citibank for "***decentralized, ineffective, and inadequate***" internal controls relating to certain accounting

practices.  Then, just a month later, the Bank of England issued its finding that Citigroup's United Kingdom operations had "***failed to ensure that systems and controls supporting their regulatory reporting framework were designed, implemented, and operating effectively***."

11.     On August 10, 2020, apparently anticipating further adverse regulatory action, Corbat circulated a firm-wide internal memorandum in which he admitted that, contrary to the Board's public statements, Citigroup was experiencing purported "execution challenges" in remediating its "controls, infrastructure, and governance."   In the memorandum, Corbat acknowledged that Citigroup needed to "think about infrastructure and controls very differently." He continued: "We can't think of them as just something that is important to our regulators.  It's not just about getting remediation projects done or checking boxes."  Citigroup, Corbat explained, needed to "change[]" its collective "mindset."   He added, unconvincingly, that the Company would now, finally, be "making our risk and controls a strategic priority."   In other words, as of August 10,  2020, the Board: (1) still had not made Citigroup's "risk and controls a strategic priority"; (2) viewed the Company's risk-management and internal controls deficiencies as problems only to the extent they created regulatory nuisances; and (3) had not truly been prioritizing necessary reforms beyond, as Corbat put it, "***checking boxes***."

12.     Corbat's *mea culpa* was too little, too late.  ***The very next day***, the Company's failure to establish enterprise-wide internal controls resulted in Citibank mistakenly paying almost $900 million of its own money to a group of lenders expecting an interest payment on behalf of a Citigroup client, Revlon, Inc., attracting widespread scrutiny and suspicion as to the state of the Company's purportedly-reformed internal controls.  Citigroup blamed the payment on human error, suggesting the continued existence of serious control deficiencies.  As one

*Bloomberg* columnist observed: "When a simple human lapse like this can cause such a problem, it suggests there may be systemic deficiencies too.  Where were the checks?"

13.     Citigroup's "accidental" $900 million payment—which *Bloomberg* has described as "***the biggest bank error in recent memory***"—appears to have been the last straw for regulators, who had spent years working behind the scenes to convince Corbat and the Board to prioritize necessary reforms.  On October 7, 2020, the OCC and Federal Reserve announced a new $400 million fine against Citigroup and published new Orders, agreed to by the Board, rebuking Citigroup for enterprise-wide internal controls and risk-management deficiencies, requiring new remedial efforts, and imposing significant restrictions on Citigroup's operations going forward.  Reflecting their respective zones of regulatory authority, the Federal Reserve's Order was imposed on Citigroup and the OCC's Orders were imposed on Citigroup's Citibank subsidiary.

14.     The Federal Reserve found that Citigroup was a repeat offender and ***still*** had failed to comply with terms of Federal Reserve Orders issued in 2013 and 2015.  The OCC unequivocally found that: "***For several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with the Bank's size, complexity, and risk profile***," noting that these were "***serious and longstanding deficiencies***."  The OCC further found that "***Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the bank. Furthermore, inadequate reporting to the Board hinders its ability to provide effective oversight***."

15.    Then, on an October 13 earnings call held the week after the OCC and Federal Reserve imposed their $400 million fine and new Orders, Corbat—who was Citigroup's CEO and a Board member during the entire Relevant Period—made the shocking confession that the Board essentially still remains at square one in terms of determining what even needs to be done to bring its systems into compliance, telling analysts: "This won't be a quick or easy fix.  We need to conduct an in-depth gap analysis to ensure our solutions are tailored to the issues we face and get us to a necessary end state."  He added: "[W]e can't fully scope out the costs yet for a multiyear transformation[.]"  Corbat's comments revealed that the Board's failures are not limited to a mere failure of results.  Not only has the Board—after more than a decade of public and private pressure from its regulators, and billions in fines—failed to reform Citigroup's internal controls and ensure the Company's regulatory compliance, ***the Board has failed to even determine what needs to be done, how long it will take, or how much it might cost***.

16.    Enough is enough.  The Board's continuing disregard of the need to implement reforms and achieve compliance with past orders has had disastrous consequences for the Company.  Among other things, the Company has incurred enormous fines, suffered serious reputational harm, and exposed itself to substantial liability.  Defendants, all of whom served on the Citigroup Board during the Relevant Period, were duty-bound to exercise oversight over the Company's most important activities and to actively monitor and ensure the Company's legal and regulatory compliance.  There can no longer be any question that they consciously failed to do so.  Nor can there be any question that the Board repeatedly misrepresented, to shareholders and the public, the state of the Company's internal controls and the status of the Company's efforts to achieve regulatory compliance.  Accordingly, Defendants are liable to Citigroup for breaches

of their fiduciary duties, for violations of Sections 10(b) and 14(a) of the Securities Exchange Act of 1934, and for other violations of state law.

17.     Plaintiffs bring this action derivatively on behalf of Citigroup, without having first made a litigation demand on the Board, because all current Board members are Defendants in this action and face a substantial likelihood of liability for their misconduct or are not independent.

## II.     JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

19.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(3) because Lead Plaintiffs and Defendants are residents of different states and/or foreign states. Furthermore, the matter in controversy exceeds $75,000, exclusive of interests and costs.

20.     Venue is appropriate within this District under 28 U.S.C. § 1391(b) and (c), because Nominal Defendant Citigroup has its principal place of business in this District, Plaintiffs' claims arose in this District and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District, and Citigroup has suffered and will continue to suffer harm in this District.

21.     This Court has personal jurisdiction over Citigroup and the other Defendants because they have sufficient minimum contacts with this District.

## III.   PARTIES

### A.   Plaintiffs

22.   Rhode Island is, and at all relevant times was, a beneficial owner of shares of Citigroup common stock. Rhode Island is domiciled in Rhode Island.

23.   Providence is, and at all relevant times was, a beneficial owner of shares of Citigroup common stock.  Providence is domiciled in Rhode Island.

### B.   Nominal Defendant

24.   Nominal Defendant Citigroup is a registered bank holding company incorporated under the laws of Delaware and headquartered within this District, at 388 Greenwich Street, New York, New York, 10013.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "C."

25.   Citigroup provides a full range of banking and financial products and services to consumer and institutional clients globally.  It operates through more than 80 subsidiaries that it deems "significant" and, reportedly, *thousands* of subsidiaries in total.  The Company as a whole owns nearly $2 trillion dollars in assets, facilitates nearly $4 trillion in financial flows daily, and acknowledges that it is among the "largest and most complex" firms in the world.

26.   Citigroup's most important subsidiary is its nationally-chartered United States commercial bank, Citibank.  Citibank's results are consolidated within Citigroup's financials and,

as shown in the table below, account for the vast majority of Citigroup's net income.  Citibank deposits also constitute Citigroup's primary source of funding.

|  | Citibank Net Income (in millions) | Citigroup Net Income (in millions) | % of Citigroup's Net Income from Citibank |
|---|---|---|---|
| **Q1–Q3 2020** | $5,435 | $7,068 | 76.9% |
| **Full Year 2019** | $17,405 | $19,401 | 89.7% |
| **Full Year 2018** | $16,582 | $18,045 | 91.9% |

27.    Accordingly, Citigroup's most important function, by far, is the operation of Citibank.  Citibank is the core around which the rest of Citigroup is built and maintained.  Indeed, Citibank is so central to, and interwoven with, the rest of Citigroup that it can be difficult to say where Citibank ends and Citigroup begins—particularly given Citigroup's deficient internal systems giving rise to this action.  For example, former FDIC Chairwoman Sheila Bair has said that, when the FDIC engaged with Citigroup amidst the financial crisis, "Citigroup's management information systems were so poor that [the FDIC] really couldn't be certain which operations were in [Citibank], and thus subject to the FDIC's powers, and which were outside the bank, and thus beyond our reach."

### C.    Defendants

28.    The twenty-one Defendants in this action include: (i) the seventeen members of Citigroup's current Board; and (ii) four former members of the Board who served during the Relevant Period.

29.    As noted below, certain Defendants also serve or served as executive officers of Citigroup or as members of Citibank's board of directors (the "Citibank Board").  The Citibank Board currently consists of nine directors, all of whom are also directors of Citigroup.  Although

the OCC recommends against overlap between chartered bank boards and the boards of their holding companies, since 2014 Citibank has never had more than a single director who was not also a director of Citigroup. This arrangement reflects the practical unity of the holding company and its primary operating subsidiary. Oversight of Citibank is a core function of the Citigroup Board, and the overlap of the Citigroup and Citibank Boards flows naturally from this reality.

### 1.   Current Director and Officer Defendants

30.   Defendant Corbat has served as Chief Executive Officer ("CEO") and a Director of Citigroup since 2012, and a director of Citibank since 2020. Corbat has served on Citigroup's Operating Committee[2] throughout his time as CEO of Citigroup. Corbat previously held various management and senior management positions with the Company or its subsidiaries since at least 1988. In 2018 and 2019, Citigroup paid Corbat nearly $50 million in total compensation. Upon information and belief, Corbat is a citizen of New York.

31.   Defendant Ellen M. Costello ("Costello") has served as a Director of Citigroup since 2016 and a director of Citibank since 2016. Costello is also a member of the Audit and Risk Management Committees. In 2018 and 2019, Costello was awarded a total of $745,000 in fees and stock awards for her service on the Board. Upon information and belief, Costello is a citizen of Illinois.

32.   Defendant Grace E. Dailey ("Dailey") has served as a Director of Citigroup since September 2019, where she is a member of the Audit and Risk Management Committees, and a director of Citibank since 2020. From 1983 to 2019 Dailey worked for the OCC in various roles. She has served as Senior Deputy Comptroller for Bank Supervision Policy and Chief National

---

[2] The Operating Committee was formed in 2011, includes the most senior executives of Citigroup who, and exercises ultimate managerial oversight over everything from Citigroup's "long-term strategic priorities" to its "day-to-day functions."

Bank Examiner, Assistant Deputy Comptroller, as well as Deputy Comptroller for Large Bank Supervision.  In 2019, Dailey was awarded a total of $105,000 in fees and stock awards for her service on the Board.  Upon information and belief, Dailey is a citizen of Minnesota.

33.     Defendant Barbara Desoer ("Desoer") has served as a Director of Citigroup since 2019, where she is a member of the Operations and Technology, Executive, and Risk Management Committees.  In 2019, Desoer was awarded a total of $292,500 in fees and stock awards for her service on the Board.  Desoer also serves as the Chair of the Citibank Board and has served as a Director of Citibank since 2014, where she served as Chief Operating Officer from October 2013 to April 2014, and as CEO from April 2014 to April 2019.  Desoer has been a member of Citigroup's Operating Committee since 2013.  Upon information and belief, Desoer is a citizen of California.

34.     Defendant John C. Dugan ("Dugan") has served as Chair of the Board since 2019, and as a Director of Citigroup since 2017.  Dugan is a member of the Nomination, Governance and Public Affairs, Personnel and Compensation, Risk Management, Executive, and Audit Committees.  In 2018 and 2019, Dugan was awarded a total of $1,040,000 in fees and stock awards for his service on the Board.  Prior to joining Citigroup's Board, Dugan was a lobbyist for Citigroup at Covington & Burling.  Dugan also served as the 29th Comptroller of the Currency (the head of the OCC) from 2005 to 2010 and overlapped at the OCC with Defendant Dailey. Dugan also served as one of the five directors of the FDIC who voted to approve FDIC assistance to Citi on November 23, 2008, in the form of an asset guarantee for a selected pool of assets (up to $306 billion) and an additional $20 billion capital investment via the Troubled Asset Relief Program ("TARP").  Upon information and belief, Dugan is a citizen of New York.

35.     Defendant Jane Fraser ("Fraser") has served as a Director of Citigroup since September 2020.  Fraser has also served as President of the Company and CEO of Global Consumer Banking since October 2019.  Fraser has held various management and senior management positions with the Company or its subsidiaries since at least 2004.  Before these roles, she was the Chief Executive Officer of Citigroup Latin America from 2015 to 2019. From 2013 to 2015, she was the Chief Executive Officer of the U.S. Consumer and Commercial Banking and CitiMortgage.  From 2009 to 2013, Fraser served as the Chief Executive Officer of Citi's Global Private Bank.  Prior, Fraser was the Global Head of Strategy and Mergers & Acquisitions for Citi from 2007 to 2009.  She joined Citi in 2004 and joined Citigroup's Operating Committee in May 2013.  In 2018 and 2019, Fraser's total compensation was $26,804,271.  The Company has announced that Fraser will succeed Defendant Corbat as Citigroup's CEO in February 2021.  Fraser has also served as a Director of Citibank since 2020. Upon information and belief, Fraser is a citizen of New York.

36.     Defendant Duncan P. Hennes ("Hennes") has served as a Director of Citigroup since 2013, where he Chairs the Risk Management Committee and is a member of the Personnel and Compensation, Executive, and Audit Committees.  In 2018 and 2019, Hennes was awarded a total of $827,500 in fees and stock awards for his service on the Board.  Hennes has also served as a Director of Citibank since 2013.  Upon information and belief, Hennes is a citizen of New York.

37.     Defendant Peter B. Henry ("Henry") has served as a Director of Citigroup since 2015.  Henry is the Chair of the Ethics, Conduct and Culture Committee, and is also a member of the Nomination, Governance and Public Affairs, Executive, and Audit Committees.  Henry served as a Director of Citibank from 2015 to 2016.  In 2018 and 2019, Henry was awarded a total of

$622,500 in fees and stock awards for his service on the Board.  Henry served as a Director of Kraft Foods Inc. from October 2012 to July 2015, overlapping with Defendant Deborah C. Wright. Upon information and belief, Henry is a citizen of New York.

38.    Defendant S. Leslie Ireland ("Ireland") has served as a Director of Citigroup since 2017, where she is a member of the Operations and Technology and the Rick Management Committees.  In 2018 and 2019, Ireland was awarded a total of $586,250 in fees and stock awards for her service on the Board.  Ireland has also served as a Director of Citibank since 2017.  Upon information and belief, Ireland is a citizen of Virginia.

39.    Defendant Lew W. Jacobs, IV ("Jacobs") has served as a Director of Citigroup since 2018.  Jacobs is the Chair of the Personnel and Compensation Committee and is also a member of the Nomination, Governance and Public Affairs, Ethics, Conduct and Culture, Executive, Risk Management, and Audit Committees.  In 2018 and 2019, Jacobs was awarded a total of $511,250 in fees and stock awards for his service on the Board. Upon information and belief, Jacobs is a citizen of California.

40.    Defendant Renée J. James ("James") has served as a Director of Citigroup since 2016.   James is a member of the Risk Management Committee and the Operations and Technology Committee.  In 2018 and 2019, James was awarded a total of $607,500 in fees and stock awards for her service on the Board. Upon information and belief, James is a citizen of California.

41.    Defendant Gary M. Reiner ("Reiner") has served as a Director of Citigroup since 2013.  Reiner is the Chair of the Operations and Technology Committee and is also a member of the Personnel and Compensation and the Executive Committees.  In 2018 and 2019, Reiner was awarded a total of $610,000 in fees and stock awards for his service on the Board.  Reiner also

served as a Director of Citibank from 2013 to 2016.  Upon information and belief, Reiner is a citizen of Connecticut.

42.    Defendant Diana L. Taylor ("Taylor") has served as a Director of Citigroup since 2009.  Taylor is the Chair of the Nomination, Governance and Public Affairs Committee, and a member of the Personnel and Compensation Committee and the Executive Committee.  In 2018 and 2019, Taylor was awarded a total of $728,750 in fees and stock awards for her service on the Board.  Taylor has also served as a director of Citibank since 2020 and previously served on the Citibank Board from 2013 to 2016.  Upon information and belief, Taylor is a citizen of New York.

43.    Defendant James S. Turley ("Turley") has served as a Director of Citigroup since 2013, where he serves as Chair of the Audit Committee.  Turley is also a member of the Executive and Risk Management Committees.  In 2018 and 2019, Turley was awarded a total of $816,250 in fees and stock awards for his service on the Board.  Turley has also served as a Director of Citibank since 2013.  Upon information and belief, Turley is a citizen of Missouri.

44.    Defendant Deborah C. Wright ("Wright") has served as a Director of Citigroup since 2017, where she is a member of the Audit Committee and the Ethics, Conduct and Culture Committee.  In 2018 and 2019, Wright was awarded a total of $577,500 in fees and stock awards for her service on the Board.  Wright has also served as a Director of Citibank since 2019.  Wright also served as a Director of Kraft Foods Inc from July 2001 to May 2011, overlapping with Defendant Henry.  Upon information and belief, Wright is a citizen of New York.

45.    Defendant Alexander Wynaendts ("Wynaendts") has served as a Director of Citigroup since September 2019, where he is a member of the Risk Management Committee and the Personnel and Compensation Committee.  In 2019, Wynaendts was awarded a total of $85,000

in fees and stock awards for his service on the Board.  Upon information and belief, Wynaendts is a citizen of the Netherlands.

46.     Defendant Ernesto Zedillo Ponce de Leon ("Zedillo") has served as a Director of Citigroup since 2010.  Zedillo is a member of the Nomination, Governance and Public Affairs, Ethics, Conduct and Culture, and Risk Management Committees.  In 2018 and 2019, Zedillo was awarded a total of $570,000 in fees and stock awards for his service on the Board.  Zedillo also served as a Director of Citibank from 2010 to at least 2012.  Upon information and belief, Zedillo is a citizen of Connecticut.

### 2.     Former Director Defendants

47.     Defendant Franz B. Humer ("Humer") served as a Director of Citigroup from 2012 to April 2019.  Humer was a member of the Ethics and Culture, Executive, and Risk Management Committees.  In 2018 and 2019, Humer was awarded a total of $400,000 in fees and stock awards for his service on the Board.  Humer also served as a Director of Citibank from 2012 to 2019.  Upon information and belief, Humer is a citizen of the United Kingdom

48.     Defendant Eugene M. McQuade ("McQuade") served as a Director of Citigroup from 2015 to April 2020, where he was a member of the Risk Management Committee, the Executive Committee, and the Audit Committee.  McQuade also served as Vice Chairman of the Company from 2014 to May 2015, and as CEO of Citibank from 2009 to April 2014.  In 2018 and 2019, McQuade was awarded a total of $716,250 in fees and stock awards for his service on the Board.  McQuade also served as a Director of Citibank from at least 2012 to at least January 2020.  Upon information and belief, McQuade is a citizen of New York.

49.     Defendant Michael E. O'Neill ("O'Neill") served as a Director of Citigroup from 2009 to January 2019, and as Chairman of the Board from 2012 to January 2019.  O'Neill was also the Chair of the Executive Committee and a member of the Nomination, Governance and

Public Affairs Committee and the Ethics and Culture, Personnel and Compensation, and Risk Management Committees.  In 2018, O'Neill was awarded a total of $500,000 in fees and stock awards for his service on the Board. O'Neil served as a Director of Citibank from 2009 to 2012. Upon information and belief, O'Neill is a citizen of Connecticut.

50.     Defendant Anthony M. Santomero ("Santomero") served as a Director of Citigroup from 2009 to April 2019.  Prior to his departure from the Company, Santomero was the Chair of the Risk Management Committee, as well as a member of the Executive and Audit Committees.  In 2018 and 2019, Santomero was awarded a total of $512,500 in fees and stock awards for his service on the Board.  Santomero also served as a Director of Citibank from 2009 to 2019.  Upon information and belief, Santomero is a citizen of Pennsylvania.

51.     Defendants Corbat, Costello, Dailey, Desoer, Dugan, Fraser, Hennes, Henry, Humer, Ireland, Jacobs, James, McQuade, O'Neill, Reiner, Santomero, Taylor, Turley, Wright, Wynaendts, and Zedillo are referred to collectively herein as "Defendants."

52.     Defendants Corbat, Costello, Dailey, Desoer, Dugan, Fraser, Hennes, Henry, Ireland, Jacobs, James, Reiner, Taylor, Turley, Wright, Wynaendts, and Zedillo are referred to collectively herein as the "Demand Board Defendants."

53.     Defendants Humer, McQuade, O'Neill, and Santomero are referred to collectively herein as the "Former Director Defendants."

## IV.     DEFENDANTS WERE DUTY-BOUND TO OVERSEE CITIGROUP'S MOST IMPORTANT ACTIVITIES AND ENSURE ITS LEGAL AND REGULATORY COMPLIANCE

### A.     Defendants' General Fiduciary Duties as Corporate Directors

54.     By reason of their positions as directors and/or officers of Citigroup and because of their ability to control the business, corporate, and financial affairs of the Company, Defendants

owed Citigroup and its shareholders the duty to exercise good faith, due care, and diligence in the management and administration of the affairs of the Company, including by ensuring that Citigroup and its subsidiaries—including Citibank—operated in compliance with all applicable government laws, rules, and regulations.  Defendants were and are required to act in furtherance of the best interests of Citigroup and its shareholders to benefit all shareholders equally and not in furtherance of Defendants' personal interest or benefit.  Each director and officer owes to Citigroup and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

55.    Because of their positions of control and authority as directors or officers of Citigroup, Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts complained of in this Complaint.  Due to their positions with Citigroup, Defendants had knowledge of material non-public information regarding the Company.

56.    To discharge their duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Company.  By virtue of such duties, the officers and directors of Citigroup were required to, among other things:

- Manage conduct, supervise, and direct the employees, businesses and affairs of Citigroup in accordance with laws, rules and regulations, and the charter and by-laws of Citigroup;

- Ensure that Citigroup did not engage in imprudent or unlawful practices and that the Company complied with all applicable laws and regulations;

- Remain informed as to how Citigroup was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including maintaining and implementing adequate financial and operational controls;

- Supervise the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by Citigroup, and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of the Company;

- Preserve and enhance Citigroup's reputation as befits a public corporation;

- Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner to make it possible to provide the highest quality performance of their business; and

- Refrain from unduly benefiting themselves and other Citigroup insiders at the expense of the Company.

57.     The Board has a responsibility, as part of its fiduciary duties to Citigroup and its stockholders, to oversee the operations of the Company—including operations of its subsidiaries—and to maintain sufficient systems or controls to be reasonably certain that misconduct at the operational level would be elevated to the Board and executive management for remediation.  The Board fails in that responsibility if it: (i) fails to implement appropriate reporting systems or controls; or (ii) consciously fails to monitor or oversee the systems and controls it put in place.

**B.** **Defendants' Specific Duties as Members of Board Committees Expressly Charged with Overseeing and Monitoring Citigroup's Internal Controls, Risk-Management, and Regulatory Compliance**

58.     Among the Board's most critical duties is overseeing the Company's risk-management structure.   Citigroup's 2020 Annual Proxy, for example, states:

> At each regularly scheduled Board meeting, the Board receives a risk report from the Chief Risk Officer with respect to the Company's approach to management of major risks, including management's risk mitigation efforts, where appropriate. Independent Risk Management, led by the Chief Risk Officer, is a company-wide function that is responsible for an integrated effort to set standards and actively manage and oversee aggregate risks that may affect Citi's ability to execute on its corporate strategy and fulfill its business objectives. The Board's role is to oversee this effort.

59.     Further, the Board's several standing committees monitor other specific aspects of Citigroup's business.   These include: the Audit Committee; the Personnel and Compensation Committee; the Nomination, Governance and Public Affairs Committee; the Ethics, Conduct and Culture Committee; and the Risk Management Committee.   These committees have their own charters setting forth duties for their respective members, in addition to the duties of board members generally.   Based on the committee charters, various committees have overlapping obligations with respect to implementing and maintaining enterprise-wide risk management and compliance risk management programs, internal controls, and data governance programs.

60.     The below chart illustrates the membership of Citigroup's principal standing Board committees during the Relevant Period:

|  | Audit Committee | Personnel and Compensation Committee | Nomination, Governance, and Public Affairs Committee | Ethics, Conduct and Culture Committee | Operations and Technology Committee | Risk Management Committee |
|---|---|---|---|---|---|---|
| Corbat |  |  |  |  |  |  |
| Costello | 2016-Present |  |  |  | 2017-2018 | 2019-Present |

| | Audit Committee | Personnel and Compensation Committee | Nomination, Governance, and Public Affairs Committee | Ethics, Conduct and Culture Committee | Operations and Technology Committee | Risk Management Committee |
|---|---|---|---|---|---|---|
| Dailey | 2020-Present | | | | | 2020-Present |
| Desoer | | | | | 2020-Present | 2020-Present |
| Dugan | 2018-Present | 2019-Present | 2018-Present | | | 2018-Present |
| Fraser | | | | | | |
| Hennes | 2020-Present | 2017-Present<br>Chair, 2018-2020 | | | | 2014-Present<br>Chair, 2020-Present |
| Henry | 2016-Present | | 2017-Present | 2019-Present<br>Chair, 2019[3]-Present | | |
| Humer | | | | 2015-2019<br>Chair, 2015-2019 | | 2013-2019 |
| Ireland | | | | | 2018-Present | 2020-Present |
| Jacobs | 2018-Present | 2018-Present<br>Chair, 2020-Present | 2020-Present | 2018-Present | | 2020-Present |
| James | | | | | 2016-Present | 2016-Present |
| McQuade | 2020 | | | | | 2016-2020<br>Chair, 2020 |
| Reiner | | 2017-Present | | | 2015-Present<br>Chair, 2015-Present | |
| Santomero | 2011-2019<br>Chair, 2014 | 2011 | | | | 2011-2019<br>Chair, 2012, 2013, 2015-2019 |

[3] Franz Humer retired from the Board on April 16, 2019, having reached the mandatory retirement age.  At the time of his retirement, Mr. Humer was the Chair of the Ethics and Culture Committee. Peter B. Henry succeeded Mr. Humer as Chair of the Ethics and Culture Committee.

| | Audit Committee | Personnel and Compensation Committee | Nomination, Governance, and Public Affairs Committee | Ethics, Conduct and Culture Committee | Operations and Technology Committee | Risk Management Committee |
|---|---|---|---|---|---|---|
| Taylor | | 2011-Present | 2011-Present Chair, 2011-Present | | | |
| Turley | 2014-Present Chair, 2015-Present | | | | | 2015-Present |
| Wright | 2017-Present | | | 2017-Present | | |
| Wynaendts | | 2020-Present | | | | 2020-Present |
| Zedillo | | 2013 | 2013-Present | 2015-Present | | 2011-Present |
| O'Neill | 2014-2016 | 2012-2019 Chair, 2013-2014 | 2013, 2015-2019 | 2015-2019 | | 2011, 2017-2019 |

### 1. Duties of the Audit Committee

61. The Board's Audit Committee is currently comprised of Costello, Dailey, Dugan, Hennes, Henry, Jacobs, Turley, and Wright. According to its charter, the Audit Committee is tasked with overseeing and monitoring the Company's risk management and its compliance with legal and regulatory requirements.

62. The Committee's charter tasks the Committee with reviewing financial statements and disclosures. Such review requires evaluation and discussion with management regarding: (a) any significant deficiencies or material weaknesses in the design or operation of Citigroup's internal control over financial reporting; and (b) any fraud, whether or not material, involving management or other employees who have a significant role in Citigroup's internal control over financial reporting. It further requires review with management of the Committee's evaluation

of Citigroup's internal control structure and procedures for financial reporting and review of management's conclusions about the efficacy of such internal controls and procedures, including any significant deficiencies or material weaknesses in such controls and procedures.

63.     The Charter also requires the Audit Committee to oversee the Company's Risk Assessment and Risk Management.  Thus, in consultation with the Risk Management Committee, the Audit Committee must review and discuss with management, *inter alia*: (a) the key guidelines and policies governing Citigroup's significant processes for risk assessment and risk management; (b) the major financial risk exposures facing the Company, including the steps management has taken to monitor and control such exposures; and (c) matters related to the effectiveness of Citigroup's control environment and the status of corrective actions with regard to operational risks.

64.     In addition, the Audit Committee has compliance and regulatory oversight responsibilities. It must review and discuss with management the implementation and effectiveness of each of the Company's compliance and ethics programs, and the effectiveness of the Company's anti-money laundering compliance program.  The Committee must receive regular reports on: (a) the results of significant regulatory examinations, including the nature and status of corrective actions; (b) significant issues that potentially create regulatory attention, including briefings on business decisions or significant issues that arise in areas on which the regulators are focused; (c) the key controls and processes in specific businesses, in particular with respect to areas that are the subject of regulatory concern; and (d) compliance with regulatory internal control and compliance reporting requirements.  Further, the Audit Committee must oversee and receive reports on ongoing regulatory projects, including regular updates on significant long-term projects being implemented in response to particular regulatory issues or

concerns.  The charter also mandates the Audit Committee to ensure that appropriate actions and other measures are taken when compliance failures are identified, including disciplinary actions for serious compliance failures.  Finally, the Audit Committee must annually review and approve management's evaluation of the effectiveness of Citigroup's systems and processes used to calculate risk-based capital requirements.

## 2.    Duties of the Risk Management Committee

65.    The Board's Risk Management Committee is currently comprised of Costello, Dailey, Desoer, Dugan, Hennes, Ireland, Jacobs, James, Turley, Wynaendts, and Zedillo. According to its charter, the Risk Management Committee is tasked with: (a) oversight of Citigroup's risk management framework; (b) oversight of Citigroup's policies and practices related to funding risk, liquidity risk, and risks pertaining to capital management; and (c) oversight of the performance of the Global Risk Review credit, capital and collateral review.

66.    Under its charter, the Risk Management Committee must, *inter alia*, review and consider for approval, Citigroup's Risk Governance Framework and review and approve Citigroup's key risk policies on the establishment of risk limits and receive reports on Citigroup's adherence to significant limits.  In addition, the Risk Management Committee must receive reports from, review with, and provide feedback to management on the categories of risk Citigroup faces, including credit, market and operational risk, and review the metrics used to monitor the exposures and management's views on the acceptable and appropriate levels of those risk exposures.  The Risk Management Committee must also review Citigroup's credit, market, and operational risk management frameworks, including the processes and systems management uses to manage risk exposures, as well as risk measurement methodologies and approaches to stress testing.  The charter further requires the Risk Management Committee to evaluate the adequacy of the Risk Management function and review its independence and authority.

Additionally, the Risk Management Committee must review the adequacy and frequency of risk reporting to the Board.  It must also review risks related to information security and cybersecurity, including steps taken by management to control such risks.

68.   Furthermore, in consultation with the Audit Committee, the Risk Management Committee must review and discuss with management the key guidelines and policies governing Citigroup's significant processes for risk assessment and risk management.  The two committees must also review and assess Citigroup's major financial risk exposures and the steps management has taken to monitor and control such exposures.

### 3.   Duties of the Ethics, Conduct and Culture Committee

68.   The Board's Ethics, Conduct and Culture Committee ("Ethics Committee") is currently comprised of directors Henry, Jacobs, Wright, and Zedillo.  According to its charter, the Ethics Committee is tasked with oversight of Citigroup management's efforts to foster a culture of ethics and appropriate conduct within the organization.  Its charter requires that its members, among other things, provide oversight over Citigroup's Conduct Risk Management Program, which has the objective of enhancing Citigroup's purported culture of compliance and control through the management, minimization, and mitigation of Citigroup's conduct risks.  To assist the Ethics Committee in this oversight responsibility, management reports directly to the Ethics Committee concerning Citigroup's Conduct Risk Program.  The charter also requires the Ethics Committee to provide input to management on the quality and availability of data and insights needed to manage conduct and culture.

### 4.   Duties of the Nomination, Governance and Public Affairs Committee

69.   The Board's Nomination, Governance and Public Affairs Committee ("Nomination Committee") is currently comprised of directors Dugan, Henry, Jacobs, Taylor, and Zedillo.  The Nomination Committee must, *inter alia*, review and assess the adequacy of the

Company's policies and practices on corporate governance including the Corporate Governance Guidelines of the Company and recommend any proposed changes to the Board for approval. It must also assess the effectiveness of the Board in meeting its responsibilities, representing the long-term interests of stockholders. The charter further mandates that the Nomination Committee review and advise management on Citigroup's relationships with governments and government policies that impact Citigroup.

**5.      Duties of the Operations and Technology Committee**

70.      The Board's Operations and Technology Committee ("Operations Committee") is currently comprised of directors Desoer, Ireland, James, and Reiner. According to its charter, the Committee is tasked with oversight regarding the scope, direction and execution of Citigroup's operations and technology strategies. The charter mandates that the Operations Committee review and assess operations and technology investments to ensure they meet the financial thresholds for Board notification and approval. The Operations Committee must also review significant technology and operational risk exposures of the Company, including information security, fraud, data protection, business continuity, third party and cybersecurity risks, and the steps management has taken to monitor and control such risks. Furthermore, the Operations Committee is mandated to review the adequacy and frequency of reporting to the Board in relation to Operations and Technology issues.

**6.      Duties of the Personnel and Compensation Committee**

71.      The Board's Personnel and Compensation Committee ("Compensation Committee") is currently comprised of directors Dugan, Hennes, Jacobs, Reiner, Taylor, and Wynaendts. According to its charter, the Committee is tasked with oversight of compensation of employees of the Company and its subsidiaries and affiliates. Under its charter, the Compensation Committee must annually review and discuss the Compensation Discussion and

Analysis required to be included in the Company's proxy statement with management and prepare an annual report on executive compensation for inclusion in the Company's proxy statement. The Compensation Committee must also provide oversight for Citigroup's incentive compensation programs so that they both: (a) appropriately balance risk and financial results in a manner that does not encourage employees to expose Citigroup to imprudent risks; and (b) are consistent with bank safety and soundness. To that end, the Committee must meet with Citigroup's senior risk officers to discuss the risk attributes of Citigroup's incentive compensation programs. Therefore, the Compensation Committee is mandated to limit risks relating to incentive-based compensation under the Dodd-Frank Wall Street Reform and Consumer Protection Act and any regulations or guidance promulgated thereunder.

### C. Defendants' Specific Duties as Directors of a Systemically-Important Banking Institution.

72.      While directors of all Delaware corporations have the oversight duties described in section IV.A, *supra*, federal regulatory bodies place special emphasis on the oversight function of boards of banking institutions. After the financial crisis and the ensuing Great Recession, which threw a spotlight on unsafe banking practices, government bodies enacted enhanced regulations and issued guidance on the duties of banks and, in particular, their boards of directors, to oversee operations. These regulatory schemes are meant to drive home the core principle that banks and other financial institutions must employ systems and controls designed to detect unsafe or suspicious activity in their operations. These regulatory schemes are also meant to preserve the integrity and soundness of the banking system and prevent another economic recession from the failure of a "too big to fail" institution like Citigroup.

73.     The Federal Reserve has made clear, in its Bank Holding Company Supervision Manual, that the board of a bank holding company, such as Citigroup, is responsible to ensure that its subsidiaries have proper internal controls and risk management systems in place:

> *One of the primary areas of focus for consolidated supervision of large complex [bank holding companies] is the adequacy of governance provided by the board and senior management.* The culture, expectations, and incentives established by the highest levels of corporate leadership set the tone *for the entire organization and are essential determinants of whether a banking organization is capable of maintaining fully effective risk management and internal control processes*.

74.     To discharge their duties as Citigroup's officers and directors, Defendants were required to exercise reasonable and prudent supervision over Citigroup's management, policies, practices, and controls of the affairs of the Company.

75.     In addition, pursuant to Regulation YY of the Federal Reserve (12 CFR § 252.33), the Board must "maintain a risk committee that approves and periodically reviews the risk-management policies of the bank holdings company's global operations and oversees the operations of the bank holdings company's global risk-management framework."  Citigroup's "global risk-management framework must be commensurate with its structure, risk profile, complexity, activities, and size and must include:"

- Policies and procedures establishing risk-management governance, risk-management procedures, and risk-control infrastructure for its global operations; and

- Processes and systems for implementing and monitoring compliance with such policies and procedures, including . . . (A) Processes and systems for identifying and reporting risks and risk-management deficiencies, including regarding emerging risks, and ensuring effective and timely implementation of actions to address emerging risks and risk-management deficiencies for its global operations

[and] (B) Processes and systems for establishing managerial and employee responsibility for risk management.

76.    Defendants were also obligated to ensure that appropriate oversight was in place for Citibank specifically.  OCC regulations (12 C.F.R. Appendix D to Part 30) establish a series of obligations on directors of large national banks such as Citibank, including: (i) to ensure the establishment and implementation of "an effective risk governance framework"; and (ii) to "actively oversee the [] bank's risk-taking activities and hold management accountable for adhering to the risk governance framework."

77.    According to the OCC's Comptroller's Handbook on Corporate and Risk Governance, a bank's board is responsible, *inter alia*, for "providing effective oversight" and for confirming: (a) that the bank has a risk management system, including audit, suitable for the bank's size and activities, and understanding the bank's material risks; (b) that the bank has an effective system of internal controls; and (c) that management's actions to correct material weaknesses, including those identified by the bank, its auditors, and regulators, are timely and effective.  The Handbook further instructs that a bank's board must "oversee the bank's compliance management programs."  Therefore, the "OCC expects the board to be responsible for confirming that a system of internal controls is in place."  To do so, the board must "receive information about the effectiveness of the bank's internal controls and information systems" and the board should "demonstrate that it has an adequate understanding of the bank's IT infrastructure, inherent risks, and existing controls."  Critically, the Handbook explains that "the sophistication of [a bank's] risk management system should reflect the bank's size, complexity, and risk profile[.]"

78.     The Comptroller's Handbook likewise explains that "[t]he OCC expects senior management to be responsible for developing and maintaining the risk governance framework and system of internal controls, which enables management to effectively identify, measure, monitor, control, and report risk exposures consistent with the board-established risk appetite." Additionally, "the CEO and his or her senior management team should be responsible for," among other things, "complying with laws, regulations, and internal bank policies, including policies governing ethics and insider activities," "developing and administering a risk governance framework that enables management to effectively identify, measure, monitor, and control risk," and "establishing and maintaining an effective system of internal controls."

### D.     Defendants Repeatedly Acknowledged that Oversight of Internal Controls, Risk-Management, and Regulatory Compliance Was a Critical Board Function

79.     As described above, Citigroup operates in a heavily regulated industry where externally-imposed regulations govern its mission critical operations.  Accordingly, the Board must exercise rigorous oversight of the Company's regulatory compliance.  In the world of banking and financial services, particularly after the financial crisis, this means exercising rigorous oversight of the Company's internal controls and risk-management systems.

80.     Consistent with this reality, the Board repeatedly acknowledged publicly that oversight of Citigroup's internal controls, risk management, and regulatory compliance was a primary concern for the Company and the Board.

81.     Indeed, in its Form 10-K Annual Reports for the years 2017, 2018, and 2019— each signed by the Board—the Company proclaimed that "***For Citi, effective risk management is of primary importance to its overall operations***," and therefore, that "Citi's risk management process has been designed to monitor, evaluate and manage the principal risks it assumes in conducting its activities."

82.     Importantly, in each of the Form 10-Ks for 2017, 2018, and 2019, the Company assured investors that "Citigroup's Board of Directors oversees Citi's risk-taking activities and holds management accountable for adhering to the risk governance framework."  The Company told the investing public the Board carried out that responsibility by reviewing multiple different reports prepared by management and by exercising "independent judgment to question, probe and challenge recommendations and decisions made by management."

83.     In addition, each of the Company's Form 10-Ks stressed the important role the Board played in ensuring risk-compliance by explaining that the Company's Chief Risk Officer "has regular and unrestricted access" to both the Risk Management Committee of the Board and the full Citigroup Board.  They likewise stated that the Chief Compliance Officer "has regular and unrestricted access to the committees of the Citigroup Board."

84.     Similarly, the Form 10-Ks explained that the Board played a pivotal function in assessing the effectiveness of the Company's processes.  For example, the 2017 Form 10-K asserted that the Company's Independent Compliance Risk Management Program reported directly to "the Citigroup Board of Directors . . . on the effectiveness of the processes and standards implemented to manage compliance risk."

85.     The 2018 Form 10-K explained that the Company's Internal Audit "provides independent assurance to the Citigroup Board of Directors . . . regarding the effectiveness of Citi's governance and controls designed to mitigate Citi's exposure to risks and to enhance Citi's culture of compliance and control."

86.     The 2019 Form 10-K stated that Internal Audit provided "independent and timely assurance to the Citigroup and Citibank Boards . . . regarding the effectiveness of governance, risk management and controls that mitigate current and evolving risks and enhance the control

culture within Citi."  The 2019 Form 10-K further asserted that information about the Company's operational risk was directly reported to the Audit and Risk Committees of Citi's Board.

87.    In addition, the Company's Proxy Statements issued by the Board in 2018, 2019, and 2020 also stressed the Board's involvement in ensuring proper regulatory compliance and internal controls.  Each of the Proxy Statements made clear that the "***Board is responsible for shaping corporate governance policies and practices, including adopting the corporate governance guidelines applicable to the Company and monitoring the Company's compliance with governance policies and the guidelines.***"  The Proxy Statements also asserted that "***Citi's Board has an important oversight function with respect to compliance with applicable [legal] requirements.***"

88.    The Proxy Statements underscored the Board's involvement in regulatory compliance by claiming that "[h]aving Directors with experience interacting with regulators or operating businesses subject to extensive regulation is important to furthering Citi's continued compliance with its many regulatory requirements."  The Proxy Statements also made clear that the "***Directors provide oversight of the Company's risk management framework, including the significant policies, procedures, and practices used in managing credit, market, and certain other risks.***"

89.    The Proxy Statements stressed the seriousness with which the Board purportedly took its oversight responsibilities.  Indeed, the Proxy Statements each stated that the Board conducted a self-evaluation of its own performance to ensure that the Board was performing its "obligations with regards to such matters as regulatory requirements, strategic and financial oversight, oversight of risk management, . . . and governance matters, among many other topics."

90.     The 2019 Proxy even specifically stated that "***The Board and our Risk Committee engage deeply in the oversight of risk management practices*** . . . always recognizing that, while Citi is in the business of taking risk, these risks must be understood, measured, monitored, and controlled."  Similarly, the 2020 Proxy explained that "***the Board remains deeply focused on Citi making substantial progress towards the termination of outstanding enforcement orders and on other remediation projects, recognizing and expecting that this progress will continue to require a substantial commitment of time and resources by both management and the Board***."

## V.     DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES TO CITIGROUP, RESULTING IN MASSIVE HARM TO THE COMPANY

### A.     Defendants Were Unquestionably Aware of The Urgent Need to Reform Citigroup's Internal Controls and Risk-Management Systems

#### 1.     Even Before the Financial Crisis, Citigroup's Deficient Internal Controls and Risk-Management Systems Were the Subject of Intense Regulatory Scrutiny

91.     Citigroup grew into the behemoth that it is today through a strategy of relentlessly aggressive M&A activity.  During the period of 1981 to 2002, Citigroup and its predecessor entities made 315 acquisitions and took stakes in 242 companies.

92.     As Citigroup expanded, its leaders failed to integrate their many acquisitions into an organic whole.  The Company never unified the internal controls and risk-management systems of its many acquired businesses.  Nor did it develop any new enterprise-wide internal controls or risk-management systems capable of servicing the Company's entire enterprise.  According to the prominent banking analyst Meredith Whitney, "it was never a priority of the company to invest [in integration]" and, as a result, Citigroup became "a gobbledygook of companies that were never integrated."  The Company's various "businesses didn't communicate with each other. There were dozens of technology systems and dozens of financial ledgers."

93.     Citigroup quickly became embroiled in a series of scandals betraying its insufficient internal controls.  Most troublingly, the Company was revealed in 2003 to have structured transactions that allowed Enron to manipulate its financial statements.  The transactions were at odds with various internal policies, but Citigroup lacked the controls to prevent the transactions from going forward.  As a result, Citigroup ultimately was forced to: (i) pay $3.7 billion to settle claims by Enron's investors and bankruptcy estate; (ii) pay $100 million in civil penalties to the Securities and Exchange Commission; and (iii) enter a pair of Written Agreements with the Federal Reserve Bank of New York ("FRBNY") and the OCC, requiring reforms to address deficiencies identified upon a regulatory review of the Company's internal controls and risk-management practices.

94.     The OCC found that Citigroup's control problems resulted from its sprawling size and the disorganization of its internal systems.  Through its post-Enron scandal agreement with the Company, entered in July 2003, the OCC demanded that the Company "establish systems to ensure appropriate coordination and communication between various business lines involved in or affected by complex structured finance transactions."  The OCC also required the Company to implement new internal controls relating to structured finance transactions and "enhanced compliance processes to ensure adherence to applicable Bank policies, laws, rules, and regulations."  The OCC reminded the Company that the "Board has the ultimate responsibility for proper and sound management of the Bank."

95.     The FRBNY likewise found that Citigroup needed to enhance its enterprise-wide oversight.  The Company's agreement with the FRBNY, likewise entered in July 2003, required Citigroup to specifically "analyze whether [its] risk identification mechanisms … are adequate and result in effective measurement and control customer exposure across Citigroup's

consolidated organization." The FRBNY mandated that Citigroup implement new oversight procedures and directed Citigroup to "require participation by control functions in all relevant areas, including legal, credit, and accounting, in transaction approval and monitoring, and to ensure that effective processes are in place for the escalation of matters."

96.     The regulators' post-Enron directives proved ineffective. In the years following the July 2003 Written Agreements, the Company continued to experience serious widespread compliance issues. In 2004, Citigroup failed to oversee its European bond traders who illegally manipulated the European bond market, in a scheme internally referred to as "Dr. Evil." England's Financial Services Authority eventually fined Citigroup approximately $25 million for the misconduct and found that the Company "failed to take reasonable care to organize and control its affairs responsibly and effectively and to implement adequate management systems" as there were "inadequate systems for supervision of traders." In addition, in September 2004, the Japanese Financial Services Authority ordered Citibank to shut down its private banking operations due to rampant violations of Japanese banking laws. According to an October 2004 *Japan Times* article, Citigroup's CEO at the time, Charles Prince, met with Japanese regulators and "apologized for the firm's inadequate governance and management structure in Japan."

97.     In a January 31, 2005 letter to Citigroup, the OCC told the Company that its "risk management practices need strengthening to help prevent the recurring control failures impacting the company." With its letter, the OCC enclosed a memorandum explaining that Citigroup was looking at its individual businesses' operations too narrowly and that the Company needed to "focus beyond specific lines of business and adopt processes to more firmly encompass enterprise risk management." The OCC warned that "[e]arnings and profitability growth have taken precedence over risk management and internal control."

98.     In March 2005, after engaging with the Federal Reserve concerning the state of its internal controls, Citigroup conceded that it still suffered from "some deficiencies in its compliance and internal controls" but that it was taking steps to "strengthen the company's compliance risk-management structure and practices."  That same month, the Federal Reserve placed a moratorium on Citigroup's ability to make large acquisitions so that Citigroup's Board and management could focus on implementing enterprise-wide controls.  The Federal Reserve noted that "an organization as large and varied as Citigroup has a particular need to adopt risk-management practices that can appropriately address the scope, complexity, and geographic diversity of its operations," and that "[g]iven the size, scope, and complexity of Citigroup's global operations, successfully addressing the deficiencies in compliance … will require significant attention over a period of time by Citigroup's senior management and board of directors."  The moratorium was therefore put in place so that "management's attention" would not be "diverted" during the enterprise-wide risk-management system implementation process.

99.     Then, in December 2005, the OCC reported to Citibank its "disappointing" findings that, despite the moratorium, "the business grew far in excess of management's underlying infrastructure and control process."  The OCC also noted that the already active "control functions raised questions as to the business's capacity to accommodate future growth, but warnings went unheeded."  The OCC cautioned that, "given this oversight failure," it was "considering options" that would further limit Citigroup's growth and that "[m]anagement should reflect on how this situation occurred, and what structural or process changes are warranted to ensure that future growth is measured, monitored, and controlled in a way that is appropriate for a national bank."

2.      **Citigroup's Deficient Internal Controls and Risk-Management Systems Led to a Near-Death Experience for the Company During the 2007–2009 Financial Crisis**

100.    Despite the OCC's stern warnings in December 2005, the Federal Reserve and OCC lifted Citigroup's acquisition moratorium in April 2006—a decision the OCC would later admit contributed to Citigroup's collapse during the financial crisis of 2007–2009.

101.    According to the Financial Crisis Report issued in January 2011, the ban was not lifted because Citigroup cured its control problems or successfully implemented enterprise-wide risk-management systems.  Rather, it was lifted because the Company assured regulators "that the bank would strive to meet the OCC's goals for improving risk management."  Indeed, an internal Federal Reserve memorandum from February 2006 explained that regulators "met with senior management and certain Citigroup board members, and share the view that the organization is committed to successfully addressing the supervisory issues."  However, according to the Financial Crisis Report, "documents obtained . . . from the New York Fed give no indication that its examination staff had any independent knowledge of" Citigroup's progress in addressing its enterprise-wide management to monitor and control risks.

102.    Citigroup's claimed oversight repentance proved false.  With the regulatory impediments lifted, Citigroup expanded its size while ignoring its pledge to integrate its internal controls and risk-management systems across its businesses.  Thomas H. Stanton, in his book *Why Some Firms Thrive While Others Fail: Governance and Management Lessons from the Crisis* (Oxford University Press, 2012), concluded that "[u]nsuccessful firms such as Citigroup … expanded in the years before the crisis, but failed to integrate their systems and business platforms to obtain the capacity to manage the entire disjointed company."  Stanton explained that "[t]he risk management system at Citigroup suffered from business lines separated into silos

without cross-cutting communication" and that "Citigroup illustrates the problems that can occur absent" "a strong enterprise-wide infrastructure."

103.    According to Professor Arthur E. Wilmarth Jr. in his *Citigroup: A Case Study in Managerial and Regulatory Failures*, after the moratorium was lifted, Citigroup completed a rapid series of acquisitions, including purchases of several banks and securities firms as well as a large hedge fund, which eventually contributed to Citigroup's near demise.  47 IND. L. REV. 69, 119 (2013) (the "Citigroup Case Study").  Indeed, in a February 2008 supervisory letter, the OCC referred to this post-moratorium activity as Citigroup's "aggressive acquisition program" and explained that with Citigroup's newfound regulatory freedom, "the previous focus on risk and compliance gave way to business expansion and profits."

104.    Official notes from a November 19, 2007 meeting between Citigroup and multiple regulators, including the Federal Reserve, the OCC, and the SEC confirm that Citigroup never implemented enterprise-wide risk management systems.  The regulators' notes list "Poor communication across businesses: decentralized nature of the firm created silos," under the header "What Did Not Work Well" at the Company.

105.    These controls deficiencies and lack of integration contributed directly to the Company's increasingly risky financial positions.  As explained in the 2007 regulatory notes, although Citigroup's consumer banks appreciated the increased risk of sub-prime borrowers, other parts of the Company still "established sizeable unhedged positions" in collateralized debt obligations ("CDOs").  In other words, because Citigroup "ran its business on a decentralized basis," the Company was harmed when "other parts of the firm were seeing early signs of deterioration in mortgage sector" but the "information was not effectively communicated to the CDO structuring business to take action."  Furthermore, "[t]he firm did not have a comprehensive

view across credit, market, liquidity and financial/accounting risks of its various businesses," and "did not have an adequate, firm-wide consolidated understanding of its risk factor sensitivities." Citigroup management even conceded to its regulators "that it has to provide better risk management oversight to its business activities."

106.    Indeed, as noted in the OCC's 2008 supervisory letter, "the Board and senior management ha[d] not ensured an effective and independent risk management process [was] in place," and the Citibank Board "had no effective oversight role specific to the risk profile of the bank."

107.    As the Financial Crisis Report ultimately concluded, "*Citigroup had two key problems: a lack of effective enterprise-wide management to monitor and control risks and a lack of proper infrastructure and internal controls with respect to the creation of CDOs.*" Professor Wilmarth similarly concluded, in his Citigroup Case Study, that Citigroup's woes were attributable to "*Citigroup's reckless growth, highly speculative activities, and shockingly inadequate risk controls.*"

108.    As a result of Citigroup's abysmal internal controls and risk-management systems—which resulted in the Company taking increasingly risky positions—Citigroup was particularly devasted by the economic downturn from 2007–2009.  During that time, Citigroup recorded more than $130 billion in write-downs on its loans and investments.  To prevent Citigroup's failure, the federal government injected $45 billion of new capital into the bank and provided the bank with $500 billion of additional assistance in the form of asset guarantees, debt guarantees, and liquidity assistance.  Citigroup received more federal financial assistance than any other bank during the financial crisis.  It was the largest bank bailout in history.

**3.**  **Citigroup Endured an Incessant Succession of Post-Crisis Government Actions as a Result of the Board's Continued Failure to Implement and Maintain Enterprise-Wide Internal Controls and Risk-Management Systems.**

109.    Regulatory oversight of large global banks like Citigroup increased significantly after the trauma of the financial crisis.  The financial crisis revealed substantial weaknesses in the banking system including, as described above, at Citigroup.  Regulators responded by enhancing supervision to improve the resilience of individual banks and the financial system as a whole.  As a result, the regulatory burden on banks has increased significantly.

110.    Indeed, as Citigroup made clear in its 2014 annual report filed with the SEC, the "frequency" with which regulatory "proceedings, investigations and inquiries [were] initiated, and the severity of the remedies sought (and in several cases obtained), [had] increased substantially over the last few years."  Indeed, due to the "heightened scrutiny" under the "heightened regulatory environment," Citigroup is "at any given time" defending against a "significant number of legal and regulatory proceedings and is subject to numerous governmental and regulatory examinations, investigations, and other inquiries."

111.    Citigroup's regulators have, in recent years, increased their focus on "conduct risk," which Citigroup defines as "the risks associated with misconduct by employees and agents that could harm consumers, investors, or the markets, such as failures to safeguard consumers' and investors' personal information and improperly creating, selling and marketing products and services, among other forms of misconduct."

112.    Citigroup's regulators investigate more than just actual violations of laws and regulations; they are also particularly interested in whether Citigroup has adequate processes to detect and prevent violations from occurring in the first place.  As Citigroup admitted in its 2019 annual report, Citigroup may be subject to multiple regulatory "enforcement proceedings" for

failing to have "adequate policies or procedures" in place or for failing "to remedy deficiencies on a timely basis."

113.    This increased oversight coupled with Citigroup's global scale means that any regulatory failures by Citigroup "may give rise to a large number of overlapping investigations and regulatory proceedings, either by multiple federal and state agencies and authorities in the U.S. or by multiple regulators and other governmental entities in different jurisdictions."  These intersecting proceedings can result in numerous fines, civil monetary penalties, or other regulatory enforcement orders based on the same underlying (mis)conduct.  It is therefore critical that Citigroup's senior leaders, including the Board first and foremost, maintain strict oversight over the Company's operations, and the operations of its subsidiaries, to ensure compliance with all applicable rules and regulations as deficiencies can lead to heavy fines from multiple different enforcement agencies.  Citigroup has acknowledged that "any failure by [Citigroup or its consolidated subsidiaries] to comply with applicable U.S. regulations, as well as the regulations in the countries and markets in which it operates as a result of its global footprint, could result in fines, penalties, injunctions or other similar restrictions, many of which could negatively impact Citi's results of operations and reputation."

114.    Despite this intensified regulatory scrutiny—and despite its own near-death experience in the financial crisis, during which Citigroup nearly collapsed due to its "***shockingly inadequate risk controls***"—the Board still failed in the post-crisis era to develop, implement, and enforce enterprise-wide internal controls commensurate with the Company's size, complexity, and risk profile.  Despite repeated private and public warnings by regulators alerting the Company to internal controls and oversight shortcomings, and despite regulatory orders mandating that the Board prioritize efforts to reform the Company's internal controls and risk-management systems,

the Board consistently failed to repair the many glaring holes in the Company's internal systems, leading to billions of dollars in monetary penalties.  The Company, somehow, remained the "gobbledygook of companies that were never integrated" that it was before the crisis.

115.    Accordingly, throughout the post-crisis era, regulators routinely identified serious continuing deficiencies in Citigroup's internal controls and risk-management systems and issued order-after-order imposing significant penalties on the Company and mandating that the Company prioritize reform.  Most of these orders were "consent orders" specifically authorized, and in many cases signed, by Defendants in their capacities as directors of Citigroup and/or Citibank.  Taken together, they leave no doubt Defendants were aware: (i) that Citigroup's enterprise-wide internal controls and risk-management systems were seriously deficient; (ii) that Citigroup's regulators were laser-focused on Citigroup's need to reform those internal controls and systems; and (iii) that Citigroup's regulators were willing and able to impose substantial monetary penalties upon the Company for their failure to achieve compliance.

> i.    **April 2012: The OCC Issues a Consent Order Identifying "*critical deficiencies*" in Citibank's Compliance Systems and Numerous "*internal control weaknesses*"**

116.    On April 5, 2012, the OCC issued a Consent Order against Citibank, following the OCC's investigation of the Company's anti-money laundering internal compliance program.  The OCC specifically found that Citibank suffered from "deficiencies in its BSA/AML [*i.e.* Bank Secrecy Act / Anti-Money Laundering] compliance program" which were "due to an inadequate system of internal controls and ineffective independent testing."  Notably, the OCC found that the "internal control weaknesses" spanned "multiple areas of the bank" and resulted in an "inability to assess and monitor client relationships on a bank-wide basis."

117.    The OCC required Citibank to create a "Compliance Committee" consisting of at least three directors, two of whom must remain independent from the Company.  The OCC also

ordered Citibank to develop a "BSA/AML Action Plan," which unsurprisingly required "timely reporting" to the bank's Board and added a common-sense requirement that "corrective action be taken in a timely manner for any non-compliance." The order instructed that "senior management" be held "accountable for effectively implementing bank policies and procedures" and required Citibank to "develop appropriate objectives and means to measure the effectiveness of compliance management officers and compliance management personnel within each line of business and for those with responsibilities across lines of business."

118. Given the wide-ranging internal control problems, the OCC required Citibank to engage an independent consultant to assess, *inter alia*, the compliance program's "organizational structure," "enterprise-wide effectiveness," and "internal controls." The consultant's evaluation was required to assess "the AML risk associated with each line of business, and an enterprise wide assessment of AML risk for higher risk products, customers, and services."

119. The OCC's order also called for independent testing and internal auditing of the bank's compliance program. The OCC made clear, however, that the Citibank Board "shall ensure that the Bank achieves and thereafter maintains compliance with this Consent Order, including, without limitation, successful implementation of the BSA/AML Action Plan," and that "the Bank achieves and maintains an effective BSA/AML compliance program, in accordance with the BSA and its implementing regulations."

120. To ensure compliance and that the full Citibank Board stay apprised of the remediation efforts, the OCC required the newly established Compliance Committee to submit quarterly reports to the Citibank Board "setting forth in detail the actions taken to comply with each Article of [the OCC's] order, and the results and status of those actions." The Citibank Board would then forward the written reports to the OCC for review.

### ii.    August 2012: The FDIC and California Department of Financial Institutions Issue a Consent Order Requiring Banamex USA "*to increase its oversight of the affairs of the Bank*"

121.    On August 2, 2012, regulators found major deficiencies in the BSA/AML compliance program at Banamex USA, a Citigroup subsidiary.  The FDIC, in conjunction with the California Department of Financial Institutions ("CDFI"), issued a Consent Order against Banamex USA relating to the bank's anti-money laundering controls and oversight.

122.    The order required Banamex USA's board to "increase its oversight of the affairs of the Bank" so that it was "consistent with the role and expertise commonly expected for the directors of banks of comparable size," and expressly recognized that the current oversight in place was insufficient.

123.    To that end, the order required the bank to implement a compliance program designed to "maintain compliance by the Bank with the BSA," and even permitted the FDIC and CDFI to determine whether the bank's current management and board members were qualified to, inter alia, "operate the Bank in a safe and sound manner" and "comply with applicable laws and regulations."  The order also mandated that the bank retain a BSA Compliance Officer.

124.    The FDIC called for annual independent testing of compliance with the BSA and all applicable rules and regulations.  The independent testing was to address, *inter alia*, the "overall integrity and effectiveness" of the compliance program, "BSA/AML risk assessment," "BSA reporting and recordkeeping requirements," and the "integrity and accuracy of the management information systems used" in the compliance program.

### iii.    March 2013: The Federal Reserve Issues a Consent Order Finding "*Citigroup lacked effective systems of governance and internal controls*"

125.    On March 21, 2013, the Federal Reserve issued a Consent Order explicitly finding that "Citigroup lacked effective systems of governance and internal controls to adequately

oversee the activities of [its subsidiary] Banks with respect to legal, compliance, and reputational risk related to the Banks' respective BSA/AML compliance programs."

126.   Citigroup was therefore required to implement a "firmwide compliance risk management program" designed to "identify and manage compliance risks across the consolidated organization related to compliance with all applicable laws, rules, and regulations." The "firmwide compliance risk program" was to include a specific anti-money laundering program to "identify and manage compliance risks" relating to money laundering.

127.   The Federal Reserve's order also required the Board to submit a written plan documenting what measures the Board implemented since the issuance of certain earlier orders from the OCC and FDIC and describing further measures the Board would take to ensure "that such compliance risk is effectively managed across Citigroup, including within and across business lines, support units, legal entities, and jurisdictions in which Citigroup and its subsidiaries operate."   Citigroup was also ordered to submit reports detailing the structure and standards of the BSA/AML compliance program, including the processes for monitoring subsidiaries' compliance with Citigroup's polices.   The Federal Reserve also required independent testing "within Citigroup entities" to ensure compliance.

128.   Importantly, the Federal Reserve required that the Citigroup Board submit written quarterly progress reports to the Federal Reserve "detailing the form and manner of all actions taken to secure compliance with this Order, a timetable and schedule to implement specific remedial actions to be taken to address the recommendation in the Report, and the results thereof." This measure guaranteed that the Board was kept well-informed and up-to-date on Citigroup's remediation efforts.

129.     On March 19, 2013, Citigroup's Board, at a duly constituted meeting, adopted a resolution authorizing entry into the March 21, 2013, Consent Order.   Defendants Corbat and Zedillo were members of the Board at time the March 21, 2013, Consent Order was entered and were obligated, by its terms, to "fully utilize Citigroup's financial and managerial resources…" "to ensure that each of the Banks complies with the Consent Orders by their respective banking agency supervisors and any other supervisory actions taken by their respective banking agency supervisors."  In addition, Defendants Desoer and Fraser were officers of Citibank at the time the March 21, 2013 Consent Order was entered and were obligated to implement reforms as part of the March 21, 2013 Consent Order.

> **iv.     November 2014: The CFTC Issues a Consent Order Imposing a *$310 Million* Fine and Finding *"internal controls and supervisory failures at Citibank"***

130.     On November 11, 2014, the CFTC fined Citibank $310 million for impermissibly attempting to manipulate foreign exchange benchmark rates.  Most notably, the CFTC expressly found that Citibank "lacked adequate internal controls or procedures to detect and deter possible misconduct" involving the impermissible fixing of foreign exchange benchmark rates. Specifically, Citibank "failed to adequately assess the risks" that traders may attempt to fix the benchmark rates, "lacked adequate internal controls in order to prevent [] traders from engaging in improper communications" with traders at other banks, "lacked sufficient policies, procedures and training specifically governing participation in trading around the [foreign exchange] benchmark rates," and had "inadequate polices pertaining to, or insufficient oversight of, its [foreign exchange] traders' use of chat rooms or other electronic messaging."

131.     Accordingly, in addition to the $310 million fine, the CFTC required Citibank to "implement and improve its internal controls and procedures."

   **v.** **November 2014: The OCC Issues a Consent Order Imposing a** *$350 Million* **Fine and Identifying "***deficiencies in [Citibank's] wholesale foreign exchange business***"**

132. On November 11, 2014, the same day as the CFTC order, the OCC fined Citibank an additional $350 million and issued a Consent Order relating to Citibank's lack of internal controls over the bank's foreign exchange trading business.

133. The OCC's order found that the "Bank had deficiencies in its internal controls . . . with respect to the oversight and governance of the Bank's [foreign exchange] [t]rading." Specifically, the OCC noted: (a) the "Bank's compliance risk assessment lacked sufficient granularity and failed to identify the risks related to market conduct"; (b) the "Bank's transaction monitoring and communications surveillance were inadequate"; (c) the "Bank's compliance testing procedures were inadequate to measure adherence to the Bank's standards of Employee conduct and firm policies"; and (d) the "Internal audit's risk assessment and coverage of [foreign exchange] [t]rading was inadequate to assess whether the Bank's control framework was effective."

134. The order also highlighted that the "Bank's internal controls surrounding benchmarks were previously criticized by the OCC in regards to the Bank's submissions in the LIBOR (London interbank offered rate) benchmark rate setting process"—thus making clear that the insufficient internal controls were not a new phenomenon within Citibank, but were an often criticized yet persistent, unremediated, problem.

135. The OCC therefore tasked the Citibank Board with ensuring that "the Bank achieves and thereafter maintains compliance with [the OCC's order]," and that "the Bank achieves and maintains effective controls, oversight and governance, monitoring and surveillance, compliance testing, and audit coverage related to Employee market conduct."  The

order provided detailed instructions regarding what steps were necessary to comply for each category.

136. To ensure ongoing Citibank Board involvement, the OCC's order required that, at the end of each calendar quarter, the Compliance Committee "submit a written progress report to the Board setting forth in detail the actions taken to comply with each Article of this Order, and the results and status of those actions." The Citibank Board was then tasked with forwarding the report and any additional comments to the OCC.

> **vi. November 2014: The FCA Issues a Final Notice Imposing a *$358 Million* Fine and Criticizing Citibank for "*failing to take reasonable care to organize and control its affairs responsibly and effectively with adequate risk management systems*"**

137. Foreign regulators similarly concluded that Citibank's foreign exchange compliance program was deficient. On the same day as the CFTC and OCC Consent Orders, the United Kingdom's FCA issued a "Final Notice" finding that Citibank "fail[ed] to take reasonable care to organize and control its affairs responsibly and effectively with adequate risk management systems" in relation to foreign exchange trading in London. The FCA noted that the limited internal controls in place failed to recognize "obvious risks associated with confidentiality, conflicts of interest and trading conduct" and that "[t]he lack of proper control by Citi… meant that misconduct went undetected for a number of years."

138. Like its U.S. counterparts, the FCA also documented that Citibank was previously aware of potential misconduct in the foreign exchange trading because regulatory actions had been brought against other banks with regard to similar practices involving LIBOR. Nonetheless, Citibank failed to implement sufficient changes to its internal controls to ensure proper compliance. In other words, despite knowing of a likelihood of misconduct, Citibank either chose not to address the issue or was incapable of doing so due to its lack of internal controls.

139.    The FCA levied an additional fine against Citibank for approximately $358 million in connection with the foreign exchange misconduct.

      **vii.**    **November 2014: FINRA Imposes a *$15 Million* Fine Finding Citigroup's Investment Bank "*failed to adequately supervise equity research analysts' compliance with its policies and deter violations of FINRA rules and the federal securities laws*"**

140.    On November 24, 2014, the Financial Industry Regulatory Authority ("FINRA") assessed a $15 million penalty against Citigroup Global Markets Inc. ("CGMI"), Citigroup's investment banking subsidiary.   FINRA found that CGMI analysts provided non-public information to select customers in violation of securities laws.  FINRA explicitly asserted in its Letter of Acceptance, Waiver and Consent that CGMI "failed to take adequate steps to supervise its equity research analysts' communications with clients to deter the selective dissemination of research."  Even when CGMI detected instances of analysts selectively sharing information, "it failed to adequately enforce [its] policies and deter future violations."

141.    The order identified six previous disciplinary actions against CGMI that resulted in more than $438 million in fines levied against the investment bank.  The previous regulatory actions penalized CGMI for failures to, *inter alia*, "adequately supervise the activities of research analysts," "establish and maintain a supervisory system reasonably designed to detect and prevent" disclosure violations, and "prevent or detect the written disclosure of material, non-public research information."

142.    Yet, despite these past violations and hefty fines, CGMI—and its corporate parent—failed to implement adequate policies, procedures, and controls to supervise employees and prevent ongoing and further violations of securities laws.  This oversight failure ultimately resulted in the additional $15 million fine.

viii.   **May 2015: The Federal Reserve Issues a Consent Order Imposing a** *$342 Million* **Fine and Finding "***Citigroup lacked adequate firm-wide governance, risk management, compliance and audit procedures***"**

143.   On May 20, 2015, Citicorp (the holding company for Citibank and certain other subsidiaries that sit below Citigroup) pleaded guilty to violating federal antitrust laws in connection with its traders' intentional manipulation of rates on the FX spot market. Citicorp's plea agreement specified that it had engaged in a "combination and conspiracy to fix, stabilize, maintain, increase or decrease the price of, and rig bids and offers for, the euro/U.S. dollar ('EUR/USD') currency pair exchanged in the foreign currency exchange spot market . . . in violation of the Sherman Antitrust Act, 15 U.S.C. § 1."  Citicorp paid a $925 million criminal fine—the highest criminal fine imposed on any of the banks involved in FX manipulation—and was placed on probation for three years.

144.   Citicorp's guilty plea was approved by resolutions at concurrent meetings of the Citigroup, Citibank, and Citicorp boards of directors on May 9, 2015.

145.   In addition, on May 20, 2015, the Federal Reserve fined Citigroup $342 million for failing to properly oversee its subsidiaries' foreign exchange trading compliance programs. The Federal Reserve's order explicitly found that "Citigroup lacked adequate firm-wide governance, risk management, compliance and audit policies and procedures" to properly oversee that its subsidiaries' foreign trading activities "complied with safe and sound banking practices." The Federal Reserve further found that "Citigroup's deficient policies and procedures prevented Citigroup from detecting and addressing [the] unsafe and unsound conduct."

146.   Apparently not trusting Citigroup to make necessary improvements to its internal controls and oversight systems, the Federal Reserve "conducted a supervisory review of the compliance and control infrastructure" and "identified areas for improvement."  The Federal Reserve ordered that Citigroup "continue to implement additional improvements in its oversight,

internal controls, compliance, risk management and audit programs" to comply with "safe and sound banking practices" and "applicable U.S. laws and regulations."  Accordingly, the order required the Board to submit a plan detailing methods "to improve senior management's oversight of Citigroup's compliance" and to submit enhanced written internal controls and compliance risk management programs relating to the foreign exchange trading practices.

147.    Furthermore, Citigroup was ordered to conduct annual tests of the internal controls and submit the results to the Federal Reserve.

148.    The Federal Reserve's order also mandated that senior management report to Citigroup's Board "on the status and results of measures taken, or to be taken, to correct identified deficiencies and to comply with this Order and to ensure the ongoing efficacy of Citigroup's overall program."  Thus, the Board was required to keep informed of the Company's progress in ameliorating its internal controls and compliance programs.

149.    On May 20, 2015, Citigroup's Board, at a duly constituted meeting, adopted a resolution authorizing entry into the May 20, 2015, Consent Order.  Defendants Corbat, Hennes, Reiner, Taylor, Turley, and Zedillo were members of the Board at the time the May 20, 2015, Consent Order was entered and Henry had been elected to the Board (his term began on July 1, 2015) and were thus obligated to take steps to ensure compliance with the Consent Order. Similarly, Defendants Corbat, Desoer, and Fraser were members of Citigroup's Operating Committee and officers of Citibank at the time the May 20, 2015 Consent Order was entered and were obligated to implement reforms in connection therewith.

>
>        ix.      **July 2015:  CFPB Issues a Consent Order Imposing a *$35 Million* Fine and Ordering Citibank to Pay *$700 Million* in Restitution**

150.    On July 21, 2015, the CFPB issued a Consent Order against Citibank and two other Citigroup subsidiaries finding that the bank violated numerous consumer protection laws in

the sale of credit card add-on services.  The CFPB concluded that Citibank and certain of its vendors employed deceptive marketing and billing tactics to sell credit card add-on services to customers who did not ask for or require the products.   Importantly, the CFPB's order noted that Citibank's "compliance monitoring, vendor management, and quality assurance functions failed to prevent, identify, or correct" the improper sales conduct.

151.    Accordingly, the CFPB required that the Citibank Board establish a three-member compliance committee to oversee the necessary changes to its credit-card sales program and reminded the board that it had "the ultimate responsibility" for "ensuring [Citibank] complies with Federal consumer financial laws."

152.    The CFPB ordered Citibank to pay $700 million directly to consumers harmed by Citibank's improper sales practices and separately fined Citibank an additional $35 million to be paid directly to the CFPB.

      **x.**    **July 2015:  OCC Issues a Consent Order Imposing a *$35 Million* Fine and Finding Citibank had "*failed to implement appropriate controls*"**

153.    The OCC also issued a Consent Order against Citibank on July 21, 2015 relating to the sale of credit card add-on services.  The OCC's order explicitly found that Citibank "failed to implement appropriate controls to ensure consumers provided informed and affirmative consent to purchase" the add-on products.

154.    The OCC fined Citibank an additional $35 million above the fine levied by the CFPB.  The OCC also mandated that Citibank make restitution to harmed customers but noted that restitution payments made by the bank will satisfy both the OCC's and CFPB's restitution requirements.

155.    The order also mandated substantial reforms to the bank's internal controls. Specifically, the order required new written policies regarding Citibank's managing of its third-

party vendors, and the development of a "written enterprise-wide risk management program" for consumer optional add-on services.   The risk management program required polices to "effectively manage, prevent, detect, and mitigate, on an on-going basis" the risks associated with employing unfair and deceptive practices, and called for the recording and monitoring of telephone calls and training of Citibank salespeople.

156.    The OCC required the Compliance Committee to submit quarterly written progress reports to the Citibank Board setting forth "in detail" what actions the bank took to comply with the order.

> xi.    **July 2015: FDIC and California Department of Business Oversight Issue a Joint Order Imposing a *$140 Million* Fine for Failing to Comply with the Previous August 2, 2012 Consent Order**

157.    On July 22, 2015, the FDIC and the CDBO—a successor to the CDFI—announced a joint $140 million civil monetary penalty assessed against Banamex USA for failing to comply with the previously issued 2012 Consent Order requiring increased board oversight over the anti-money laundering compliance program.

158.    The CDBO's press release announcing the fine—the then-largest fine ever assessed by the CDBO against a bank—explained that "[Banamex USA] agreed three years ago to correct numerous weaknesses in its anti-money laundering program" but "ha[d] failed to do so."  Not only were the previous problems not reformed, the CDBO and the FDIC found "new, substantial violations of the BSA and anti-money laundering mandates over an extended period of time."

159.    Indeed, despite the explicit directive in the 2012 order requiring Banamex USA to "[e]stablish a system of internal controls to ensure compliance with the BSA…including policies and procedures to detect and monitor all transactions to identify suspicious or unusual activity," the FDIC's press release announcing the fine explained the opposite was true: the bank failed to

"maintain adequate internal controls reasonably designed to detect and report illicit financial transactions and other suspicious activities."  Similarly, in complete disregard of the 2012 mandate to "provide for independent testing of compliance with the BSA," the FDIC found that the bank ultimately failed to "conduct effective independent testing."

      **xii.**    **May 2016: CFTC Issues Two Separate Consent Orders Imposing *$425 Million* in Fines and Ordering Implementation of Certain Internal Controls**

160.    On May 25, 2016, the CFTC issued two separate orders assessing a total of $425 million in fines against Citibank in connection with the bank's failure to submit accurate and proper metrics used in the calculation of benchmark interest rates.

161.    The CFTC fined Citibank and a number its subsidiaries $175 million for their attempted manipulation of the LIBOR and the Euroyen Tokyo Interbank Offered Rate ("Euroyen TIBOR") and for falsely reporting market information relating to those rates.  In its order, the CFTC required Citibank to implement substantial additional internal controls to ensure that its submissions for the benchmark rates were accurate.  The new internal controls required, *inter alia*, daily review of each of Citibank's daily submissions relating to the benchmark rates as well as the construction of additional "firewalls" between employees who submit the bank's interest rate submissions and traders who deal in products that rely on those rates.  The CFTC also mandated that Citibank establish stronger monitoring and auditing of its submissions.

162.    In addition, the CFTC fined Citibank $250 million for attempting to manipulate, and submitting false reports concerning, the U.S. Dollar International Swaps and Derivatives Association Fix ("USD ISDAFIX"), a global benchmark for interest rate products.  In its order, the CFTC specifically found that "Citibank did not have specific internal controls or procedures, written or otherwise, regarding how USD ISDAFIX submissions should be determined or monitored."  Furthermore, the CFTC found that the Bank's "ISDAFIX submitters received no

formal training on making ISDAFIX submissions, and the Bank did not require submissions to be documented."

163.    Unsurprisingly, the CFTC ordered that Citibank "implement and improve its internal controls and procedures in a manner reasonably designed to ensure the integrity of the fixing of any interest-rate swap benchmark."  The order listed specific internal controls necessary to ensure compliance, including improvements to: (a) the measures designed to detect and deter improper communications; (b) the monitoring systems used to detect and deter manipulation of the swap rates; (c) the auditing process; and (d) the supervision over the trading desks that participate in the fixing of benchmarks based on interest-rate swaps.

> **xiii.    January 2017: SEC Issues Cease and Desist Order Imposing an $*18 Million* Fine and Finding Citigroup's Investment Bank "*either did not have adequate policies and procedures in place…or failed to implement the policies and procedures that were in place*"**

164.    Even though CGMI had already been subject to hefty regulatory fines for violating securities laws, Citigroup failed to ensure that the investment bank implemented policies and procedures to prevent further violations of law.  On January 26, 2017, the SEC levied a $18.3 million fine against CGMI finding that the investment bank, in violation of the Investment Advisers Act, overbilled clients for more than fifteen years and had misplaced client contracts.

165.    In the press release announcing the fine, the SEC explained that CGMI's misconduct occurred because "Citigroup failed to confirm the accuracy of billing rates entered into its computer systems in comparison to the fee rates outlined in client contracts" and "Citigroup failed to take the necessary precautions to ensure clients were billed in a manner consistent with their advisory agreements."

166.    The SEC's cease and desist order further confirmed that the misconduct occurred because of the lack of internal controls.  The order explicitly found that "CGMI failed to adopt

and implement written policies and procedures reasonably designed to prevent the [] Advisers Act violations." The SEC pointed to numerous deficiencies with CGMI's internal controls, including that the investment bank "failed to do sample testing of newly opened" accounts, "lacked adequate policies and procedures that would have required escalation of advisory fee billing errors," and "did not conduct any advisory fee testing or other type of compliance review to ensure that …[certain] rebates were issued."

167. As a result, the SEC concluded that "CGMI willfully violated" the Investment Advisers Act provision requiring "that a registered investment adviser adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act."

### xiv. May 2017: DOJ Enters Non-Prosecution Agreement Requiring Forfeiture of *$97 Million* and Criticizing Citigroup's Cooperation During the Investigation

168. On May 18, 2017, the Money Laundering and Asset Recovery Section of the U.S. Department of Justice ("DOJ") entered into a criminal non-prosecution agreement ("NPA") with Banamex USA and Citigroup, relating to the bank's anti-money laundering compliance failures. The NPA required forfeiture of more than $97 million.

169. The NPA highlighted in detail numerous control deficiencies in Banamex USA's BSA/AML compliance program between 2007 and 2012.

170. The NPA also highlighted Citigroup's apathy toward dealing with governmental regulators. The DOJ applied only a "partial credit" for Banamex USA's cooperation during the investigation because the bank's "initial efforts to provide relevant facts and documents to the [DOJ] were neither timely nor substantial." Moreover, the DOJ did not apply any "voluntary disclosure credit," because "neither [Banamex USA] nor Citigroup voluntarily and timely disclosed to the [DOJ] the conduct described" in the NPA.

171.    Recognizing Citigroup's historical oversight blunders, the NPA required Citigroup to report directly to the DOJ "regarding remediation and implementation of compliance enhancements … in connection with BSA and money laundering compliance, including internal controls, policies, and procedures relating to Citigroup's oversight of BSA and money laundering compliance at its subsidiary financial institutions."

       **xv.**    **December 2017: OCC Issues a Consent Order Imposing a *$70 Million* Fine and Finding Citigroup Remained "*in violation of the 2012 Consent Order*"**

172.    Despite many years of regulatory prodding to fix its anti-money laundering compliance program, including Consent Orders from the OCC, FDIC, CFDI/CDOB, and Federal Reserve, a joint FDIC/CDOB fine of $140 million, and a DOJ criminal forfeiture penalty of $97 million, Citigroup astonishingly failed to address the shortcomings in Citibank's compliance program.  In fact, on December 12, 2017, the OCC concluded that Citibank failed to "achieve[] compliance" by failing to complete the corrective actions mandated by the OCC's 2012 Consent Order.  Thus, notwithstanding the quarterly reports provided to the Citibank Board and the Citigroup Board detailing the Company's progress—or lack thereof—in remediating its anti-money laundering programs, the bank had still not sufficiently ameliorated the compliance problems previously highlighted by the regulators. The OCC therefore fined Citibank an additional $70 million.

\*      \*      \*

173.    In total, the partial list of regulatory orders identified above imposed a total of more than $3.8 billion in monetary penalties on Citigroup between 2012 and 2017 alone.  The orders and associated fines unquestionably put Defendants on notice that Citigroup's enterprise-wide internal controls and procedures were in urgent need of remediation and that regulators were

willing and able to impose substantial monetary penalties on the Company if the Board continued to disregard the need to achieve reforms.

**B.      During the Relevant Period, Defendants Continued to Consciously Disregard the Need to Reform Citigroup's Internal Controls and Risk-Management Systems**

174.     At the beginning of 2018, it appeared as though the Board might finally be poised to turn over a new leaf.  In the wake of the OCC's December 2017 Order rebuking the Company for its continuing failure to comply with past orders, a Citigroup spokesperson publicly "*committed to taking all necessary and appropriate steps to remedy the concerns identified by the OCC*."  It appeared possible that the OCC's $70 million fine had finally shaken the Board from its apathy and caused it to prioritize reform.

175.     Throughout the Relevant Period (*i.e.* the beginning of 2018 through the present), Citigroup and the Board actively promoted this story.  In public statement after public statement, the Board told shareholders and the public that Citigroup and its leaders were prioritizing compliance and had substantially reformed the Company's relevant internal controls and risk-management systems.[4]  But the story was false.  We now know that, behind the scenes, the Board continued to disregard its duties to oversee Citigroup's reform of its enterprise-wide internal controls and risk-management systems to achieve regulatory compliance.

**1.      During the Relevant Period, Regulators Continue to Pressure Citigroup's Leaders to Prioritize Reform and Issue Additional Orders Resulting from the Board's Continuing Failure.**

176.     *The Wall Street Journal* has reported that, throughout the Relevant Period, the Federal Reserve and the OCC privately pushed the Company's leaders, including Corbat, to "give

---

[4] Defendants' false and misleading statements during the Relevant Period are recounted and addressed in detail in sections VI(B) and VII(A)–0(C), *infra*.

priority to an overhaul of the [risk] systems."   Nevertheless, the Board failed to heed the regulators' warnings or prioritize reform and the Company's enterprise-wide internal controls and risk-management systems remained deficient and in violation of past orders.   The Company continued to be subjected to adverse regulatory actions as a result.   Indeed, between October 2019 and the Fall of 2020—when Corbat would finally concede publicly that the Board had failed for years to prioritize reform—regulators issued four significant orders against Citigroup and/or Citibank for violations of law resulting from internal control deficiencies.

i.   **October 2019:  The OCC Issues a Consent Order Imposing a** *$30 Million* **Fine for Citibank's** *"deficient processes and controls"* **Concerning Other Real Estate Owned (OREO) Accounting**

177.   On October 11, 2019, the OCC entered a Consent Order against Citibank for failure to fix long-standing problems, this time assessing a $30 million penalty for violations of the statutory holding period for other real estate owned (OREO) in 12 U.S.C. § 29 and C.F.R. § 34.82.

178.   By way of background, in 2015 Citibank committed to developing and implementing corrective actions to fix its "deficient processes and controls in the identification and monitoring" of the holding periods for OREO assets.

179.   Despite that past promise to enhance its internal controls, the OCC notified the bank in April 2017 that "its internal controls governing OREO remained decentralized, ineffective, and inadequate."   The bank therefore "recommitted" to fixing its internal control problems by August 31, 2018.

180.   However, as a result of the Board's continuing failures to prioritize compliance, the bank again missed the 2018 deadline to overhaul its internal controls for OREO.  A year later, in October 2019, the OCC issued its order finding that Citibank had "engaged in repeated violations of the statutory holding period . . . including over 200 violations alone between April

4, 2017 and August 14, 2019"—well after the date the bank promised the issues would be resolved.

181.    Thus, despite promising in 2015 and 2017 to remediate the internal control problems, Citibank's internal controls were still deficient as of the summer of 2019.  Indeed, the OCC found that these later "violations resulted from the Bank's deficient processes and controls in the identification and monitoring of the OREO holding period."

> ii.    **November 2019: The Bank of England Imposes a *$56.6 Million* Fine on Citigroup After Finding it "*failed to ensure that systems and controls supporting their regulatory reporting framework were designed, implemented, and operating effectively*"**

182.    On November 26, 2019, the Bank of England's Prudential Regulatory Authority ("PRA") issued a Final Notice imposing a £43.9 million ($56.6 million) fine on Citigroup's United Kingdom operations because the Company had continuously failed to submit complete and accurate regulatory returns to the PRA from June 2014 through December 31, 2018.  The regulatory filings had been so inept that they failed to provide the PRA "with an accurate picture of [Citigroup's] capital or liquidity position" and "negatively impacted the PRA's ability to supervise Citi."  In fact, the reporting errors were so extensive, the PRA concluded that the "root" of the problem lied in the Company's lack of oversight.

183.    The press release announcing the fine specifically cautioned that "[t]he pervasiveness of the errors and misstatements identified in the firm's returns raised fundamental concerns about the effectiveness of Citi's UK regulatory reporting control framework."  The press release further explained that "Citi failed to deliver accurate returns and failed to meet the standards of governance and oversight of regulatory reporting which we expect of a systemically important bank."  The PRA also found that the Company "failed to ensure that systems and controls supporting its UK regulatory reporting framework were designed, implemented and

operating effectively" and that "Citi's oversight and governance in relation to regulatory reporting fell significantly below the standards expected of a systemically important institution."

184.     The Final Notice issued by the PRA made similar findings.  The Final Notice explained that the "root cause" of the reporting errors was that Citigroup and its subsidiaries "failed to ensure that key systems and controls supporting their regulatory reporting framework were designed, implemented and operating effectively."  Indeed, the Final Notice made clear that despite knowing of data quality issues since 2013, Citigroup failed to ensure "that adequate systems and controls were in place."

   **iii.** **January 17, 2020:  The OCC issues a Consent Order Imposing an approximate *$18 Million* Fine for Citibank's "*pattern or practice of violations*" of the Flood Disaster Protection Act**

185.     On January 17, 2020, the OCC entered a Consent Order imposing a $17,998,510 civil penalty in connection with Citibank's "pattern or practice of violations" of the Flood Disaster Protection Act, as amended, ("Flood Act") (42 U.S.C. § 4012a(f)) and its implementing regulations, specifically 12 C.F.R. § 22.7(a).

186.     By way of background, Citibank used a third-party to service loans secured by homes and other buildings that are located in special flood hazard areas as collateral, and relied on the third-party to force placement of appropriate flood insurance as required under the Flood Act.   The OCC found that Citibank's Flood Act compliance program was deficient and resulted in the untimely force placement of flood insurance on certain loans, in violation of the Flood Act and its implementing regulations.

   **iv.** **September 24, 2020: The CFTC Issues a Consent Order Assessing a *$4.5 Million* Fine and Finding that "*Citi did not maintain adequate internal controls*" with Respect to Data Preservation**

187.     On September 24, 2020, the CFTC issued a Consent Order against Citibank, Citigroup Energy Inc. and CGMI assessing a $4.5 million civil penalty in connection with internal

control failures that resulted in the deletion of millions of recordings Citibank was required to maintain.  Notably, some of the deleted recordings were responsive to a CFTC subpoena request yet were deleted in October 2018 even after Citibank had assured the CFTC that they would be preserved and later produced.

188.    Citibank had used the same audio preservation system since 2001, and in 2014 recognized that the system could not implement targeted legal holds for particular custodians and time periods.  Citibank therefore implemented a "stop-gap" measure to indefinitely preserve recordings for all users subject to regulatory retention requirements.  This "stop-gap" measure ultimately became the permanent fix, yet internal memoranda from 2014 show that some Citibank employees knew the system would start to delete recordings when it ran out of storage space.  Moreover, an employee identified the "design flaw" that the system would automatically seek out and delete audio recordings when storage was limited without alerting staff.  The employee described this design flaw as a "ticking time bomb effect" because storage was limited and automatic deletions would inevitably occur.  In addition, the CFTC found that other important changes made to the preservation system were not properly documented, making it impossible for Citibank employees to recognize how the changes would affect the preservation of the recordings.  This ultimately resulted in the deletion of recordings in October 2018, including recordings responsive to the CFTC subpoena request.

189.    The CFTC expressly found that "Citi did not maintain adequate internal controls with respect to its preservation of audio and thus failed to diligently supervise matters related to its business as a [CFTC] registrant."  The CFTC further found that Citibank and other Citigroup subsidiaries "lacked adequate procedures to detect and elevate risks in the Audio Preservation

System." Thus, several Citigroup subsidiaries once again found themselves subject to regulatory rebuke and were assessed a monetary civil penalty.

> **2.      In August 2020, Corbat Circulated a Firm-Wide Memorandum Conceding that the Board has Failed to Prioritize Compliance or Take Action to Achieve the Necessary Reforms.**

190.    The necessary overhaul of the Company's internal controls was still not performed by August 2020.  On August 10, 2020, after what Business Insider has described as "*months of escalating tensions . . . between Citigroup and its regulators over the bank's tech and risk systems*," Corbat—apparently already anticipating a new regulatory rebuke—circulated a firm-wide internal memorandum in which he admitted that, contrary to the Board's public statements, Citigroup was experiencing "execution challenges" in remediating its "controls, infrastructure, and governance."

191.    In his firm-wide memorandum, Corbat acknowledged to his staff that the Company needed to "think about infrastructure and controls very differently."  He continued: "We can't think of them as just something that is important to our regulators.  It's not just about getting remediation projects done or checking boxes." Citigroup, Corbat explained, needed to "change[]" its collective "mindset."

192.    Corbat added, unconvincingly, that the Company would now be "making our risk and controls a strategic priority."

193.    Corbat's memorandum effectively conceded that, as of August 2020:

●      The Board *still* had not made Citigroup's "risk and controls a strategic priority";

●      The Board had, theretofore, viewed the Company's enterprise-wide risk-management and internal controls deficiencies as problems only to the extent they created regulatory nuisances; and

- The Board had not truly been prioritizing necessary reforms beyond, as he put it, "*checking boxes*."

### 3. The Day After Corbat's Internal *Mea Culpa*, Citigroup's Deficient Internal Controls Cause the Company to Inadvertently Pay $900 Million of Its Own Money to Creditors of Revlon, Inc.

194. Corbat's belated internal acknowledgment of Citigroup's control deficiencies was too little, too late. That reality was underscored *the very next day*—*i.e.* August 11, 2020—when the Company mistakenly paid $900 million of its own money to certain creditors of Revlon Inc., inviting widespread scrutiny over the Company's internal controls. Citibank was serving as Revlon's agent for administering a loan extended to Revlon by certain hedge fund creditors. In August 2020, Citibank intended to make only an interest payment to the creditors but, instead, accidentally paid back the full amount of principal and interest owed on the loan. Many of the creditors, who were already involved in a legal dispute with Citibank and Revlon concerning the loan, refused to return the mistakenly paid funds. As a result, hundreds of millions of dollars of Company money remain in limbo.

195. In litigation between Citigroup and certain of the creditors who have refused to return funds received as a result of the error, Citigroup blamed the inadvertent payment on human error, explaining in Court filings that "the individual who processed the payment mistakenly did not manually select the correct options and, unfortunately, the manual checks of that selection failed to detect the mistake." Citibank's Global Head of Loan and Credit Risk Services Operations, Brendan Zeigon, testified, shockingly, that Citibank lacked *any* internal controls that would have caught the mistaken $900 million payment and prevented it.

196. Counsel for the recipients argued that the recipients had a reasonable belief that the money was paid intentionally rather than as an "utterly apparent mistake," and that they therefore had the right to retain the funds. Indeed, a vice-president for HPS Investment Partners,

LLC, one of the recipients of the money, testified that he assumed the money was intentionally paid because he "worked in the operations of financial institutions for 17 years and [understood] that sophisticated financial institutions such as Citibank have many levels of internal controls in place to prevent issuing wire payments by mistake" and that a mistake of that magnitude would not be "possible given the extensive internal controls that I presume a sophisticated financial institution like Citibank would have."  A representative for another recipient, Brigade Capital Management, LP, parroted the testimony asserting that "I knew that Citibank is one of the largest, most sophisticated financial institutions in the world. As such, I presumed Citibank has many levels of internal controls in place to prevent mistaken payments, particularly mistaken payments of funds from Citibank's own balance sheet."  In addition, the recipients presented expert testimony that "it is virtually inconceivable that the Citi loan processing would simply send wires in the amount of the [$900 million payment] based on a single clerk 'checking a box' (or failing to check a box)."

197.   It was not only the recipients who were shocked to learn that Citigroup lacked the internal controls to prevent the alleged mistake.  As one *Bloomberg* columnist observed: "When a simple human lapse like this can cause such a problem, it suggests there may be systemic deficiencies too.  Where were the checks?"  In another report, titled "Citi's $25 Billion Reasons to Fix Repeat Control Failures," *Bloomberg* chastised Citigroup for ignoring repeated compliance issues raised in the bank's "long history of regulatory troubles."  The article noted "[w]hen there are warnings that you don't have the right resources, don't be surprised when issues result if you choose to ignore them."

### C. The Federal Reserve and OCC Impose a New *$400 Million* Penalty on Citigroup and Reveal the Extent of Defendants' Failure to Fulfill Their Fiduciary Duties.

198.    On September 10, 2020, amid intensifying regulatory scrutiny, the Company announced that Corbat would be retiring in February 2021—much earlier than had previously been expected—and that he would be replaced as CEO by Fraser.

199.    Then, on September 14, 2020, *The Wall Street Journal* reported that federal regulators were preparing to issue a new rebuke to the Company for its continued compliance failures.  In response to that news, the Company acknowledged publicly that its "risk and control environment" was "not yet where we need to be and that has to change."  It further admitted that the Company's accidental $900 million payment resulted from "unacceptable" control failures.

200.    On October 7, 2020, the OCC and Federal Reserve issued new coordinated Orders finding that major deficiencies with the Company's enterprise-wide risk-management and internal controls, which had been the subject of past regulatory actions, still had not been remediated.

201.    Reflecting their respective zones of regulatory authority, the OCC's orders were issued against Citibank specifically whereas the Federal Reserve's order was issued against Citigroup as a whole.  The new orders confirmed that, during the Relevant Period, the Board failed to prioritize necessary reforms, that the Company had failed to implement or maintain enterprise-wide internal controls and risk-management systems, and that, as a result, the Company remained in violation of several past governmental orders.

202.    Accordingly, the regulators imposed a *$400 million fine* on the Company.

203.    The new Orders revealed the scale of the Board's failure during the Relevant Period to prioritize reforms and take compliance seriously.

### 1.   The October 7, 2020 Federal Reserve Cease and Desist Order

204.   On October 7, 2020 the Federal Reserve issued a Cease and Desist Order, which was agreed to by the Citigroup Board.   The Order explains that the Federal Reserve had "*identified significant ongoing deficiencies in implementation and execution by Citigroup with respect to various areas of risk management and internal controls, including for data quality management and regulatory reporting, compliance risk management, capital planning, and liquidity risk management*."

205.   Most notably, the Order found that Citigroup failed to take "prompt and effective actions to correct practices previously identified by [the Federal Reserve]."   That is, Citigroup's management and Board had still not implemented the changes required by the Federal Reserve's orders issued years earlier.   The prior Consent Orders (discussed *supra* at Section V.A.3.) had placed responsibility for necessary reforms squarely on the Board's shoulders, mandating that the Board issue progress reports detailing Citigroup's efforts to achieve compliance.   Accordingly, the Board was undeniably aware of the need to prioritize reforms but failed to do so.

206.   The Federal Reserve's order expressly noted that "*Citigroup has not adequately remediated the longstanding enterprise-wide risk management and controls deficiencies previously identified by the Federal Reserve*, including … those addressed in (i) the Consent Order issued by the [Federal Reserve] on March 21, 2013 to remediate outstanding deficiencies in Citigroup's anti-money laundering compliance program and (ii) the Consent Order issued by the [Federal Reserve] on May 20, 2015 to remediate outstanding deficiencies in Citigroup's compliance and control infrastructure relating to its foreign exchange program and designated market activities."

207.    Notably, nine of the Board's seventeen current members had been elected to the Board at the time of the 2015 Federal Reserve order or served as managers responsible for implementing elements of the 2013 and 2015 orders.

208.    The Order imposed requirements for Citigroup to take significant steps to remedy the longstanding deficiencies in its risk-management, internal controls, data management, and compliance risk management systems.

209.    The order specifically required the Board to submit a plan to the Federal Reserve including:

- "actions that the board of directors will take to hold senior management accountable for executing effective and sustainable remediation plans by committed deadlines;"

- "actions the board of directors will take to ensure senior management improves, and thereafter maintains, effective and independent enterprise-wide risk management, and that internal audit findings are effectively remediated;"

- "actions that the board of directors will take to ensure that senior management incentive compensation is consistent with risk management objectives and measurement standards;" and

- "actions that the board of directors will take to ensure effective reporting to the board of directors that will enable it to oversee management's execution of the matters identified in this Order."

210.    These actions, however, are already required by the Board's fiduciary duties to the Company and were previously mandated under prior regulatory orders. See *supra* at Sections IV

and V.A.3.  In other words, the Federal Reserve ordered the Citigroup Board to submit a plan specifying the actions that it intends to take to live up to its fiduciary duties.

### 2.    The October 7, 2020 OCC Consent Orders

211.    Also on October 7, 2020, the OCC issued two carefully worded Consent Orders against Citibank and that were agreed to by the Citibank Board.

212.    Given that (1) Citibank is wholly owned and controlled by Citigroup; (2) there is overwhelming board overlap between Citibank and Citigroup; and (3) Citigroup's Board is obligated under federal regulations to oversee Citibank, the Citibank Board's failures can be attributed to Citigroup's Board.

213.    The first Order imposes a monetary penalty, and the second requires severe governance changes.  Both expressly found—and Citibank agreed not to deny—that: "*For several years, the Bank has failed to implement and maintain an enterprise-wide risk management and compliance risk management program, internal controls, or a data governance program commensurate with the Bank's size, complexity, and risk profile,*" noting that these were "*serious and longstanding deficiencies.*"

214.    This establishes that the Board had not ensured that the Company implemented the minimum level of reporting and monitoring systems and controls required by a bank of Citibank's profile.  This is tantamount to having no controls whatsoever for a bank of the Company's size, complexity, and risk profile.

215.    The OCC found that—despite the Company's years of control failures and resulting fines and the Board's undeniable knowledge of the Company's compliance problems— the Board still had failed to remedy voluminous "deficiencies, noncompliance with 12 C.F.R. Part 30, Appendix D, … [and] unsafe or unsound practices with respect to the Bank's enterprise-wide risk management and compliance risk management program" including:

- "failure to establish effective front-line units and independent risk management as required by 12 C.F.R. Part 30, Appendix D;"

- "failure to establish an effective risk governance framework as required by 12 C.F.R. Part 30, Appendix D;"

- "failure of the Bank's enterprise-wide risk management policies, standards, and frameworks to adequately identify, measure, monitor, and control risks;" and

- "failure of compensation and performance management programs to incentivize effective risk management."

216.    The OCC also "identified unsafe or unsound practices with respect to the Bank's internal controls, including, among other things, an absence of clearly defined roles and responsibilities and noncompliance with multiple laws and regulations."

217.    The OCC further identified numerous "deficiencies, noncompliance with 12 C.F.R. Part 30, Appendix D, or unsafe or unsound practices with respect to the Bank's data quality and data governance, including risk data aggregation and management and regulatory reporting" including:

- "failure to establish effective front-line units, independent risk management, internal audit, and control functions as required by 12 C.F.R. Part 30, Appendix D;"

- "inability to develop and execute on a comprehensive plan to address data governance deficiencies, including data quality errors and failure to produce timely and accurate management and regulatory reporting;" and

- "inadequate reporting to the Board on the status of data quality and progress in remediating identified deficiencies."

218.    The OCC specifically placed blame for Citibank's persistent failure to achieve compliance on the Citibank Board and its reporting systems, explaining that "***Board and senior management oversight is inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices in the areas of risk management, internal controls, and data governance at the bank.  Furthermore, inadequate reporting to the Board hinders its ability to provide effective oversight.***"

219.    The Citibank Board's inability to develop and execute a comprehensive plan to address the bank's issues, and inadequate reporting to the board on the status of data quality and progress in remediating identified deficiencies confirms that the Board's failure to exercise reasonable oversight was both sustained and systematic.

220.    As a result of these deficiencies, the OCC required Citibank to pay a $400 million penalty.  The OCC also required Citibank to agree to numerous remedial measures, including: (i) forming a new board-level Compliance Committee; (ii) developing a comprehensive action plan for achieving compliance; (iii) implementing an appropriate and detailed data governance program; (iv) implementing an appropriate and detailed enterprise-wide risk management program; (v) implementing an appropriate and detailed compliance risk management program; (vi) improving the bank's capital planning processes; (vii) and improving the bank's internal controls.

221.    The Orders also imposed a new requirement for Citibank to seek OCC approval before making any significant new acquisitions.  As a *Bloomberg* commentator explained, this

requirement is likely a direct result of "Citibank's inability to properly integrate new acquisitions into its expansive network" that contributed to many of the underlying problems in the first place.

222.    Seeking to remedy the gross oversight deficiencies at Citibank, the OCC's orders also required that Citibank implement numerous Board-level reforms to ensure appropriate oversight over the bank.  Further, the order placed responsibility for achieving compliance squarely on the shoulders of the Citibank Board, stating: "The Board shall ensure that the Bank has timely adopted and implemented all corrective actions required by this Order, and shall verify that the Bank adheres to the corrective actions and they are effective in addressing the Bank's deficiencies that resulted in this Order." The Orders also allow the OCC to make changes to Citibank's management or Board membership if it determines that the board and management are not performing adequately.

### D.    Corbat and Other Citigroup Executives Confess Publicly That, After All These Years, Citigroup Remains at Square One.

223.    On an October 13, 2020 earnings call held the week after the OCC and Federal Reserve imposed their $400 million fine and new Consent Orders, Corbat made the shocking public confession, echoing his earlier internal memorandum, that the Company essentially remains at square one in terms of determining what even needs to be done to bring its systems into compliance with years-old orders.  He explained that the Company *still* (1) "need[ed] to modernize [its] infrastructure, governance and processes;" (2) "reduc[e] manual touch-points [and] automat[e] processes;" and (3) "ensur[e] accurate data can be accessed quickly when . . . producing management and regulatory reports."  He further cautioned analysts: "This won't be a quick or easy fix.  We need to conduct an in-depth gap analysis to ensure our solutions are tailored to the issues we face and get us to a necessary end state," and that as of that late date, the Company

"can't fully scope out the costs yet for a multiyear transformation[.]"  "These are investments we need to make," he said. "*In hindsight, we should have done them faster.*"

224.    Corbat's comments revealed that the Board's failures were not limited to a mere failure of results.  After a decade of incessant pressure from regulators, and billions in fines, the Board not only failed to reform Citigroup's internal controls and ensure the Company's regulatory compliance*, the Board failed even to determine what needs to be done, how long it will take, or how much it might cost.*

225.    In subsequent public statements, other executives provided additional detail concerning the scale of Citigroup's deficiencies.

226.    On November 10, 2020, at the Bank of America Future of Financials Virtual Conference, Karen Peetz, Citigroup's Chief Administrative Officer, further explained the many problems with Citigroup's past approach to regulatory compliance, which shows that the Board blatantly ignored the numerous red flags concerning the Company's compliance deficiencies. First, Citigroup lacked adequate "coordination on a global basis," and amazingly *still* had a "silo" culture with separate "swim lanes instead of One Citi."  Second, Citigroup's internal controls were "subject to human error" by having "a lot of manual workarounds" instead of "more automatic controls that kind of keep up with [Citigroup's] business risk."  Third, "culturally, [Citigroup] need[ed] clear accountability and decision-making."  Fourth, from a process perspective, "[Citigroup] often [was] solving smaller problems versus looking at the total picture."  She also made clear that Citigroup is still just in its first steps of determining what needs to be done to bring Citigroup into compliance: "So all I can say is we're working on it, and we would certainly plan to keep you informed as soon as we have some news and some quantification to give you."

227.    Following Peetz's November 10, 2020 presentation, Citigroup's Board and CEO received a stinging rebuke from analysts at Wells Fargo in a November 10, 2020 equity research report titled "C: Mixed Thoughts From Fix-it Executive:" "[W]e've heard many of these goals before at [Citigroup] ('simplification', 'less silos', etc.)." "[W]hen the CAO talks about the need for greater accountability, the greatest accountability starts at the board and CEO level and, on this measure, Citi has fallen far short of any other top 10 bank over almost any time period for the past two decades, in our view."  The report further stated that "these are the early days for fixing reg issues – no time frame, no est. cost, and still hiring employees and setting up committees" and that "we've heard many of these goals before at Citi."

228.    Citigroup's Chief Financial Officer, Mark Mason, further expounded on Citigroup's failure to remediate its compliance programs when he presented at the 2020 Goldman Sachs US Financial Services Conference on December 9, 2020.  Mason noted Citigroup requires a "transformation" to "improv[e] the operations across the franchise."  He explained that the transformation "includes everything from data and getting the quality of the data that we need sooner in a more efficient way," "enhancing our risk and controls and our enterprise risk control framework," "improving the way we think about compliance," and the "digitization of a lot of our operations."

229.    On the October 13, 2020, earnings call, Wells Fargo Securities analyst Mike Mayo expressed his frustration with the Board's lack of urgency in remediating past problems, stating, "there is collective sense of extreme disappointment … The root problems were not transparent to investors.  On execution, you didn't go fast enough."  Another commentator from the investing website The Motley Fool noted that what is "even more frustrating for investors in all of this is

that management has known about at least some of these problems since at least 2013…. ***How do you not fully address issues you've known were serious for at least seven years?***"

### E.   Citigroup Suffers Massive Harm as a Result of the Board Oversight Failures Resulting in Regulatory Rebuke

230.   The revelation of Citigroup's continuing failures has had disastrous consequences for the Company.  As noted above, the Company has incurred a new $400 million fine—adding to the billions of dollars the Company has paid regulators for its compliance failures in recent years.  The fine is, however, only the tip of the iceberg.

231.   The OCC's order requires that "[w]ith the exception of ordinary course transactions, such as hedging, market making, and securitization transactions . . . the Bank shall not complete any new portfolio or business acquisitions until it has received prior written determination of no supervisory objection to the review process from the Deputy Comptroller." That means that Citibank cannot open new retail bank branches, acquire other banks, or increase its already massive derivatives book (other than hedging) without the express consent of the OCC.

232.   Moreover, Citi has not yet been transparent as to future costs to develop new systems to comply with its regulatory obligations.  A report published on October 13, 2020 by an analyst for Deutsche Bank indicated that "it's unclear how much expenses will rise, but the tone on today's earnings call seemed to imply that a lot of spend could be needed to address regulatory issues."  The report went on to say, "We now assume a $3b[illion] increase in related costs in 2022 vs. 2019, with about $1b[illion] already disclosed."  On December 9, 2020, Citigroup's CFO hinted that the remediation efforts may exceed $1.5 billion in 2021 alone.

233.   In addition, the Company's mistaken payment of $900 million of its own money to certain creditors of Revlon Inc. is expected to result in additional costs to the Company,

including from litigation arising from that payment under the caption *In re Citibank August 11, 2020 Wire Transfers*, C.A. No. 1:20-cv-06539-JMF (S.D.N.Y.).

234.    News of the regulatory rebuke and revelations concerning Citigroup's persistent control deficiencies seriously damaged the Company's reputation and destroyed billions of dollars of corporate equity.  Citigroup's stock dropped more than 15% in the days following the mid-September report of impending regulatory action—representing a market capitalization loss of well over $16 billion.

235.    The Company also faces significant additional liability in connection with its past disclosures concerning its internal controls, risk-management systems, and regulatory compliance.  For example, on October 30, 2020, a Citigroup stockholder commenced a securities fraud action in this Court seeking to hold the Company liable for $17.43 billion in shareholder losses.  That action is captioned *City of Sunrise Firefighters' Pension Fund v. Citigroup, Inc., et al.*, Case No. 1:20-cv-0132 (S.D.N.Y.).

\*      \*      \*

236.    As detailed above, Defendants were charged with a duty to oversee the Company's most important affairs and to take affirmative steps to ensure that the Company's operations were conducted in a lawful manner.  There can be no doubt that Defendants were aware of the importance to the Company of reforming its internal controls and risk-management systems. Those systems were the subject of incessant scrutiny by the Company's regulators and had caused the Company to incur enormous fines in the past.  Moreover, as detailed above, Defendants repeatedly acknowledged publicly their awareness of the importance of reforming the Company's internal controls and risk-management systems and of achieving compliance with applicable laws and regulations.  The October 2020 Consent Orders issued by the OCC and Federal Reserve

revealed that, behind the scenes, Defendants utterly disregarded their duties.  Unbeknownst to investors, Defendants failed to prioritize reform of the Company's internal controls and risk-management systems.  After years of adverse regulatory action and innumerable public promises to do better, the Board still had, in the Federal Reserve's words, ***failed to "remediate[] the longstanding enterprise-wide risk management and controls deficiencies previously identified by [its regulators]."***

237.  Given that state of affairs, Defendants had a duty to take affirmative steps to prioritize reform and do everything in their power to ensure the Company achieved compliance. They had a duty to be actively engaged in overseeing the Company's efforts to reform its internal systems.  The October 2020 Consent Orders revealed, however, that Defendants were not actively engaged in overseeing this effort.  To the contrary, as the OCC put it, ***"Board and senior management oversight [remained] inadequate to ensure timely, appropriate actions to correct the serious and longstanding deficiencies and unsafe or unsound practices…."***

## VI.   DEFENDANTS VIOLATED SECTION 10(B) OF THE EXCHANGE ACT AND BREACHED THEIR FIDUCIARY DUTIES BY KNOWINGLY OR RECKLESSLY ISSUING MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

### A.   Defendants Caused Citigroup to Conduct a Massive Stock Repurchase Program

238.  In breach of their fiduciary duties to Citigroup and its shareholders, and in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, Defendants issued, and caused the Company to issue, statements that, in light of Citigroup's utterly deficient risk management, internal controls, and regulatory compliance detailed above, were materially false or misleading when made.  Simultaneously, the Board caused Citigroup to pursue what a *Barron's* journalist described as "one of the industry's most aggressive share-repurchase programs."

Defendants' misrepresentations artificially inflated the price of Citigroup's shares, causing the Company to purchase shares at artificially inflated prices through its stock repurchase program.

239.   By causing Citigroup to conduct share repurchases, Defendants signaled to investors their purported belief that Citigroup shares were trading at a discount, which caused investors to purchase shares and thereby drive the price up.  Further, and relatedly, the Board's authorization of share repurchases artificially inflated the Company's financial metrics such as earnings per share, as the repurchases resulted in fewer outstanding shares.  The artificial inflation of Citigroup shares was financially and professionally beneficial to Defendants.  Corbat's massive compensation was tied to the Company's financial performance.  Further, the inflation of Citigroup's share price helped protect all members of the Board from scrutiny and dissent by the Company's shareholders.  Among other things, the inflation of the Company's share price helped insulate the Board from criticism for the utterly deficient risk management, internal controls, and regulatory compliance described herein.  As a result, the members of the Board were able to maintain their seats and the lucrative compensation they received in connection therewith.

240.   In June 2018, Citigroup's Board approved a $17.6 billion common stock repurchase program during the four quarters beginning in the third quarter of 2018 and expiring on June 30, 2019.  Then, in June 2019, the Board of Directors approved a $17.1 billion common stock repurchase program during the four quarters beginning in the third quarter of 2019 and expiring on June 30, 2020.  In sum, as detailed in the chart below, between January 2018 and March 2020,[5] Citigroup repurchased over 517 million shares of its stock, paying over $35 billion:

---

[5]  Citigroup suspended the repurchase program in March 2020 in light of the COVID-19 pandemic.

| Date of Repurchase | Shares (In Millions) | Average Price Per Share | Total Amount Paid |
|---|---|---|---|
| January 2018 | 7.9 | $76.87 | $607,273,000 |
| February 2018 | 13.2 | $75.63 | $998,316,000 |
| March 2018 | 9.2 | $72.72 | $669,024,000 |
| April 2018 | 13.9 | $69.54 | $966,606,000 |
| May 2018 | 11.0 | $69.40 | $763,400,000 |
| June 2018 | 8.5 | $67.24 | $571,540,000 |
| July 2018 | 21.0 | $69.06 | $1,450,260,000 |
| August 2018 | 30.0 | $71.05 | $2,131,500,000 |
| September 2018 | 23.6 | $71.62 | $1,690,232,000 |
| October 2018 | 32.0 | $68.78 | $2,200,960,000 |
| November 2018 | 20.7 | $64.81 | $1,341,567,000 |
| December 2018 | 21.1 | $54.87 | $1,157,757,000 |
| January 2019 | 24.1 | $59.35 | $1,430,335,000 |
| February 2019 | 21.1 | $63.60 | $1,341,960,000 |
| March 2019 | 20.4 | $62.98 | $1,284,792,000 |
| April 2019 | 14.4 | $67.51 | $972,144,000 |
| May 2019 | 22.8 | $66.05 | $1,505,940,000 |
| June 2019 | 16.4 | $67.03 | $1,099,292,000 |
| July 2019 | 20.2 | $71.46 | $1,443,492,000 |
| August 2019 | 34.9 | $64.46 | $2,249,654,000 |
| September 2019 | 20.8 | $68.43 | $1,423,344,000 |
| October 2019 | 21.6 | $69.77 | $1,507,032,000 |
| November 2019 | 21.0 | $74.80 | $1,570,800,000 |

| Date of Repurchase | Shares (In Millions) | Average Price Per Share | Total Amount Paid |
|---|---|---|---|
| December 2019 | 26.6 | $77.03 | $2,048,998,000 |
| January 2020 | 14.1 | $78.86 | $1,111,926,000 |
| February 2020 | 16.3 | $74.60 | $1,215,980,000 |
| March 2020 | 10.3 | $57.87 | $596,061,000 |
| Total | 517.1 | - | $35,350,185,000 |

241.    In conducting these share repurchases, Defendants falsely signaled to the public that they believed Citigroup shares were undervalued and that the repurchases were the best use of the Company's cash.  The share repurchases also had the effect of growing the Company's earnings per share—as share repurchases lower the number of shares outstanding, on which earnings per share are based—as well as its return on assets, return on equity, and other metrics. Together, these actions helped inflate Citigroup's share price.

**B.    In Connection with the Share Repurchases, Defendants Issued Materially False and Misleading Statements**

242.    During the Relevant Period, Defendants issued materially false and misleading statements and omissions concerning: (i) the Company's regulatory compliance; (ii) the Company's purported compliance risk management practices; and (iii) the Company's internal controls.

**1.    False Statements Regarding Citigroup's Regulatory Compliance**

243.    Following the OCC's 2017 imposition of a $70 million fine for the Company's failure to fix its money-laundering controls and comply with the OCC's previous order issued in 2012, the Company released a statement published in media reports on January 4, 2018 representing: "Citi is committed to taking all necessary and appropriate steps to remedy the

concerns identified by the OCC."  Citigroup further highlighted steps it claimed to have already taken in bringing the Company into compliance with the OCC, stating, "We have made substantial investments to enhance our [anti-money-laundering] programs and we maintain a commitment to developing an industry-leading program to help to protect the integrity of the financial system."

244.    On April 24, 2018, Citigroup held a Shareholder/Analyst call where then-Chair of the Board O'Neill claimed that the regulatory problems the bank previously faced were behind the Company.  He noted "[O]ne of the things we learned from the crisis is that risk management is the bedrock of banking, and that we certainly had not done as good a job in the past. And that the outcome was rather unfortunate, as we all know. It's taken quite a while to work through that problem. I've already talked about how we've done that. I think we made great progress."

245.    On April 10, 2019, Corbat testified before the United States House of Representatives Financial Services Committee where he claimed that Citigroup had a "strong culture of compliance," and "governance structure in place that helps [the Company] identify mistakes and misbehavior, learn from them and hold ourselves accountable for whatever actions preceded those episodes."  His testimony further discussed the Company's recent regulatory history and purported compliance efforts, stating in relevant part:

> Over the last decade, we have worked hard to improve both our culture and controls, as we resolved issues arising out of the financial crisis, such as a variety of regulatory matters and Consent Orders related to mortgage practices. Although we have made significant strides since the financial crisis, we recognize that we have more work to do. For example, as the firm was working to recover from the financial crisis, we learned that employees had engaged in misconduct in connection with foreign exchange trading. We settled a number of government investigations arising from this conduct and took remedial action to significantly tighten controls. During this period, we have also been working to resolve issues identified in Consent Orders related to our BSA/AML program. These experiences reinforced the need to continue to examine our practices and procedures, which includes implementing and promoting firm-wide controls and establishing clear escalation processes that enable senior managers to quickly understand emerging issues. ***We have had success in this***

*effort*. Over the last several years we can point to multiple instances in which we self-identified problems and escalated them, both within the firm and to our regulators.

246.    On April 16, 2019, the Company held a Shareholder/Analyst call, where Dugan was introduced as the new Chair of the Board, replacing O'Neill.  A former Comptroller of the Currency, Dugan highlighted his experience and background in regulatory issues, and stressed the Company's "absolutely critical" focus on compliance in light of the claim that Citigroup had made "*tremendous progress*" with regard to "existential regulatory issues" and that the Company could "not afford to backslide."  In response to an analyst question about Dugan's experience and how it could help "make Citigroup better," Dugan stated, in relevant part:

> I think . . . from my background, is on regulatory issues and risk. I am pleased to say that Citi has made tremendous progress on what I describe as the existential regulatory issues of being able to pass, on an annual basis, CCAR stress testing and also to be able to submit a resolution plan for the company that is approved by the regulators without deficiency where Citi has really best-in-class record. But beyond that, the fact is since the financial crisis, regulatory and supervisory expectations for all large banks, including Citi, have been raised. And it is absolutely critical that we keep our eyes focused on that, move forward, address these regulatory and supervisory issues because we cannot afford to backslide. And the same is true about risk. We -- *the company spends a great deal of time, the Board does and the Risk Committee in particular, on making sure that management identifies, measures, monitors and controls the key risks facing the company because again, we have to have a culture of disciplined, prudent risk-taking* for which -- to achieve sustainable earnings because we can never have the company slip back to the place where we were before.

247.    On July 15, 2019, during Citigroup's second quarter earnings call, Corbat again stressed Citigroup's "commitment to our shareholders and our regulators to make sure that we're making the investments in terms of safety and soundness."

248.    Following the OCC's $30 million fine issued to Citibank for its "deficient processes and controls" related to violations of the OREO holding period, the Company released a statement published in media reports on October 11, 2019 representing, "Since identifying the

issue, *we have strengthened controls, processes and procedures* to ensure the timely disposition of these assets."

249.    Following the Bank of England's PRA's $56.6 million fine issued on November 26, 2019 for regulatory reporting failures, the Company released a statement representing, "Citi has *fully remediated* the *past regulatory reporting issues* identified by the PRA, and settled this matter at the earliest possible opportunity."  Additionally, the statement continued, "Citi places a high priority on meeting its regulatory reporting requirements, and has devoted significant resources to UK financial reporting before, during and after the period to which the PRA's notice relates."

250.    On January 14, 2020, the Company held an earnings call for the fourth quarter of 2019.  During the call, Citigroup referred to a slide presentation, which was posted to the Company's website for investors.  Those slides, titled "Fourth Quarter 2019 Earnings Review," stated that one of Citigroup's "[o]pportunities for continued progress" was "[i]nvesting where we see client-led growth, *while strengthening infrastructure & controls*."

251.    On April 15, 2020, the Company held an earnings call for the first quarter of 2020. In his opening statement, Corbat touted Citigroup's risk management and controls in the face of an economic downturn, stating, "Our investments in risk management and controls, while never complete, are also serving us well in the face of a severe economic downturn and large swings across market, whether in equities, fixed income or commodities."  During the call, Citigroup also referred to a slide presentation, which was posted to the Company's website for investors. Those slides, titled "First Quarter 2020 Earnings Review," stated that "[d]espite a challenging environment, [Citi] delivered . . . strong risk management" and that Citi's priorities were to

"Continue to demonstrate … operational resiliency" and "Focus on risk management and building a stronger company for the future."

252.    On another Shareholder/Analyst call which occurred on April 21, 2020, Corbat again claimed, "We have the resources we need to serve our clients without jeopardizing our safety and soundness, and *our investments in risk management and controls, while never complete, are serving us well in the face of a severe economic downturn* and the accompanying market volatility."

253.    On July 14, 2020, just a month before the Company's $900 million blunder, Corbat stated during a second quarter earnings call that, despite the uncertainty brought about by the COVID-19 pandemic, "*We'll keep* managing *through this with a sharp emphasis on our risk management*."   Corbat also stated that Citigroup continues "*to make investments in our infrastructure to enhance our safety, soundness and controls to ensure that we have an indisputably strong and stable institution*." Also, during the earnings call, Citigroup referred to a slide presentation, which was posted to the Company's website for investors.  Those slides, titled "Second Quarter 2020 Earnings Review," highlighted Citi's priorities of "risk management" and "operational resiliency."

254.    On April 23, 2020, during the Company's earnings call for first quarter of 2020, the Company's Chief Financial Officer, Mark Mason, responded to an investor question regarding the Company's preferred stock stating that "our focus will be" on "maintaining nearly robust level of capital and liquidity and be[ing] in a position to serve our clients."  There was no disclosure of deficiencies in the implementation and execution of Citi's risk management and internal controls regarding capital planning or liquidity risk management.

255.    On August 13, 2020, *The Wall Street Journal* first reported the $900 million mistaken payment to Revlon creditors.  Soon thereafter, *Bloomberg* published an article reporting that Citigroup blamed "human error" for the mistaken payment and that the Company was in the process of clawing back some of the funds through litigation.  In a statement released to media coverage, Citigroup said, "We take pride in the role that we play as a global leader in financial services and recognize that an operational error of this nature is unacceptable.  We have put significant, additional controls in place until the new system is operational."

256.    On September 10, 2020, Citigroup issued a press release announcing Corbat's retirement and the selection of Fraser as his successor as CEO.  Corbat's statement in the press release noted that "as the world's most global bank, safety and soundness always have to be a foundation of our institution. We have launched significant investments in our infrastructure as part of our push to make ***strengthening our risk and control environment a strategic priority for the firm***."

257.    Citigroup also has a Code of Conduct, Risk Management Committee Charter, and Environmental, Social, and Governance ("ESG") report, which are incorporated by reference into the Company's SEC filings. In those documents, Citigroup touted, among other things, the strength of its internal controls, risk management oversight, and compliance.  Specifically, the Code of Conduct states, "We maintain processes and controls to govern the use, transmission, sharing, storage, disclosure, transfer, security, accuracy, and access to client and employee information globally."  Similarly, the Risk Management Committee Charter states that the Company's Risk Management Committee purported to provide "oversight of Citigroup's risk management framework, including the significant policies and practices used in managing credit, market, operational and certain other risks," among other oversight functions.  Additionally, the

2019 ESG report states "[t]hrough an integrated compliance risk management framework, this group protects Citi by setting standards; providing guidance, training and advice to our businesses regarding compliance risk; and driving ownership and accountability for managing compliance risk in accordance with Citi standards across the firm."  The 2019 ESG report also claimed that "[w]ith data security among Citi's most material environmental, social and governance issues, 2019 Spotlight communications focused on information security, addressing topics such as … the importance of proper data classification and handling[.]"

258.    The foregoing statements were materially false and misleading and failed to disclose material adverse facts about the Company's business, operational, and compliance policies.  Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (i) Citigroup was not in compliance with its regulators and regulatory Consent Orders entered before and throughout the Relevant Period; (ii) Citigroup had inadequate risk and compliance management and internal controls; (iii) Citigroup's remediation efforts were inadequate; (iv) as a result of Citigroup's continued noncompliance with its regulators and regulatory Consent Orders, the Company faced further regulatory Consent Orders and penalties; and (v) as a result of the foregoing, Defendants' statements about Citigroup's business, operational, and compliance policies were materially false and/or misleading and/or lacked a reasonable basis.

### 2.    False Statements in Citigroup's Public Filings

259.    Citigroup's SEC filings included representations that were materially false when made in light of the lack of risk-management oversight and internal controls detailed above. Indeed, the OCC and Federal Reserve identified substantial deficiencies and unsafe and unsound practices in the Company's risk management oversight and internal controls in the October 2020 Consent Orders.  Defendants, however, had previously falsely represented that they maintained a

robust risk-management system that was designed to meet the standards of the OCC and the Federal Reserve.

260.    On February 23, 2018, Citigroup filed its Form 10-K for the year ended December 31, 2017 (the "2017 Form 10-K"), which was signed by Defendants Corbat, Costello, Dugan, Hennes, Henry, Humer, Ireland, McQuade, O'Neill, Santomero, Taylor, Turley, Wright, and Zedillo.

261.    The 2017 Form 10-K claimed that "For Citi, **effective risk management is of primary importance** to its overall operations," and therefore, "Citi's risk management process has been designed to monitor, evaluate and manage the principal risks it assumes in conducting its activities."

262.    The 2017 Form 10-K detailed the Company's purported risk management framework and Defendants' roles in the framework.  In the section titled Managing Global Risk, the Board described a "Company-wide risk governance framework consist[ing] of the policies, procedures, and processes through which Citi identifies, measures, manages, monitors, reports and controls risks across the Company."  Furthermore, the 2017 Form 10-K asserted that the "**risk governance framework has been developed in alignment with the expectations of the Office of the Comptroller of the Currency (OCC) Heightened Standards**," as well as "aligned" with the "**relevant components of the Federal Reserve's Enhanced Prudential Standards for Bank Holding Companies and Foreign Banking Organizations**."

263.    According to the 2017 Form 10-K, part of Citigroup's risk management systems were the "independent control functions."  The Company claimed:

Citi's independent control functions, including Risk, Independent Compliance Risk Management, Human Resources, Legal, Finance and Finance & Risk Infrastructure, set standards by which Citi and its businesses manage and oversee risks, including compliance with applicable laws, regulatory requirements, policies and other relevant standards of conduct. Additionally, among other responsibilities, the independent control functions *provide advice and training to Citi's businesses and establish tools, methodologies, processes and oversight for controls used by the businesses to foster a culture of compliance and control*.

264.    The risk management system also allegedly included a "Risk" organization, which Citigroup asserted "establishes policies and guidelines for risk assessments and risk management and contributes to controls and tools to manage, measure and mitigate risks taken by the Company." The 2017 Form 10-K explained the reporting structure of the Risk organization to both the Citigroup CEO and the Risk Management Committee of the Board.

265.    The 2017 Form 10-K further claimed that "Citigroup's Board of Directors oversees Citi's risk-taking activities and holds management accountable for adhering to the risk governance framework." The Board purportedly carried out that responsibility by "review[ing] reports prepared by the businesses, Risk, Independent Compliance Risk Management, Internal Audit and others, and exercis[ing] sound independent judgment to question, probe and challenge recommendations and decisions made by management."

266.    Furthermore, the 2017 Form 10-K described Citigroup's compliance risk systems and touted the Company's Independent Client Risk Management organization ("ICRM") as "*the champion of responsible finance*" responsible for maintaining a "culture of compliance, control and ethical conduct throughout Citi."

267.    Aside from ICRM overseeing compliance, the 2017 Form 10-K claimed that within Citigroup "Each business and function *identifies its significant conduct risks through a diagnostic process* that includes broadly understanding their potential significant conduct risks in the context of their overall activities, identifying and flagging their significant conduct risks

and related controls and incorporating the results of this diagnostic process into their annual risk assessment process."

268.   Likewise, the 2017 Form 10-K claimed that "[t]o anticipate, mitigate and control operational risk, Citi has established *policies and a global framework* for assessing, monitoring and communicating operational risks and the overall operating effectiveness *of the internal control environment across Citigroup.*"

269.   The 2017 Form 10-K also contained a certification by Defendant Corbat that attested to the integrity of the Company's internal controls and veracity of the Annual Report.  In addition, the Defendant certified that he had disclosed "(a) all significant deficiencies and material weaknesses in the design or operation of internal control … and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

270.   Additionally, on May 1, 2018, July 31, 2018, and October 30, 2018, Citigroup filed its Form 10-Q's for the first, second, and third quarters of 2018, respectively (the "2018 Form 10-Qs").  The 2018 Form 10-Qs contained a certification by Defendant Corbat that attested to the integrity of the Company's internal controls and veracity of the 2010 Form 10-Qs.  In addition, the Defendant certified that he had disclosed "(a) all significant deficiencies and material weaknesses in the design or operation of internal control … and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

271.   The foregoing statements in Paragraphs 261 to 270 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operational, and compliance policies.  Specifically, Defendants made false and/or misleading

statements and failed to disclose to investors that: (i) Citigroup was not in compliance with its regulators and regulatory Consent Orders entered before and throughout the Relevant Period; (ii) Citigroup had inadequate risk and compliance management and internal controls; (iii) Citigroup's risk governance framework did not meet the standards of the OCC and the Federal Reserve; (iv) Citigroup's remediation efforts were inadequate; (v) as a result of Citigroup's continued noncompliance with its regulators and regulatory Consent Orders, the Company faced further regulatory Consent Orders and penalties; and (vi) as a result of the foregoing, Defendants' statements about Citigroup's business, operational, and compliance policies were materially false and/or misleading and/or lacked a reasonable basis.

272.     On February 22, 2019, Citigroup filed its Form 10-K for the year ending December 31, 2018 ("2018 Form 10-K"). The 2018 Form 10-K was signed by Defendants Corbat, Costello, Dugan, Hennes, Henry, Humer, Ireland, Jacobs, James, McQuade, Reiner, Santomero, Taylor, Turley, Wright, and Zedillo.

273.     The 2018 Form 10-K repeated the claim that "For Citi, effective risk management is of primary importance to its overall operations," and therefore, "Citi's risk management process has been designed to monitor, evaluate and manage the principal risks it assumes in conducting its activities."

274.     The 2018 Form 10-K also repeated the false statement that Citigroup's "Company-wide risk governance framework consists of the policies, standards, procedures and processes through which Citi identifies, assesses, measures, manages, monitors, reports and controls risks across the Company." Furthermore, the 2018 Form 10-K re-asserted that the "***risk governance framework has been developed in alignment with the expectations of the Office of the Comptroller of the Currency (OCC) Heightened Standards***," as well as "aligned" with the

"*relevant components of the Federal Reserve's Enhanced Prudential Standards for Bank Holding Companies and Foreign Banking Organizations*."

275.     According to the 2018 Form 10-K, part of Citigroup's risk management systems were the "independent control functions."  The Company claimed:

> Citi's independent control functions, including Risk, Independent Compliance Risk Management, Human Resources, Legal, Finance and Finance & Risk Infrastructure, set standards by which Citi and its businesses manage and oversee risks, including compliance with applicable laws, regulatory requirements, policies and other relevant standards of conduct. Additionally, among other responsibilities, the independent control functions *provide advice and training to Citi's businesses and establish tools, methodologies, processes and oversight for controls used by the businesses to foster a culture of compliance and control*.

276.     The risk management system also allegedly included a "Risk" organization, which Citigroup asserted "establishes policies and guidelines for risk assessments and risk management and contributes to controls and tools to manage, measure and mitigate risks taken by the Company."  The 2018 Form 10-K explained the reporting structure of the Risk organization to both the Citigroup CEO and the Risk Management Committee of the Board.

277.     The 2018 Form 10-K likewise repeated the claim that "Citigroup's Board of Directors oversees Citi's risk-taking activities and holds management accountable for adhering to the risk governance framework."  The Board purportedly carried out that responsibility by "review[ing] reports prepared by the businesses, Risk, Independent Compliance Risk Management, Internal Audit and others, and exercise[ing] sound independent judgment to question, probe and challenge recommendations and decisions made by management."

278.     The 2018 Form 10-K further claimed that "[t]o anticipate, mitigate and control operational risk, Citi has *established policies and a global framework* for assessing, monitoring

and communicating operational risks and the overall operating effectiveness *of the internal control environment across Citigroup.*"

279.    Additionally, the 2018 Form 10-K described Citigroup's Compliance Risk Management Framework, which had four components: (i) governance and organization; (ii) compliance risk ethics and conduct risk; (iii) processes and activities; and (iv) resources and capabilities.  The CRM Framework included the following steps:

> •    *Establishing, maintaining and adhering to policies, standards and procedures for the management of compliance risk, in accordance with policy governance requirements*.

> •    Developing and providing training to support the effective execution of roles and responsibilities related to the identification, control, reporting and escalation of matters related to compliance risks.

> •    Independently testing and monitoring that Citi is operating within the Compliance Risk Appetite.

> •    Identifying instances of non-conformance with Laws, regulations, rules and breaches of internal policies.

280.    The 2018 Form 10-K also contained a certification by Defendant Corbat that attested to the integrity of the Company's internal controls and veracity of the Annual Report.  In addition, the Defendant certified that he had disclosed "(a) all significant deficiencies and material weaknesses in the design or operation of internal control . . . and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

281.    Additionally, on April 30, 2019, August 1, 2019, and November 1, 2019, Citigroup filed its Form 10-Q's for the first, second, and third quarters of 2019, respectively (the "2019 Form 10-Qs"). The 2019 Form 10-Qs contained a certification by Defendant Corbat that attested to the integrity of the Company's internal controls and veracity of the 2019 Form 10-Qs. In addition, the Defendant certified that he had disclosed "(a) all significant deficiencies and material weaknesses in the design or operation of internal control . . . and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

282.    The foregoing statements in Paragraphs 273 to 281 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operational, and compliance policies. Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (i) Citigroup was not in compliance with its regulators and regulatory Consent Orders entered before and throughout the Relevant Period; (ii) Citigroup had inadequate risk and compliance management and internal controls; (iii) Citigroup's risk governance framework did not meet the standards of the OCC and the Federal Reserve; (iv) Citigroup's remediation efforts were inadequate; (v) as a result of Citigroup's continued noncompliance with its regulators and regulatory Consent Orders, the Company faced further regulatory Consent Orders and penalties; and (vi) as a result of the foregoing, Defendants' statements about Citigroup's business, operational, and compliance policies were materially false and/or misleading and/or lacked a reasonable basis.

283.    On February 21, 2020, Citigroup filed its Form 10-K for the year ending December 31, 2019 ("2019 Form 10-K"). The 2019 Form 10-K was signed by Defendants Corbat, Costello,

Dailey, Desoer, Dugan, Hennes, Henry, Ireland, Jacobs, James, McQuade, Reiner, Taylor, Turley, Wright, Wynaendts, and Zedillo.

284.    The 2019 Form 10-K again repeated the claim that "For Citi, **effective risk management is of primary importance** to its overall operations," and therefore, "Citi's risk management process has been designed to monitor, evaluate and manage the principal risks it assumes in conducting its activities."

285.    The 2019 Form 10-K also repeated the false statement that Citigroup's "Company-wide risk governance framework consists of the key policies, standards, and processes through which Citi identifies, assesses, measures, monitors, and controls risks across the Company."

286.    According to the 2019 Form 10-K, Citigroup's risk management systems included "independent risk management" and "control function."  Specifically:

> Citi's Independent Risk Management (IRM) and Independent Compliance Risk Management (ICRM) together with other control functions (Finance, Human Resources, Legal) set standards that Citi and its businesses and products are required to adhere to in order to manage and oversee risks, including conformance with applicable laws, regulatory requirements, policies and other relevant standards of ethical conduct.

287.    The 2019 Form 10-K further asserted that these systems "provide credible challenge to first line units in their assessment and management of risk."

288.    The 2019 Form 10-K likewise repeated the claim that "Citigroup's Board of Directors oversees Citi's risk-taking activities and holds management accountable for adhering to the risk governance framework."  The Board purportedly carried out that responsibility by "review[ing] reports prepared by and receive presentations from management, and exercise independent judgment to question, probe and challenge recommendations of and decisions made by management."

289.    The 2019 Form 10-K further claimed that "[t]o anticipate, mitigate and control operational risk, Citi has established policies and a global framework for assessing, monitoring and communicating operational risks and the overall operating effectiveness of the internal control environment across Citigroup."

290.    It also claimed that "[t]o anticipate, control and mitigate compliance risk, Citi has established the CRM Policy to achieve standardization and centralization of methodologies and processes, and to enable more consistent and comprehensive execution of compliance risk management."

291.    Additionally, the 2019 Form 10-K described Citigroup's Compliance Risk Management policy, which had four components: "(i) governance and organization; (ii) compliance risk; (iii) processes and activities; and (iv) resources and capabilities".  The CRM policy included the following steps:

•    ***Establishing, maintaining and adhering to policies, standards and procedures for the management of compliance risk, in accordance with policy governance requirements***.

•    Developing and providing training to support the effective execution of roles and responsibilities related to the identification, control, reporting and escalation of matters related to compliance risks.

•    Independently resting and monitoring that Citi is operating within the Compliance Risk Appetite. Identifying instances of non-conformance with laws, regulations, rules and breaches of internal policies.

292.    The 2019 Form 10-K also contained a certification by Defendant Corbat that attested to the integrity of the Company's internal controls and veracity of the Annual Report. In

addition, the Defendant certified that he had disclosed "(a) all significant deficiencies and material weaknesses in the design or operation of internal control . . . and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial report."

293.    Additionally, on May 4, 2020 and August 5, 2020, Citigroup filed its Form 10-Q's for the first and second quarters of 2019, respectively (the "2020 Form 10-Qs").  The 2020 Form 10-Qs contained a certification by Defendant Corbat that attested to the integrity of the Company's internal controls and veracity of the 2020 Form 10-Qs.  In addition, the Defendant certified that he had disclosed "(a) all significant deficiencies and material weaknesses in the design or operation of internal control . . . and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

294.    Further, on July 14, 2020, Citigroup filed a Form 8-K with the SEC containing a press release announcing its financial results for the second quarter of 2020.  In the press release, CEO Corbat is quoted reassuring investors by stating: "*With a sharp emphasis on risk management, we are prepared for a variety of scenarios and will continue to operate our institution prudently given this unprecedented situation.*"

295.    The foregoing statements in Paragraphs 284 to 294 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operational, and compliance policies.  Specifically, Defendants made false and/or misleading statements and failed to disclose to investors that: (i) Citigroup was not in compliance with its regulators and regulatory Consent Orders entered before and throughout the Relevant Period; (ii) Citigroup had inadequate risk and compliance management and internal controls;  (iii) Citigroup's

remediation efforts were inadequate; (iv) as a result of Citigroup's continued noncompliance with its regulators and regulatory Consent Orders, the Company faced further regulatory Consent Orders and penalties; and (v) as a result of the foregoing, Defendants' statements about Citigroup's business, operational, and compliance policies were materially false and/or misleading and/or lacked a reasonable basis.

### C.   In Repurchasing Stock, Citigroup Relied on Defendants' False and Misleading Statements

296.   In repurchasing shares in connection with the stock repurchase program, Citigroup relied on Defendants' false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

297.   Throughout the Relevant Period, Citigroup justifiably expected Defendants to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC.  Citigroup would not have repurchased its securities at artificially inflated prices had Defendants disclosed all material information then known to them, as detailed in this Complaint.  Thus, reliance by Citigroup should be presumed with respect to Defendants' omissions of material information as established under the *Affiliated Ute* presumption of reliance.

298.   Additionally, the "fraud on the market" presumption applies to Defendants' misstatements of material fact or failures to disclose material facts.  At all relevant times, the market for Citigroup's common stock was efficient, for the following reasons, among others:

   a.   Citigroup's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.      As a regulated issuer, Citigroup filed periodic reports with the SEC and the NYSE;

c.      Citigroup's common-stock trading volume was substantial on a daily basis, averaging tens of millions of shares per day throughout the Relevant Period;

d.      Citigroup regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e.      Citigroup was followed by numerous securities analysts employed by major brokerage firms, who wrote reports that were distributed to those brokerage firms' sales force and certain customers, and each of those reports was publicly available and entered the public marketplace; and

f.      The market price of Citigroup's stock reacted rapidly to new information entering the market.

299.    As a result of the foregoing, the market for Citigroup's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Citigroup's stock.  The foregoing facts indicate the existence of an efficient market for trading of Citigroup stock and support application of the fraud-on-the-market doctrine.

300.    Citigroup relied on the integrity of the market price for the repurchase of its stock and is entitled to a presumption of reliance with respect to Defendants' misstatements and omissions alleged in this Complaint.

301.    Had Citigroup known of the material adverse information not disclosed by Defendants or been aware of the truth behind Defendants' material misstatements, the Company would not have repurchased Citigroup stock at artificially inflated prices and been damaged thereby.

**D.      Neither the Statutory "Safe Harbor" Nor the "Bespeaks Caution" Doctrines Apply to Defendants' Misrepresentations**

302.    Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor the judicially created "bespeaks caution" doctrine applicable to forward-looking statements under certain circumstances applies to any of the false or misleading statements pleaded in this Complaint.  None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Citigroup's present risk management systems and its internal controls, among other things.

303.    Alternatively, to the extent any of the false or misleading statements pleaded in this Complaint could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded in this Complaint, Defendants are liable for those false or misleading statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Citigroup or a Defendant who knew the statement was materially false or misleading when made.

E.      **Defendants' Misstatements and Omissions Damaged Citigroup**

304.    Throughout the Relevant Period, the price of Citigroup's common stock was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above.  Defendants engaged in a scheme to deceive the market and a course of conduct that operated as a fraud or deceit on Citigroup, which repurchased shares at artificially inflated prices.   When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Citigroup stock fell as the prior artificial inflation dissipated.  As a result of its purchases of Citigroup shares during the Relevant Period, the Company suffered damages under the federal securities laws.

305.    On September 11, 2020, the last trading day before news reports began to reveal the pending regulatory action against Citigroup for its ongoing failure of its risk management systems, as well as the false and misleading nature of Defendants' statements and omissions, Citigroup common stock traded at $51.00 per share.

306.    On September 14, 2020, before the market closed, *The Wall Street Journal* published an article titled "Regulators Prepare to Reprimand Citigroup for Failing to Improve Risk Systems" that reported the OCC and Federal Reserve's impending public action against Citigroup "for failing to improve its risk management systems."  The article highlighted that it was this "expected rebuke" from regulators that triggered Corbat's early retirement, and that Citigroup's management were blamed by regulators "for not giving priority to the risk-management overhaul."  Additionally, the article emphasized that "for years" regulators "pressed Citigroup and Mr. Corbat to fix the bank's risk systems," but due to the Company's continued noncompliance, it became necessary to "ratchet up the pressure" with a public sanction.  A Consent Order, the article said, would make clear that the "many tools" regulators previously used privately with Citigroup "didn't achieve the desired results."

307.    In addition, *Business Insider* also made public a company-wide internal memo from Michael Corbat dated August 10, 2020, reflecting what it described as "months of escalating tension between Citigroup and regulators over the bank's tech and risk systems."  In the memo, Corbat admitted that Citigroup experienced "execution challenges" in remediating its "controls, infrastructure, and governance."  Corbat revealed to his staff that the Company needed to "think about infrastructure and controls very differently.  We can't think of them as just something that is important to our regulators."  Citigroup, Corbat explained, needed to "change[]" its collective "mindset" and that Citigroup was now "making our risk and controls a strategic priority."  In essence, Corbat admitted to his staff—which later became public—that the Company had not put a true emphasis on achieving regulatory controls and oversight, and that only now, in August 2020, was the Company going to truly reform its past deficiencies.

308.    During a conference call also held on September 14, 2020, Citigroup's chief financial officer revealed that the Company planned on investing over $1 billion in 2020 alone to fix the deficient infrastructure and controls.  The CFO also confirmed that "fundamentally transforming our operating environment and strengthening our infrastructure risk and controls is a strategic priority of the firm."  During the call, the CFO referred to a slide presentation, which was posted to the Company's website for investors.  Those slides, titled "Barclays Global Financial Services Conference," provided on a slide titled "Risk & Control Environment is a Strategic Priority" a long list of planned "Organization Changes" that included "[n]ew governance design with centralized program management and regulatory affairs under newly created Chief Administrative Officer position," "[i]nstilling a culture of risk management across all businesses, regions and functions," "[p]roactive approach to control environment with a focus on coordination to ensure tight linkages across all areas of the company," and "[r]emediation

programs tagged to key issues and deliverables to strengthen our controls, infrastructure and governance."  Like Corbat's memo, the CFO revealed that prior to summer 2020, Citigroup had not considered internal controls a priority.

309.    In response to these disclosures, the price of Citigroup's common stock declined precipitously.  On September 14, 2020, following publication of the article, Citigroup's share price declined $2.85, closing at $48.15 per share.  On September 15, 2020, the stock price further declined $3.34, closing at $44.81 per share, a two-day decline of $6.19, or 12%, wiping out billions of dollars of market capitalization.  The stock price continued to decline in the following week, falling as low as $41.85 per share on September 23, 2020.

310.    Finally, on October 7, 2020, the OCC and Federal Reserve proceeded with their public "rebuke" of Citigroup, as described above, issuing a $400 million fine to Citigroup, as well as the October 2020 Consent Orders.  On October 13, 2020, the earnings call for the third quarter of 2020 referred to a slide presentation, titled "Third Quarter 2020 Earnings Review."  It included a slide titled "Risk & Control Environment is a Strategic Priority" that is virtually identical to the slide with the same title included in the September 14, 2020 slide presentation discussed above. These events further confirmed to the market the extent of Defendants' fraud.

### 1.    Analyst Reports Following Revelations of the Fraud Attest That it Caused a Decline in Citigroup's Share Price

311.    Credit Suisse released an equity research report on October 13, 2020 titled "Solid Results Overshadowed by the Cost of Consent Orders; TP Reduced to $65" that stated "Citi's shares were down another 5%, with underperformance evidencing frustration with Consent Orders, both the issues they cover and the related costs to remedy. Resolution will take time; sustained share price outperformance will require both clarity on the path to resolution and a clearly articulated longer term plan from incoming CEO Jane Fraser."

312.     J.P. Morgan released an equity report on October 14, 2020 titled "Mixed 3Q: Consent Orders – Board, Management, Comp Changes Needed; Further Costs Unknown" that stated the "recent surprise consent orders . . . led us to downgrade the stock and move to the sidelines," and that "in our view, Board and further senior management changes are needed given these failures" and "incentive compensation changes are needed, including clawbacks, given the comments by regulators."

313.     Barclays released an equity report on October 14, 2020 titled "3Q20 EPS Review: Uncertainty around Costs, Consent Orders Weigh" that stated that "we are lowering our 2021 estimate [of EPS] to $6.00 (-$0.75) as our EPS estimate now includes a higher expense base to compile [sic] with its Consent Orders," and that the reduced multiple of price target to estimated 2021 EPS "reflects the increased uncertainty created by its recent Consent Orders."

314.     An October 13, 2020, Wells Fargo Securities equity research report titled "C: Tale of Two Citi's" commented "We repeat that the new CEO should take over as soon as possible given a need to restructure tech, business mix, and model more aggressively, esp. given a stock that   trades only slightly more than ½ of book value."   A   month   later,   on November 10, 2020, another Wells Fargo Securities equity research report blasted the Board: "the greatest accountability starts at the board and CEO level and, on this measure, Citi has fallen far short of any other top 10 bank over almost any time period for the past two decades, in our view."

315.     The decline in Citigroup's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to the market.  The timing and magnitude of the decline in the Company's share price negates any inference that the losses suffered by Citigroup were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## VII. DEFENDANTS MAINTAINED THEIR BOARD POSITIONS AND PREVENTED APPROPRIATE USE OF THE SHAREHOLDER FRANCHISE BY ISSUING FALSE AND MISLEADING PROXY STATEMENTS AND VIOLATING SECTION 14(A) OF THE EXCHANGE ACT

316.    Defendants also violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing Citigroup to issue proxy statements that failed to disclose its seriously deficient risk management, internal controls, and regulatory compliance practices. Defendants' failure to disclose those material facts likewise constitutes a breach of their fiduciary duties.

317.    Defendants' false and misleading disclosures in the Company's annual proxy statements are particularly troubling because those statements were designed to secure Defendants' reelection to the Board. Had the Board made accurate disclosures concerning the Company's continuing compliance deficiencies, shareholders would have had the ability to vote out the Board and vote in a new one that would prioritize those efforts. By misleading stockholders into believing that the Board *was* prioritizing compliance and taking significant action to improve the Company's internal systems, Defendants were able to avoid any such vote and retain their seats without a meaningful contested election.

### A.    Defendants Caused Citigroup to Issue Materially False and Misleading Statements In the 2018 Proxy

318.    On March 14, 2018, Defendants Corbat, Costello, Dugan, Hennes, Henry, Humer, Ireland, James, McQuade, O'Neill, Reiner, Santomero, Taylor, Turley, Wright, and Zedillo caused Citigroup to issue its 2018 Annual Proxy Statement (the "2018 Proxy") in connection with the 2018 annual stockholders meeting to be held on April 24, 2018. In the 2018 Proxy Statement, these Defendants solicited stockholder votes to, among other things: (i) re-elect themselves to the Board, and (ii) approve executive compensation. With respect to each of these solicited votes, these Defendants issued materially false or misleading statements.

319.    The 2018 Proxy made numerous false or misleading statements regarding Citigroup's corporate governance and regulatory compliance, including the following, which the Company highlighted in the "Letter from the Board of Directors to Our Shareholders":

> We will continue to make investments when their expected return exceeds our cost of capital or when ***such investments improve the quality of our risk management processes***. The significant investments in digitization in both our Institutional Clients Group and Global Consumer Bank are examples of the former, and the investments in straight-through processing that will improve the accuracy and timeliness of our data gathering are an example of the latter. Machine learning, robotics, and blockchain offer potentially meaningful long-term improvements in both operating efficiencies and client satisfaction. Resources are also being devoted to these efforts which are, for the most part, in the early stages of development.
>
> For several years, Mike Corbat and the senior management team have worked hard to inculcate a culture of responsible finance into the organization. That work continues. We all believe that recruiting and nurturing a diverse workforce is both morally right and good business, and we remain committed to that effort as well.
>
> Although we are gratified by the market's recognition of management's efforts, neither management nor your directors are complacent. The economic environment seems propitious, but risks, as well as opportunities, loom large. Among other things, we continue to invest in cyber-security, given the increasing sophistication of those who would seek to disrupt our operations, and are also ***continuing to invest heavily in our Anti-Money Laundering processes***.
>
> * * *
>
> Citigroup Inc. (Citigroup, Citi, or the Company) continually strives to maintain the highest standards of ethical conduct: reporting results with accuracy and transparency and maintaining full compliance with the laws, rules, and regulations that govern Citi's businesses. ***Citi is active in ensuring its governance practices are at the leading edge of best practices***.

320.    The 2018 Proxy claimed that "the Board oversees Citi's global risk management framework."

321.    The 2018 Proxy also made the following false or misleading statements about the Board's evaluation of its own performance and nominating process:

The Nomination, Governance and Public Affairs Committee nominates one of the members of the Board to serve as Chairman of the Board on an annual basis. . . As part of the self-evaluation, the Board engages in an examination of its own performance of its obligations on such **matters as regulatory requirements, strategic and financial oversight, oversight of risk management**, executive compensation, succession planning, and governance matters, among many other topics. The committees evaluate their performance against the requirements of their charters and other aspects of their responsibilities. The full Board and each committee then discuss the results of their respective self-evaluations in executive session, highlighting actions to be taken in response to the discussion.

322.    In evaluating the composition of the Board, the Company claimed that it "seeks to find and retain individuals who…have the skills, experience and abilities necessary to meet Citi's unique needs as a highly regulated financial services company…"  The Proxy highlighted that its Board required "expertise and experience" in the following areas:

Corporate Governance

Citi aspires to the highest standards of corporate governance and ethical conduct: doing what we say, reporting results with accuracy and transparency, and maintaining compliance with the laws, rules, and regulations that govern the Company's businesses. **The Board is responsible for shaping corporate governance policies and practices, including adopting the corporate governance guidelines applicable to the Company and monitoring the Company's compliance with governance policies and the guidelines.** To carry out these responsibilities, the Board must include experienced leaders in the area of corporate governance who must be familiar with governance issues, the constituencies most interested in those issues, and the impact that governance policies have on the functioning of a company.

Legal Matters

In addition to the regulatory supervision described below, Citi is subject to myriad laws and regulations and is party to legal actions and regulatory proceedings from time to time. **Citi's Board has an important oversight function with respect to compliance with applicable requirements**, monitors the progress of legal proceedings, and evaluates major settlements. Citi's Board must include members with experience in regulatory compliance, as well as an understanding of complex litigation and litigation strategies.

Operations and Technology

Citi has a long history as a technology innovator - Citibank, N.A. was one of the first banks to offer automatic teller machines for its customers during the 1970s. Since then, Citi has continued to leverage new technologies to deliver enhanced products and services to its clients and customers such as online banking; mobile and tablet banking; and mobile check deposit. In addition, Citi deploys new technology and platform innovations to gather, process, analyze, and provide information to execute transactions and meet the needs of its clients and customers. In this context, ***Citi must be able to access reliable data to ensure that it complies with regulatory requirements including anti-money laundering and sanctions, and to meet other information security and control objectives***. Citi must ensure that its operations are efficient and there is a continuous focus on enhancing productivity to meet its operational and strategic goals. The Board must include members that have knowledge and experience in technology, including such technology-centric issues as cybersecurity, data privacy and data management, and the changing supervisory and regulatory technology landscape. Members of the Board must be qualified to provide oversight of the development and maintenance of Citi's technology platforms; Citi's compliance with regulatory requirements; Citi's operational efficiency and productivity strategies; the operations and reliability of Citi's systems; and the protection of client and customer data.

Regulatory and Compliance

Citi and its subsidiaries are regulated and supervised by numerous regulatory agencies, both domestically and internationally, including in the U.S. the Federal Reserve Board, the Office of the Comptroller of the Currency, the FDIC, the Consumer Financial Protection Bureau, and state banking and insurance departments, as well as international financial services authorities. ***Having Directors with experience interacting with regulators or operating businesses subject to extensive regulation is important to furthering Citi's continued compliance with its many regulatory requirements*** and fostering productive relationships with its regulators. Several of Citi's Board members have experience with ethics and compliance and building an effective, values-based ethics and compliance program.

Risk Management

Risk management is a critical function of a complex global financial services company and its proper supervision requires Board members with sophisticated risk management skills and experience. ***Directors provide oversight of the Company's risk management framework***, including the significant policies, procedures, and practices used in managing credit, market, and certain other risks, including liquidity, capital, and balance sheet risks, as well as capital markets risks, and review recommendations by management regarding risk mitigation. Given increased cybersecurity threats, Citi's Board must have members who have sufficient experience to enable them to oversee management's efforts to monitor, detect and prevent cyber threats to Citi. Citi's Board must include members with

risk expertise to assist Citi in its efforts to properly identify, measure, monitor, report, analyze, and control or mitigate risk.

323.    Each nominee's biography highlights his or her particular skills, qualifications, and experience that support the conclusion of the Nomination, Governance and Public Affairs Committee that the nominee is extremely qualified to serve on Citi's Board.  However, the 2018 Proxy misleadingly omitted that each director nominee identified with one of the five qualifications above was failing to implement internal controls necessary for legal and regulatory compliance, and failing to adequately manage serious enterprise risks:

> a.    Misleadingly identified with the Corporate Governance qualification were the following defendants: Dugan, Henry, O'Neill, Santomero, Taylor, and Zedillo.

> b.    Misleadingly identified with the Legal Matters qualification were the following defendants: Dugan and Humer.

> c.    Misleadingly identified with the Operations and Technology qualification were the following defendants: Costello, Ireland, James, and Reiner.

> d.    Misleadingly identified with the Regulatory and Compliance qualification were the following defendants: Corbat, Dugan, Hennes, Humer, McQuade, O'Neill, Santomero, Taylor, Turley, and Wright.

> e.    Misleadingly identified with the Risk Management qualification were the following defendants: Corbat, Dugan, Hennes, Ireland, James, McQuade, Santomero, Turley, Wright, and Zedillo.

324.    The 2018 Proxy made the following false or misleading statements in connection with the Board's role in risk oversight:

> At each regularly scheduled Board meeting, the Board receives a risk report from the Chief Risk Officer with respect to the Company's approach to management of major risks, including management's risk mitigation efforts, where appropriate.

Global Risk Management, led by the Chief Risk Officer, is a company-wide function that is responsible for an integrated effort to identify, assess, and manage risks that may affect Citi's ability to execute on its corporate strategy and fulfill its business objectives. The Board's role is to oversee this effort.

***The Risk Management Committee enhances the Board's oversight of risk management. The Committee's role is one of oversight, recognizing that management is responsible for executing Citi's risk management policies.***

325.    The 2018 Proxy made the following false or misleading statements in connection

with Citigroup's ethics programs:

Conduct and Culture

At Citi, our mission is to serve as a trusted partner to our clients by responsibly providing financial services that enable growth and economic progress.

***We foster a culture of ethics through our governance framework, programs and efforts that embed our culture and expectations for behavior throughout the organization***, and collaboration with key stakeholders outside Citi to improve Citi's and the banking industry's culture.

Governance over Conduct and Culture

The cornerstone of our approach to conduct and culture is our governance framework, which begins with a strong "tone from the top" starting with the Citigroup Board of Directors. In 2014, Citi's Board established a standing Ethics and Culture Committee of the Board to oversee senior management's ongoing efforts to foster a culture of ethics throughout Citi. The Chairman of the Citi Board is a member of the Ethics and Culture Committee. For more information, please see the Ethics and Culture Committee Charter, which is set forth on Citi's website at www.citigroup.com.

Among its first actions taken in 2014, the Ethics and Culture Committee directed Citi senior management to undertake a review of Citi's culture. Since that time, with oversight from the Ethics and Culture Committee, senior management has undertaken a number of efforts in support of Citi's culture, including developing Citi's Mission and Value Proposition and Leadership Standards. On an ongoing basis, the Ethics and Culture Committee remains responsible for overseeing senior management's efforts to reinforce and enhance a culture of ethics within Citi, including by:

- Overseeing efforts to enhance and communicate Citi's Mission and Value Proposition, evaluating management's progress, and providing feedback on these efforts;

- Reviewing and assessing Citi's culture to determine if further enhancements are needed to foster ethical decision-making by employees and overseeing efforts to support ethical decision-making by employees;
- Reviewing Citi's Code of Conduct and Code of Ethics for Financial Professionals; and
- Reviewing Citi's Conduct Risk Program

\* \* \*

<u>Code of Ethics for Financial Professionals</u>

The Citi Code of Ethics for Financial Professionals applies to Citi's Chief Executive Officer (Principal Executive Officer), Chief Financial Officer (Principal Financial Officer), Controller (Principal Accounting Officer), and all finance professionals and administrative staff in a finance role, including Controllers, CSS Finance & Risk Operations, Financial Planning & Analysis, Treasury, Tax, Strategy and M&A, Investor Relations, and the Regional/Business teams. Citi expects all of its employees to act in accordance with the highest standards of personal and professional integrity in all aspects of their activities, to comply with all applicable laws, rules, and regulations, to deter wrongdoing, and abide by the Citi Code of Conduct and other policies and procedures adopted by Citi that govern the conduct of its employees. The Code of Ethics is intended to supplement the Citi Code of Conduct.

326.     In addition, the 2018 Proxy incorporated by reference Citigroup's Code of Conduct, Risk Management Committee Charter, and ESG report.  In those documents, Citi group touted, among other things, the strength of its internal controls, risk management oversight, and compliance.  Specifically, the Code of Conduct stated, "We maintain processes and controls to govern the use, transmission, sharing, storage, disclosure, transfer, security, accuracy, and access to client and employee information globally."  Similarly, the Charter stated that Citigroup's Risk Management Committee purported to provide "oversight of Citigroup's risk management framework, including the significant policies and practices used in managing credit, market, operational and certain other risks," among other oversight functions.  Additionally, the ESG report stated "Through an integrated compliance risk management framework, this group protects Citi by setting standards; providing guidance, training and advice to our businesses regarding

compliance risk; and driving ownership and accountability for managing compliance risk in accordance with Citi standards across the firm."

327.    Those statements conveyed that the Board (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing undisclosed material legal and compliance risks that could affect the Company; and (iii) had policies to implement adequate internal controls.

328.    The 2018 Proxy omitted any disclosures regarding (i) Citigroup's ineffective internal and regulatory compliance controls and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013. The 2018 Proxy also omitted any disclosures reflecting or acknowledging that defendants failed to take appropriate steps to address the inadequate internal controls, even after years of red flags alerting them to the improper behavior.

329.    The 2018 Proxy harmed Citigroup by interfering with proper governance on its behalf that follows stockholders' informed voting of directors. As a result of the false or misleading statements in the 2018 Proxy, Citigroup stockholders voted to re-elect Defendants Corbat, Costello, Dugan, Hennes, Henry, Humer, Ireland, James, McQuade, O'Neill, Reiner, Santomero, Taylor, Turley, Wright, and Zedillo to the Board.

330.    The 2018 Proxy also harmed Citigroup by obtaining shareholder approval of the Citigroup 2018 Stock Incentive Plan which resulted in millions of dollars in equity compensation paid to wrongdoers.  As a result of the false or misleading statements in the 2018 Proxy, Citigroup stockholders voted to approve 2018 Stock Incentive Plan.

**B.**     **Defendants Caused Citigroup to Issue Materially False and Misleading Statements In the 2019 Proxy**

331.    On March 6, 2019, Defendants Corbat, Costello, Dugan, Hennes, Henry, Humer, Ireland, Jacobs, James, McQuade, Reiner, Santomero, Taylor, Turley, Wright, and Zedillo caused Citigroup to issue its 2019 Annual Proxy Statement (the "2019 Proxy") in connection with the 2019 annual stockholders meeting to be held on April 16, 2019.  In the 2019 Proxy Statement, these Defendants solicited stockholder votes to, among other things: (i) re-elect all of the current directors to the Board except for Humer and Santomero, and (ii) approve executive compensation. With respect to each of these solicited votes, these Defendants issued materially false or misleading statements.

332.    The 2019 Proxy made numerous false or misleading statements regarding Citigroup's corporate governance and regulatory compliance, including the following, which the Company highlighted in the "Letter from the Board of Directors to Our Shareholders":

> ***Management also made progress on the regulatory front last year, which we believe is critical to the firm's success***. Citi again achieved a successful result in the Federal Reserve's annual Comprehensive Capital Analysis and Review (CCAR) stress test, enabling the return of over $18 billion of capital to common shareholders during the calendar year, while maintaining levels of regulatory capital well in excess of minimum requirements. In addition, Citi made headway on a range of heightened regulatory requirements that all large banks have faced in the wake of the financial crisis. Nevertheless, your Board will continue to pay close attention to – and expect management to make continued progress on – regulatory matters in 2019 and beyond.

> As it should be for a global firm like Citi, ***prudent risk management was top of mind for both management and the Board in 2018***. Our three lines of defense – the business lines, the control functions, and internal audit – dove deeply and, where necessary, ***took proactive steps in critical risk areas*** such as Brexit, the potential fall-out from trade wars, evolving industry underwriting standards in leveraged lending, and the potential turn of the credit cycle. Cyber risk remains a crucial priority, and the firm has invested heavily to maintain state-of-the-art defenses and cyber resilience. ***The Board and our Risk Committee engage deeply in the oversight of risk management practices in these and other areas, always recognizing that, while Citi is in the business of taking risk, these risks must be understood, measured, monitored, and controlled***.

Much has been written about the ethical lapses that have damaged the reputation of the banking industry, including Citi, both during and after the financial crisis. We continue to believe that strong ethical standards and practices are critically important, which is why Citi, alone in the banking industry, maintains an Ethics and Culture Committee of the Board as one means to keep management striving to achieve best practices – not just at senior levels but throughout the organization.

\* \* \*

Citigroup Inc. (Citigroup, Citi, or the Company) continually strives to maintain the highest standards of ethical conduct: reporting results with accuracy and transparency and maintaining full compliance with the laws, rules, and regulations that govern Citi's businesses. ***Citi is active in ensuring its governance practices are at the leading edge of best practices***.

333.    The 2019 Proxy also made the following false or misleading statements about the

Board's evaluation of its own performance and nominating process:

Evaluation of Board Performance

The Nomination, Governance and Public Affairs Committee nominates one of the members of the Board to serve as Chair of the Board on an annual basis. The Nomination, Governance and Public Affairs Committee also conducts an annual review of Board performance in which the full Board participates, and each standing committee (except for the Executive Committee) conducts its own self-evaluation. As part of the self-evaluation, the Board engages in an examination of its own performance of its obligations with regards to such matters as ***regulatory requirements, strategic and financial oversight, oversight of risk management***, executive compensation, succession planning, and governance matters, among many other topics. The committees evaluate their performance against the requirements of their charters and other aspects of their responsibilities. The full Board and each committee then discuss the results of their respective self-evaluations in executive session, highlighting actions to be taken in response to the discussion.

334.    In evaluating the composition of the Board, the Proxy claimed that the Company

"seeks to find and retain individuals who…have the skills, experience and abilities necessary to

meet Citi's unique needs as a highly regulated financial services company…"  The Proxy

highlighted that its Board required "expertise and experience" in the following areas:

Corporate Governance

Citi aspires to the highest standards of corporate governance and ethical conduct: doing what we say, reporting results with accuracy and transparency, and maintaining compliance with the laws, rules, and regulations that govern the Company's businesses. The Board is responsible for shaping corporate governance policies and practices, including adopting the corporate governance guidelines applicable to the Company and monitoring the Company's compliance with governance policies and the guidelines. To carry out these responsibilities, the Board must include experienced leaders in the area of corporate governance who must be familiar with governance issues, the constituencies most interested in those issues, and the impact that governance policies have on the functioning of a company.

Legal Matters

In addition to the regulatory supervision described below, Citi is subject to myriad laws and regulations and is party to legal actions and regulatory proceedings from time to time. ***Citi's Board has an important oversight function with respect to compliance*** with applicable requirements, monitors the progress of legal proceedings, and evaluates major settlements. Citi's Board must include members with experience in regulatory compliance, as well as an understanding of complex litigation and litigation strategies.

Operations and Technology

Citi has a long history as a technology innovator—Citibank, N.A. was one of the first banks to offer automatic teller machines for its customers during the 1970s. Since then, Citi has continued to leverage new technologies to deliver enhanced products and services to its clients and customers such as online banking, mobile and tablet banking, and mobile check deposit. In addition, Citi deploys new technology and platform innovations to gather, process, analyze, and provide information to execute transactions and meet the needs of its clients and customers. In this context, ***Citi must be able to access reliable data to ensure that it complies with regulatory requirements, including anti-money laundering and sanctions, and to meet other information security and control objectives***. Citi must ensure that its operations are efficient and there is a continuous focus on enhancing productivity to meet its operational and strategic goals. The Board must include members who have knowledge and experience in technology, including such technology-centric issues as cybersecurity, data privacy and data management, and the changing supervisory and regulatory technology landscape. Members of the Board must be qualified to provide oversight of the development and maintenance of Citi's technology platforms; Citi's compliance with regulatory requirements; Citi's operational efficiency and productivity strategies; the operations and reliability of Citi's systems; and the protection of client and customer data.

<u>Regulatory and Compliance</u>

Citi and its subsidiaries are regulated and supervised by numerous regulatory agencies, both domestically and internationally, including in the U.S. the Federal Reserve Board, the Office of the Comptroller of the Currency, the FDIC, the Consumer Financial Protection Bureau, and state banking and insurance departments, as well as international financial services authorities. ***Having Directors with experience interacting with regulators or operating businesses subject to extensive regulation is important to furthering Citi's continued compliance with its many regulatory requirements*** and fostering productive relationships with its regulators. Several of Citi's Board members have experience with ethics and compliance and building an effective, values-based ethics and compliance program.

<u>Risk Management</u>

Risk management is a critical function of a complex global financial services company and its proper supervision requires Board members with sophisticated risk management skills and experience. ***Directors provide oversight of the Company's risk management framewor***k, including the significant policies, procedures, and practices used in managing credit, market, and certain other risks, including liquidity, capital, and balance sheet risks, as well as capital markets risks, and review recommendations by management regarding risk mitigation. Given increased cybersecurity threats, Citi's Board must have members who have sufficient experience to enable them to oversee management's efforts to monitor, detect and prevent cyber threats to Citi. Citi's Board must include members with risk expertise to assist Citi in its efforts to properly identify, measure, monitor, report, analyze, and control or mitigate risk.

335.    Each nominee's biography highlights his or her particular skills, qualifications, and experience that support the conclusion of the Nomination, Governance and Public Affairs Committee that the nominee is extremely qualified to serve on Citi's Board.  However, the 2019 Proxy misleadingly omitted that each director nominee identified with one of the five qualifications above was failing to implement internal controls necessary for legal and regulatory compliance, and failing to adequately manage serious enterprise risks:

a.    Misleadingly identified with the Corporate Governance qualification were the following defendants: Dugan, Henry, Taylor, and Zedillo.

     b.     Misleadingly identified with the Legal Matters qualification were the following defendants: Dugan.

     c.     Misleadingly identified with the Operations and Technology qualification were the following defendants: Costello, Desoer, Ireland, James, and Reiner.

     d.     Misleadingly identified with the Regulatory and Compliance qualification were the following defendants: Corbat, Desoer, Dugan, Hennes, McQuade, Taylor, Turley, and Wright.

     e.     Misleadingly identified with the Risk Management qualification were the following defendants: Corbat, Costello, Desoer, Dugan, Hennes, Ireland, Jacobs, James, McQuade, Turley, Wright, and Zedillo.

336.    The 2019 Proxy Statement made the following false or misleading statements in connection with the Board's role in risk oversight:

> At each regularly scheduled Board meeting, the Board receives a risk report from the Chief Risk Officer with respect to the Company's approach to management of major risks, including management's risk mitigation efforts, where appropriate. Global Risk Management, led by the Chief Risk Officer, is a company-wide function that is responsible for an integrated effort to identify, assess, and manage risks that may affect Citi's ability to execute on its corporate strategy and fulfill its business objectives. The Board's role is to oversee this effort.
>
> ***The Risk Management Committee enhances the Board's oversight of risk management. The Committee's role is one of oversight, recognizing that management is responsible for executing Citi's risk management policies***.

337.    The 2019 Proxy Statement made the following false or misleading statements in connection with Citigroup's ethics programs:

> <u>Ethics and Culture</u>
>
> At Citi, our mission is to serve as a trusted partner to our clients by responsibly providing financial services that enable growth and economic progress.
>
> ***We foster a culture of ethics through our governance framework, programs and***

*efforts that embed our culture and expectations for behavior throughout the organization*, and collaboration with key stakeholders outside Citi to improve Citi's and the banking industry's culture.

Governance over Culture

The cornerstone of our approach to culture is our governance framework, which begins with a strong "tone from the top" starting with the Citigroup Board of Directors. In 2014, Citi's Board established a standing Ethics and Culture Committee of the Board to oversee senior management's ongoing efforts to foster a culture of ethics throughout Citi. For more information, please see the Ethics and Culture Committee Charter, which is set forth on Citi's website at www.citigroup.com.

With oversight from the *Ethics and Culture Committee, senior management has undertaken a number of efforts in support of Citi's culture*, including developing Citi's Mission and Value Proposition and Leadership Standards. On an ongoing basis, the Ethics and Culture Committee remains responsible for overseeing senior management's efforts to reinforce and enhance a culture of ethics within Citi, which includes:

- Overseeing efforts to enhance and communicate Citi's Mission and Value Proposition, evaluating management's progress, and providing feedback on these efforts;
- Reviewing and assessing Citi's culture to determine if further enhancements are needed to foster ethical decision-making by employees and overseeing efforts to support ethical decision-making by employees; and
- Reviewing Citi's Code of Conduct and Code of Ethics for Financial Professionals.

* * *

Code of Ethics for Financial Professionals

The Citi Code of Ethics for Financial Professionals applies to Citi's Chief Executive Officer (Principal Executive Officer), Chief Financial Officer (Principal Financial Officer), Controller (Principal Accounting Officer), and all finance professionals and administrative staff in a finance role, including Controllers, Finance & Risk Shared Services, Finance and Risk Infrastructure, Financial Planning & Analysis and Strategy, Treasury, Tax, M&A, Investor Relations, and the Regional/Business teams. Citi expects all of its employees to act in accordance with the highest standards of personal and professional integrity in all aspects of their activities, to comply with all applicable laws, rules, and regulations, to deter wrongdoing, and abide by the Citi Code of Conduct and other policies and procedures adopted by Citi that govern the conduct of its employees. The Code of

Ethics for Financial Professionals is intended to supplement the Citi Code of Conduct.

338.    In addition, the 2019 Proxy incorporated by reference Citigroup's Code of Conduct, Citi's Risk Management Charter, and Citi's ESG report.  In those documents, Citigroup touted, among other things, the strength of its internal controls, risk management oversight, and compliance.  Specifically, the Code of Conduct stated, "We maintain processes and controls to govern the use, transmission, sharing, storage, disclosure, transfer, security, accuracy, and access to client and employee information globally."  Similarly, the Charter stated that Citigroup's Risk Management Committee purported to provide "oversight of Citigroup's risk management framework, including the significant policies and practices used in managing credit, market, operational and certain other risks," among other oversight functions.  Additionally, the ESG report stated "Through an integrated compliance risk management framework, this group protects Citi by setting standards; providing guidance, training and advice to our businesses regarding compliance risk; and driving ownership and accountability for managing compliance risk in accordance with Citi standards across the firm."

339.    Those statements conveyed that the Board (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing undisclosed material legal and compliance risks that could affect the Company; and (iii) had policies to implement adequate internal controls.

340.    The 2019 Proxy omitted any disclosures regarding (i) Citigroup's ineffective internal and regulatory compliance controls and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013. The 2019 Proxy also omitted any disclosures reflecting or acknowledging that defendants failed

to take appropriate steps to address the inadequate internal controls, even after years of red flags alerting them to the improper behavior.

341.    The 2019 Proxy harmed Citigroup by interfering with proper governance on its behalf that follows stockholders' informed voting of directors.  As a result of the false or misleading statements in the 2019 Proxy, Citigroup stockholders voted to re-elect Defendants Corbat, Costello, Desoer, Dugan, Hennes, Henry, Ireland, Jacobs, James, McQuade, Reiner, Taylor, Turley, Wright, and Zedillo to the Board.

342.    The 2019 Proxy also harmed Citigroup by obtaining shareholder approval of the Citigroup 2019 Stock Incentive Plan which resulted in millions of dollars in equity compensation paid to wrongdoers.  As a result of the false or misleading statements in the 2019 Proxy, Citigroup stockholders voted to approve 2019 Stock Incentive Plan.

**C.    Defendants Caused Citigroup to Issue Materially False and Misleading Statements in the 2020 Proxy**

343.    On March 11, 2020, Defendants Corbat, Costello, Dailey, Desoer, Dugan, Hennes, Henry, Ireland, Jacobs, James, McQuade, Reiner, Taylor, Turley, Wright, Wynaendts, and Zedillo caused Citigroup to issue its 2020 Annual Proxy Statement (the "2020 Proxy") in connection with the 2020 annual stockholders meeting to be held on April 21, 2020.  In the 2020 Proxy Statement, these Defendants solicited stockholder votes to, among other things: (i) re-elect all of the current directors to the Board except for McQuade, and (ii) approve executive compensation.  With respect to each of these solicited votes, these Defendants issued materially false or misleading statements.

344.    The 2020 Proxy made numerous false or misleading statements regarding Citigroup's corporate governance and regulatory compliance, including the following, which the Company highlighted in the "Letter from the Board of Directors to Our Shareholders":

With respect to regulatory matters, Citi again achieved a successful result in the Federal Reserve's annual Comprehensive Capital Analysis and Review (CCAR), resulting in a return of capital to common shareholders of $22.3 billion during the calendar year, while maintaining levels of capital and liquidity well in excess of minimum requirements. In addition, the Federal Reserve and the Federal Deposit Insurance Corporation once again determined that the company's Resolution Plan had no deficiencies, although we did receive one shortcoming, as did several other large banks, related to governance mechanisms. More broadly, the **Board remains deeply focused on Citi making substantial progress towards the termination of outstanding enforcement orders and on other remediation projects**, recognizing and expecting that this progress will continue to require a substantial commitment of time and resources by both management and the Board.

\* \* \*

Citigroup Inc. (Citigroup, Citi, or the Company) continually strives to maintain the highest standards of ethical conduct: reporting results with accuracy and transparency and maintaining full compliance with the laws, rules, and regulations that govern Citi's businesses. **Citi is active in ensuring its governance practices are at the leading edge of best practices**.

345.    The 2020 Proxy also made the following false or misleading statements in connection with the Board's evaluation of its own performance and nominating process:

The Nomination, Governance and Public Affairs Committee conducts an annual review of Board performance in which the full Board participates, and each standing committee (except for the Executive Committee) conducts its own self-evaluation. As part of the self-evaluation, the Board engages in an examination of its own performance of its obligations with regard to **such matters as regulatory requirements, strategic and financial oversight, oversight of risk management**, executive compensation, succession planning, and governance, among many other topics. The committees evaluate their performance against the requirements of their charters and other aspects of their responsibilities. The full Board and each committee then discuss the results of their respective self-evaluations in executive session, highlighting actions to be taken in response to the discussion.

346.    In particular, the 2020 Proxy identifies twelve specific areas of "expertise and experience" that Citigroup determined are "critically important to Citi's proper operation and success" and which director nominees should possess to enable Citigroup to meet its "unique needs as a highly regulated financial services company."  The 2020 Proxy identified each of the twelve areas of expertise and experience with a particular heading, which, the Proxy claimed,

appear in the biographies of director nominees possessing that particular category of expertise and experience. Of particular relevance are the following qualifications:

Corporate Governance

Citi aspires to the highest standards of corporate governance and ethical conduct: doing what we say, reporting results with accuracy and transparency, and maintaining compliance with the laws, rules, and regulations that govern the Company's businesses. The Board is responsible for shaping corporate governance policies and practices, including adopting the corporate governance guidelines applicable to the Company and monitoring the Company's compliance with governance policies and the guidelines. To carry out these responsibilities, the Board must include experienced leaders in the area of corporate governance who must be familiar with governance issues, the constituencies most interested in those issues, and the impact that governance policies have on the functioning of a company.

Legal Matters

In addition to the regulatory supervision described below, Citi is subject to myriad laws and regulations and is party to legal actions and regulatory proceedings from time to time. ***Citi's Board has an important oversight function with respect to compliance with applicable requirements***, monitors the progress of legal proceedings, and evaluates major settlements. Citi's Board must include members with experience in regulatory compliance, as well as an understanding of complex litigation and litigation strategies.

Operations and Technology

Citi has a long history as a technology innovator—Citibank, N.A. was one of the first banks to offer automatic teller machines for its customers during the 1970s. Since then, Citi has continued to leverage new technologies to deliver enhanced products and services to its clients and customers such as online banking, mobile and tablet banking, and mobile check deposit. In addition, Citi deploys new technology and platform innovations to gather, process, analyze, and provide information to execute transactions and meet the needs of its clients and customers. In this context, ***Citi must be able to access reliable data to ensure that it complies with regulatory requirements, including anti-money laundering and sanctions, and to meet other information security and control objectives***. Citi must ensure that its operations are efficient and there is a continuous focus on enhancing productivity to meet its operational and strategic goals. The Board must include members who have knowledge and experience in technology, including such technology-centric issues as cybersecurity, data privacy and data management, and the changing supervisory and regulatory technology landscape. Members of the Board must be qualified to provide oversight of the development and maintenance

of Citi's technology platforms; Citi's compliance with regulatory requirements; Citi's operational efficiency and productivity strategies; the operations and reliability of Citi's systems; and the protection of client and customer data.

<u>Regulatory and Compliance</u>

Citi and its subsidiaries are regulated and supervised by numerous regulatory agencies, both domestically and internationally, including in the U.S. the Federal Reserve Board, the Office of the Comptroller of the Currency, the FDIC, the Consumer Financial Protection Bureau, and state banking and insurance departments, as well as international financial services authorities. ***Having Directors with experience interacting with regulators or operating businesses subject to extensive regulation is important to furthering Citi's continued compliance with its many regulatory requirements*** and fostering productive relationships with its regulators. Given the critical importance of ethics, conduct and culture, Citi's Board must include members with experience overseeing ethics and compliance and building an effective, values-based ethics and compliance program.

<u>Risk Management</u>

Risk management is a critical function of a complex global financial services company and its proper supervision requires Board members with sophisticated risk management skills and experience. ***Directors provide oversight of the Company's risk management framework***, including the significant policies, procedures, and practices used in managing credit, market, and certain other risks, including liquidity, capital, and balance sheet risks, as well as capital markets risks, and review recommendations by management regarding risk mitigation. Given increased cybersecurity threats, Citi's Board must have members who have sufficient experience to enable them to oversee management's efforts to monitor, detect and prevent cyber threats to Citi. Citi's Board must include members with risk expertise to assist Citi in its efforts to properly identify, measure, monitor, report, analyze, and control or mitigate risk.

347.   Each nominee's biography highlights his or her particular skills, qualifications, and experience that support the conclusion that the nominee is extremely qualified to serve on Citi's Board. However, the 2020 Proxy misleadingly omitted that each director nominee identified as having one of the five qualifications was failing to implement internal controls necessary for legal and regulatory compliance, and failing to adequately manage serious enterprise risks:

a.      Misleadingly identified with the Corporate Governance qualification were the following defendants: Dugan, Henry, Taylor, and Zedillo.

b.      Misleadingly identified with the Legal Matters qualification were the following defendants: Dugan.

c.      Misleadingly identified with the Operations and Technology qualification were the following defendants: Ireland, James, and Reiner.

d.      Misleadingly identified with the Regulatory and Compliance qualification were the following defendants: Corbat, Dailey, Desoer, Dugan, Hennes, Ireland, Taylor, Turley, Wright, and Wynaendts.

e.      Misleadingly identified with the Risk Management qualification were the following defendants: Costello, Dailey, Desoer, Dugan, Hennes, Ireland, James, Turley, Wright, Wynaendts, and Zedillo.

348.    The 2020 Proxy made the following false or misleading statements in connection with the Board's role in risk oversight:

> At each regularly scheduled Board meeting, the Board receives a risk report from the Chief Risk Officer with respect to the Company's approach to management of major risks, including management's risk mitigation efforts, where appropriate. Independent Risk Management, led by the Chief Risk Officer, is a company-wide function that is responsible for an integrated effort to set standards and actively manage and oversee aggregate risks that may affect Citi's ability to execute on its corporate strategy and fulfill its business objectives. The Board's role is to oversee this effort.
>
> ***The Risk Management Committee enhances the Board's oversight of risk management. The Committee's role is one of oversight, recognizing that management is responsible for executing Citi's risk management policies***.

349.    The 2020 Proxy made the following false or misleading statements in connection with Citigroup's ethics programs:

Ethics and Culture

At Citi, our mission is to serve as a trusted partner to our clients by responsibly providing financial services that enable growth and economic progress.

***We foster a culture of ethics through our governance framework, programs and efforts that embed our culture and expectations for behavior throughout the organization***, and collaboration with key stakeholders outside Citi to improve Citi's and the banking industry's culture.

Governance over Culture

The cornerstone of our approach to culture is our governance framework, which begins with a strong "tone from the top" starting with the Citigroup Board of Directors. In 2014, Citi's Board established a standing Ethics, Conduct and Culture Committee of the Board to oversee senior management's ongoing efforts to foster a culture of ethics throughout Citi. For more information, please see the Ethics, Conduct and Culture Committee Charter, which is set forth on Citi's website at www.citigroup.com.

With oversight from the Ethics, Conduct and Culture Committee, senior management has undertaken a number of efforts in support of Citi's culture, including developing Citi's Mission and Value Proposition and Leadership Standards. On an ongoing basis, the Ethics, Conduct and Culture Committee remains responsible for overseeing senior management's efforts to reinforce and enhance a culture of ethics within Citi, which includes:

- Overseeing efforts to enhance and communicate Citi's Mission and Value Proposition, evaluating management's progress, and providing feedback on these efforts;
- Overseeing management's efforts to support ethical decision-making in the organization, evaluating management's progress and providing feedback on these efforts; and
- Reviewing Citi's Code of Conduct and Code of Ethics for Financial Professionals.

\* \* \*

Code of Ethics for Financial Professionals

The Citi Code of Ethics for Financial Professionals applies to Citi's Chief Executive Officer (Principal Executive Officer), Chief Financial Officer (Principal Financial Officer) and Controller (Principal Accounting Officer) and all Finance Professionals and Administrative Staff in a finance role, including but not limited to Controllers, Finance & Risk Shared Services (FRSS), Capital Planning, Financial Planning & Analysis, Productivity and Strategy, Treasury, Tax, M&A,

Investor Relations, and the Regional/Business teams. Citi expects all of its employees to act in accordance with the highest standards of personal and professional integrity in all aspects of their activities, to comply with all applicable laws, rules, and regulations, to deter wrongdoing, and abide by the Citi Code of Conduct and other policies and procedures adopted by Citi that govern the conduct of its employees. The Code of Ethics for Financial Professionals is intended to supplement the Citi Code of Conduct.

350.    In addition, the 2020 Proxy incorporated by reference Citigroup's Code of Conduct, Risk Management Charter, and ESG report. In those documents, Citigroup touted, among other things, the strength of its internal controls, risk management oversight, and compliance.  Specifically, the Code of Conduct stated, "We maintain processes and controls to govern the use, transmission, sharing, storage, disclosure, transfer, security, accuracy, and access to client and employee information globally."  Similarly, the Charter stated that Citigroup's Risk Management Committee purported to provide "oversight of Citigroup's risk management framework, including the significant policies and practices used in managing credit, market, operational and certain other risks," among other oversight functions.  Additionally, the ESG report stated "Through an integrated compliance risk management framework, this group protects Citi by setting standards; providing guidance, training and advice to our businesses regarding compliance risk; and driving ownership and accountability for managing compliance risk in accordance with Citi standards across the firm."

351.    The foregoing statements conveyed that the Board (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing undisclosed material compliance and regulatory risks that could affect the Company; and (iii) had policies to implement adequate internal controls.

352.    The 2020 Proxy omitted any disclosures regarding (i) Citigroup's ineffective internal and disclosure controls and (ii) the Board's failure to comply with commitments it had

made to federal regulators to resolve enforcement proceedings since 2013.  The 2020 Proxy also omitted any disclosures reflecting or acknowledging that Defendants failed to take appropriate steps to address the inadequate internal controls, even after years of red flags alerting them to the improper behavior.

353.    The 2020 Proxy harmed Citigroup by interfering with proper governance on its behalf that would have occurred had stockholders been informed when voting for directors.  As a result of the false or misleading statements in the 2020 Proxy, Citigroup stockholders voted to re-elect Defendants Corbat, Costello, Dailey, Desoer, Dugan, Hennes, Henry, Ireland, Jacobs, James, Reiner, Taylor, Turley, Wright, Wynaendts, and Zedillo to the Board.

354.    The 2020 Proxy also harmed Citigroup by obtaining shareholder approval of the amendment to Citigroup 2019 Stock Incentive Plan which resulted in Citigroup increasing the number of shares authorized for grants under the plan by 15 million.  As a result of the false or misleading statements in the 2020 Proxy, Citigroup stockholders voted to approve the amendment.

## VIII.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

355.    Plaintiffs are current owners of Citigroup common stock and were owners of Citigroup common stock at all relevant times, including throughout the entire Relevant Period.

356.    Citigroup is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

357.    Plaintiffs bring this action derivatively to redress injuries suffered, and to be suffered, by the Company as a result of Defendants' breaches of fiduciary duty, unjust enrichment, and violations of §§ 10(b) and 14(a) of the Securities Exchange Act of 1934 and Rules 10b-5 and 14a-9.  Plaintiffs will adequately and fairly represent the interests of Citigroup

in enforcing and prosecuting its rights.  Prosecution of this action, independent of the Citigroup Board, is in the best interests of the Company.

358.   Demand on the Demand Board Defendants at the time this suit was filed would have been futile because the facts alleged herein create a reasonable doubt that the Demand Board Defendants could have properly exercised their independent and disinterested business judgment in response to a demand to take the action requested in this Complaint.  The Demand Board Defendants face a substantial likelihood of liability, as alleged in detail below, that renders them personally interested in the outcome of the decision whether to pursue the claims asserted in this Complaint and therefore not disinterested or independent.

359.   The Citigroup Board's personal liability cannot be exculpated for: (i) any non-monetary liability; (ii) monetary liability for breaches of the duty of loyalty; (iii) monetary liability for acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law; or (iv) monetary liability in connection with any transaction from which they derived an improper personal benefit. As detailed in this Complaint, the Defendants' misconduct: (i) involved breaches of the duty of loyalty; and/or (ii) involved acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law. Citigroup's exculpatory provision therefore cannot immunize the Defendants from liability for that misconduct.

360.   The Demand Board Defendants cannot exercise independent and disinterested business judgment in response to a demand because they are obligated to repay any expenses incurred in defending this suit advanced by Citigroup if it is ultimately determined that such Defendant is not entitled to indemnification. Pursuant to the By-laws of Citigroup Inc., as amended and effective December 18, 2019, Article IV—Directors—Section 4 states in part as

follows: "The Company shall advance expenses incurred in defending a civil or criminal action, suit or proceeding to any such director, officer or employee upon receipt of an undertaking by or on behalf of the director, officer or employee to repay such amount, if it shall ultimately be determined that such person is not entitled to indemnification by the Company."

361.    The Citigroup Board, at the time of the filing of this action, consists of seventeen of the twelve Defendants named in this action: Defendants Corbat, Costello, Dailey, Desoer, Dugan, Fraser, Hennes, Henry, Ireland, Jacobs, James, Reiner, Taylor, Turley, Wright, Wynaendts, and Zedillo.

362.    A twelve-member majority of the current seventeen-member Board has served on the Board throughout the entire Relevant Period: Defendants Corbat, Costello, Dugan, Hennes, Henry, Ireland, James, Reiner, Taylor, Turley, Wright, and Zedillo. The remaining directors—Dailey, Desoer, Fraser, Jacobs, and Wynaendts—each served on the Board during the Relevant Period. Further, Defendants Corbat, Desoer, and Fraser hold or held senior executive positions, with fiduciary duties substantially the same as those of corporate directors, during the Relevant Period—Corbat as CEO of Citigroup, Desoer as CEO of Citibank, and Fraser as President of Citigroup and CEO of Citigroup's Global Consumer Banking division. All three of them have served on Citigroup's Operating Committee since at least 2013. Pursuant to the Citigroup Inc. Corporate Governance Guidelines dated as of January 16, 2020, the Board's Director Independence Standards provide that a Director qualifies as independent for purposes of service on the Board of Citigroup and its Committees if the Board has determined that the Director has no material relationship with Citigroup, either directly or as an officer, partner, or employee of an organization that has a relationship with Citigroup. Therefore, Defendants Corbat, Desoer, and Fraser are not independent pursuant to Citigroup's Director Independence Standards.

363.    As alleged above, Defendants—including the Demand Board Defendants—breached their fiduciary duties of loyalty and good faith by, *inter alia*, consciously disregarding their duties to oversee the Company's reform of its internal controls and risk-management systems and to monitor and ensure the Company's legal and regulatory compliance.   Moreover, Defendants—including the Demand Board Defendants—breached their fiduciary duties of loyalty, good faith, and candor and violated federal securities laws by making or approving false and misleading public statements concerning the state of the Company's compliance with relevant laws and regulations.

364.    Federal regulators' findings that the Company failed to implement and maintain internal controls and compliance systems of the appropriate scope, and the Company's admission that the Board has barely even begun the analysis phase of a total systems revamp, demonstrate that the Board utterly failed during the Relevant Period to ensure that the Company had a reasonable information and reporting system.   These facts also demonstrate that the Board disregarded their duty to seriously address the Company's mission critical failures of risk management, internal controls, and data governance and thereby exhibited a sustained and systematic failure to exercise appropriate oversight.

365.    These failures constitute an even more egregious breach of fiduciary duty for the members of the Citibank Board by virtue of their heightened duties as directors of the Bank. Indeed, although the board memberships of Citigroup and Citibank may legally overlap, the Comptrollers Handbook warns that instances where "directors serve on both the holding company board and the bank board" can "create conflicts of interest or force directors to act on competing priorities."   And in such instances, the "bank's board should ensure the interests of the bank are not subordinate to the interests of the parent holding company in decisions that may adversely

affect the bank's risk profile, financial condition, safety and soundness, and compliance with laws and regulations."

366.    The following chart shows the Defendants who executed the OCC Consent Orders on Citibank's behalf (designated with a "B" for Citibank board member), authorized Citigroup's entry into the Cease and Desist and Consent Orders with the Federal Reserve or served on Citigroup's Board at the time Citibank and other subsidiaries entered into agreements with regulators (designated with a "G" for Citigroup board member), as well as the Defendants who knew of the Cease and Desist and Consent Orders with the Federal Reserve and OCC and were responsible for implementing their requirements as senior management of Citibank and/or Citigroup and/or members of Citigroup's Operating Committee (designated with an "M" for management):

| | OCC 04-05-2012 | Federal Reserve 03-21-2013 | OCC 11-11-2014 | Federal Reserve 05-20-2015 | FDIC & CDBO 07/22/2015 | CFTC 05/25/2016 | SEC 01/26/2017 | DOJ 05/18/2017 | OCC 12-27-2017 | OCC 03-19-2019 | OCC 10-11-2019 | OCC 01-17-2020 | OCC 10-07-2020 | Federal Reserve 10-07-2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Corbat** | | G/M | G/M | G/M | G/M | G/M | G/M | G/M | G/M | G/M | G/M | G/M | B/M | G/M |
| **Costello** | | | | | | G | G | G | B | B | B | B | B | G |
| **Dailey** | | | | | | | | | | | G | G | G | G |
| **Desoer** | | M | B/M | M | M | M | M | M | B/M | B/M | B/M | B/M | B/M | G/M |
| **Dugan** | | | | | | | | | G | G | G | G | G | G |
| **Fraser** | M | M | M | M | M | M | M | M | M | M | M | M | M | G/M |
| **Hennes** | | | B | G | G | G | G | G | B | B | B | B | B | G |
| **Henry** | | | | [G*] | G | G | G | G | G | G | G | G | G | G |
| **Ireland** | | | | | | | | | B | B | B | B | B | G |
| **Jacobs** | | | | | | | | | | G | G | G | G | G |
| **James** | | | | | | G | G | G | G | G | G | G | G | G |
| **Reiner** | | | B | G | G | G | G | G | G | G | G | G | G | G |
| **Taylor** | G | G | B | G | G | G | G | G | G | G | G | G | G | G |
| **Turley** | | | B | G | G | G | G | G | B | B | B | B | B | G |
| **Wright** | | | | | | G | G | G | G | G | B | B | B | G |
| **Wynaendts** | | | | | | | | | | | G | G | G | G |
| **Zedillo** | B | G | G | G | G | G | G | G | G | G | G | G | G | G |

* Henry was elected to the Board on February 17, 2015 but his term began on July 1, 2015.

### A.    Corbat Faces a Substantial Likelihood of Liability and Is Not Independent

367.    Corbat has served as CEO since 2012.  Corbat also served as a Director of Citigroup at all relevant times.  He was, therefore, undeniably aware of the long history of Consent

Orders and regulatory proceedings against the Company and its subsidiaries and of the urgent need for Citigroup to reform its internal systems and achieve compliance. Corbat was a member of the Citigroup Board that authorized Citigroup's entry into the March 21, 2013, May 20, 2015 and October 7, 2020 Cease and Desist and Consent Orders with the Federal Reserve and, as a Citibank Director, signed the October 7, 2020 OCC Consent Orders. Corbat has also served on Citigroup's Operating Committee throughout his time as Citigroup's CEO and as a result has had responsibility for ensuring Citigroup's compliance with regulatory orders entered against the Company.

368. As demonstrated by the October 2020 Consent Orders, Corbat consciously disregarded his fiduciary duties by failing to exercise oversight over Citigroup's regulatory compliance and by failing to act to ensure that Citigroup was prioritizing efforts to achieve compliance with past government orders and all relevant laws and regulations.

369. Moreover, during the Relevant Period, Corbat issued false and misleading statements and omissions, including in his April 2019 testimony before the Financial Services Committee, where he stated that Citigroup had a "strong culture of compliance," and "governance structure in place that helps [the Company] identify mistakes and misbehavior, learn from them and hold ourselves accountable for whatever actions preceded those episodes." At the same time, Corbat further stated that Citigroup "took remedial action to significantly tighten controls" and was "working to resolve issues identified in Consent Orders related to our BSA/AML program." Less than a month before the $900 million accidental payment, Corbat stated that Citigroup was making "a sharp emphasis on our risk management." The OCC and Federal Reserve orders issued on October 7, 2020 show those statements were false.

370.     Additionally, Corbat issued, caused to be issued, and participated in the issuance of the 2018, 2019, and 2020 Proxies and the 2017, 2018, and 2019 Form 10-K's described above. These filings misleadingly suggested that the Board maintained effective compliance risk management and omitted any disclosures regarding (i) Citigroup's ineffective internal and regulatory compliance controls; and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013.

371.     As a result, Corbat faces a substantial likelihood of liability for his actions described herein, rendering any demand upon him futile.

**B.      Costello Faces a Substantial Likelihood of Liability**

372.     Costello has served as a Director of Citigroup and Citibank since 2016 and is a member of Citigroup's Audit and Risk Management Committees.  She was, therefore, undeniably aware of the numerous Consent Orders and regulatory proceedings brought against the Company and its subsidiaries and of the urgent need for Citigroup to reform its internal systems and achieve compliance.  Costello was a member of the Citigroup Board that authorized Citigroup's entry into the October 7, 2020 Cease and Desist and Consent Order with the Federal Reserve and, as a Citibank Director, signed the December 27, 2017, March 19, 2019, October 11, 2019, January 17, 2020, and October 7, 2020 OCC Consent Orders.

373.     As demonstrated by the October 2020 Consent Orders, Costello consciously disregarded her fiduciary duties by failing to exercise oversight over Citigroup's regulatory compliance and by failing to act to ensure that Citigroup was prioritizing efforts to achieve compliance with past government orders and all relevant laws and regulations.

374.     In addition, Costello issued, caused to be issued, and participated in the issuance of the 2018, 2019, and 2020 Proxies and the 2017, 2018 and 2019 Form 10-Ks as described above. These filings misleadingly suggested that the Board maintained effective compliance risk

management and omitted any disclosures regarding (i) Citigroup's ineffective internal and regulatory compliance controls; and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013.

375.   As a result, Costello faces a substantial likelihood of liability for her actions described herein, rendering any demand upon her futile.

### C.   Dailey Faces a Substantial Likelihood of Liability

376.   Dailey has served as a Director of Citigroup since 2019 and is a member of the Audit and Risk Management Committees.  Dailey also serves as a Director of Citibank.  She was, therefore, undeniably aware of the numerous Consent Orders and regulatory proceedings brought against the Company and its subsidiaries and of the urgent need for Citigroup to reform its internal systems and achieve compliance.  Dailey was a member of the Citigroup Board that authorized Citigroup's entry into the October 7, 2020 Cease and Desist and Consent Order with the Federal Reserve.

377.   As demonstrated by the October 2020 Consent Orders, Dailey consciously disregarded her fiduciary duties by failing to exercise oversight over Citigroup's regulatory compliance and by failing to act to ensure that Citigroup was prioritizing efforts to achieve compliance with past government orders and all relevant laws and regulations.

378.   In addition, Dailey issued, caused to be issued, and participated in the issuance of the 2020 Proxy and the 2019 Form 10-K described above.  These filings misleadingly suggested that the Board maintained effective compliance risk management and omitted any disclosures regarding (i) Citigroup's ineffective internal and regulatory compliance controls; and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013.

379.  As a result, Dailey faces a substantial likelihood of liability for her actions described herein, rendering any demand upon her futile.

**D.  Desoer Faces a Substantial Likelihood of Liability and Is Not Independent**

380.  Desoer has served as a Director of Citigroup since 2019 and is a member of the Operations and Technology, Executive, and Risk Management Committees.  Desoer also serves as a Director of Citibank.  She was, therefore, undeniably aware of the numerous Consent Orders and regulatory proceedings brought against the Company and its subsidiaries and of the urgent need for Citigroup to reform its internal systems and achieve compliance.  Desoer was a member of the Citigroup Board that authorized Citigroup's entry into the October 7, 2020 Cease and Desist and Consent Order with the Federal Reserve and, as a Citibank Director, signed the November 11, 2014, December 27, 2017, March 19, 2019, October 11, 2019, January 17, 2020, and October 7, 2020 OCC Consent Orders.  Desoer has also served on Citigroup's Operating Committee since 2013 and as a result has had responsibility for ensuring Citigroup's compliance with regulatory orders entered against the Company.

381.  As demonstrated by the October 2020 Consent Orders, Desoer consciously disregarded her fiduciary duties by failing to exercise oversight over Citigroup's regulatory compliance and by failing to act to ensure that Citigroup was prioritizing efforts to achieve compliance with past government orders and all relevant laws and regulations.

382.  In addition, Desoer issued, caused to be issued, and participated in the issuance of the 2020 Proxy and the 2019 Form 10-K as described above.  These filings misleadingly suggested that the Board maintained effective compliance risk management and omitted any disclosures regarding (i) Citigroup's ineffective internal and regulatory compliance controls; and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013.

383.   As a result, Desoer faces a substantial likelihood of liability for her actions described herein, rendering any demand upon her futile.

### E.   Dugan Faces a Substantial Likelihood of Liability

384.   Dugan has served as Chair of the Board since 2019, and as a Director of Citigroup since 2017.  He was, therefore, undeniably aware of the numerous Consent Orders and regulatory proceedings brought against the Company and its subsidiaries and of the urgent need for Citigroup to reform its internal systems and achieve compliance.  Dugan was a member of the Citigroup Board that authorized Citigroup's entry into the October 7, 2020 Cease and Desist and Consent Order with the Federal Reserve.

385.   As demonstrated by the October 2020 Consent Orders, Dugan consciously disregarded his fiduciary duties by failing to exercise oversight over Citigroup's regulatory compliance and by failing to act to ensure that Citigroup was prioritizing efforts to achieve compliance with past government orders and all relevant laws and regulations.

386.   During the Relevant Period, Dugan issued false and misleading statements and omissions regarding this failure, including in his comments to investors in April 2019 stating, that Citigroup had "made tremendous progress" with respect to "existential regulatory issues" and that "We -- the company spends a great deal of time, the Board does and the Risk Committee in particular, on making sure that management identifies, measures, monitors and controls the key risks facing the company because again, we have to have a culture of disciplined, prudent risk-taking for which -- to achieve sustainable earnings because we can never have the company slip back to the place where we were before."

387.   Additionally, Dugan issued, caused to be issued, and participated in the issuance of the 2018, 2019, and 2020 Proxies and the 2017, 2018, and 2019 Form 10-Ks as described above.  These filings misleadingly suggested that the Board maintained effective compliance risk

management and omitted any disclosures regarding (i) Citigroup's ineffective internal and regulatory compliance controls; and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013.

388. As a result, Dugan faces a substantial likelihood of liability for his actions described herein, rendering any demand upon him futile.

389. Additionally, Dugan's relationships with Citigroup prior to his appointment as a Citigroup director call into question whether he is sufficiently independent and disinterested to fairly consider a demand. Prior to joining Citigroup's Board, Dugan was a lobbyist for Citigroup at Covington & Burling. In a 2012 speech, Dugan recognized Citigroup's historic challenges with addressing enterprise risk and compliance. For example, Dugan described how in 2007, losses at Citigroup's non-bank subsidiaries were translated to the bank and how these losses and risk management failures resulted in the replacement of management, a re-composed Citigroup board of directors, and subjected Citigroup to intensified regulatory scrutiny. As discussed above, Dugan served as one of the five directors of the FDIC who voted to approve hundreds of billions of dollars in FDIC assistance to Citigroup on November 23, 2008, in the form of an asset guarantee for a selected pool of assets (up to $306 billion) and an additional $20 billion capital investment via the TARP. At a meeting of the FDIC directors to approve the relief for Citigroup, Dugan stated "I strongly support this case" and advocated for Citigroup.

### F. Fraser Faces a Substantial Likelihood of Liability and Is Not Independent

390. Fraser has served as a Director of Citigroup and Citibank since September 2020. Fraser has also served as President of the Company and CEO of Global Consumer Banking since October 2019. Fraser was previously the CEO of Citigroup Latin America from 2015 to 2019.

391. In her senior executive positions, including as President of the Company for the past year, Fraser possessed duties substantially identical to those possessed by corporate directors.

Further, as a longstanding senior executive of the Company, she was undeniably aware of the numerous Consent Orders and regulatory proceedings brought against the Company and its subsidiaries and of the urgent need for Citigroup to reform its internal systems and achieve compliance.  Fraser was a member of the Citigroup Board that authorized Citigroup's entry into the October 7, 2020 Cease and Desist and Consent Order with the Federal Reserve.  Fraser has also served on Citigroup's Operating Committee since May 2013 and as a result has had responsibility for ensuring Citigroup's compliance with regulatory orders entered against the Company.

392.   As demonstrated by the October 2020 Consent Orders, Fraser consciously disregarded her fiduciary duties by failing to exercise oversight over Citigroup's regulatory compliance and by failing to act to ensure that Citigroup was prioritizing efforts to achieve compliance with past government orders and all relevant laws and regulations.

393.   Further, the Company has recently announced that Fraser will be replacing Corbat as the Company's CEO in 2021.  Fraser stands to make millions of dollars of compensation in that position.  Fraser derives substantially all of her income from her employment with Citigroup. Indeed, according to Citigroup's 2020 proxy statement, in 2017 Fraser received $8,627,415 in total compensation, in 2018 Fraser received $9,490,490 in total compensation, and in 2019 Fraser received $17,313,781 in compensation.   The Board has ultimate authority over Fraser's employment and compensation.  Fraser could not independently and disinterestedly consider a demand for action that might require her to sue the directors that control her continued employment, compensation, and pending promotion to CEO.

394.   As a result, Fraser faces a substantial likelihood of liability and is not independent, rendering any demand upon her futile.

### G.     Hennes Faces a Substantial Likelihood of Liability

395.    Hennes has served as a Director of Citigroup and Citibank since 2013.  He was, therefore, undeniably aware of the long history of Consent Orders and regulatory proceedings against the Company and its subsidiaries and of the urgent need for Citigroup to reform its internal systems and achieve compliance.  Hennes was a member of the Citigroup Board that authorized Citigroup's entry into the May 20, 2015 and October 7, 2020 Cease and Desist and Consent Orders with the Federal Reserve and, as a Citibank Director, signed the November 11, 2014, December 27, 2017, March 19, 2019, October 11, 2019, January 17, 2020, and October 7, 2020 OCC Consent Orders.

396.    As demonstrated by the October 2020 Consent Orders, Hennes consciously disregarded his fiduciary duties by failing to exercise oversight over Citigroup's regulatory compliance and by failing to act to ensure that Citigroup was prioritizing efforts to achieve compliance with past government orders and all relevant laws and regulations.

397.    In addition, Hennes issued, caused to be issued, and participated in the issuance of the 2018, 2019, and 2020 Proxies and the 2017, 2018, and 2019 Form 10-Ks as described above. These filings misleadingly suggested that the Board maintained effective compliance risk management and omitted any disclosures regarding (i) Citigroup's ineffective internal and regulatory compliance controls; and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013.

398.    As a result, Hennes faces a substantial likelihood of liability for his actions described herein, rendering any demand upon him futile.

### H.     Henry Faces a Substantial Likelihood of Liability

399.    Henry has served as a Director of Citigroup since 2015 and is the Chair of the Ethics, Conduct and Culture Committee, and is also a member of the Nomination, Governance

and Public Affairs, and Audit Committees. He also served as a Director of Citibank from 2015 to 2016. He was, therefore, undeniably aware of the long history of Consent Orders and regulatory proceedings against the Company and its subsidiaries and of the urgent need for Citigroup to reform its internal systems and achieve compliance. Henry was a member of the Citigroup Board that authorized Citigroup's entry into the May 20, 2015 and October 7, 2020 Cease and Desist and Consent Orders with the Federal Reserve.

400.    As demonstrated by the October 2020 Consent Orders, Henry consciously disregarded his fiduciary duties by failing to exercise oversight over Citigroup's regulatory compliance and by failing to act to ensure that Citigroup was prioritizing efforts to achieve compliance with past government orders and all relevant laws and regulations.

401.    In addition, Henry issued, caused to be issued, and participated in the issuance of the 2018, 2019, and 2020 Proxies and the 2017, 2018, and 2019 Form 10-Ks as described above. These filings misleadingly suggested that the Board maintained effective compliance risk management and omitted any disclosures regarding (i) Citigroup's ineffective internal and regulatory compliance controls; and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013.

402.    As a result, Henry faces a substantial likelihood of liability for his actions described herein, rendering any demand upon him futile.

403.    Additionally, as discussed above, Henry and Wright overlapped in their tenure as Directors of Kraft Foods Inc., and Henry may have reason to act to protect Wright from the consequences of his misconduct alleged herein.

I.    **Ireland Faces a Substantial Likelihood of Liability**

404.    Ireland has served as a Director of Citigroup since 2017 and is a member of the Operations and Technology Committee and Risk Management Committee. Ireland also serves

as a Director of Citibank.  She was, therefore, undeniably aware of the long history of Consent Orders and regulatory proceedings against the Company and its subsidiaries and of the urgent need for Citigroup to reform its internal systems and achieve compliance.  Ireland was a member of the Citigroup Board that authorized Citigroup's entry into the October 7, 2020 Cease and Desist and Consent Order with the Federal Reserve and, as a Citibank Director, signed the December 27, 2017, March 19, 2019, October 11, 2019, January 17, 2020, and October 7, 2020 OCC Consent Orders.

405.    As demonstrated by the October 2020 Consent Orders, Ireland consciously disregarded her fiduciary duties by failing to exercise oversight over Citigroup's regulatory compliance and by failing to act to ensure that Citigroup was prioritizing efforts to achieve compliance with past government orders and all relevant laws and regulations.

406.    In addition, Ireland issued, caused to be issued, and participated in the issuance of the 2018, 2019, and 2020 Proxies and the 2017, 2018, and 2019 Form 10-Ks as described above. These filings misleadingly suggested that the Board maintained effective compliance risk management and omitted any disclosures regarding (i) Citigroup's ineffective internal and regulatory compliance controls; and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013.

407.    As a result, Ireland faces a substantial likelihood of liability for her actions described herein, rendering any demand upon her futile.

### J.    Jacobs Faces a Substantial Likelihood of Liability

408.    Jacobs has served as a Director of Citigroup since 2018.  Jacobs is also Chair of the Personnel and Compensation Committee and is also a member of the Nomination, Governance and Public Affairs, Ethics, Conduct and Culture, Executive, Risk Management, and Audit Committees.  He was, therefore, undeniably aware of the long history of Consent Orders and

regulatory proceedings against the Company and its subsidiaries and of the urgent need for Citigroup to reform its internal systems and achieve compliance.  Jacobs was a member of the Citigroup Board that authorized Citigroup's entry into the October 7, 2020 Cease and Desist and Consent Order with the Federal Reserve.

409.    As demonstrated by the October 2020 Consent Orders, Jacobs consciously disregarded his fiduciary duties by failing to exercise oversight over Citigroup's regulatory compliance and by failing to act to ensure that Citigroup was prioritizing efforts to achieve compliance with past government orders and all relevant laws and regulations.

410.    In addition, Jacobs issued, caused to be issued, and participated in the issuance of the 2019 and 2020 Proxies and the 2018 and 2019 Form 10-Ks as described above.  These filings misleadingly suggested that the Board maintained effective compliance risk management and omitted any disclosures regarding (i) Citigroup's ineffective internal and regulatory compliance controls; and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013.

411.    As a result, Jacobs faces a substantial likelihood of liability for his actions described herein, rendering any demand upon him futile.

### K.    James Faces a Substantial Likelihood of Liability

412.    James has served as a Director of Citigroup since 2016 and is a member of the Risk Management Committee and the Operations and Technology Committee.  She was, therefore, undeniably aware of the long history of Consent Orders and regulatory proceedings against the Company and its subsidiaries and of the urgent need for Citigroup to reform its internal systems and achieve compliance.  James was a member of the Citigroup Board that authorized Citigroup's entry into the October 7, 2020 Cease and Desist and Consent Order with the Federal Reserve.

413.    As demonstrated by the October 2020 Consent Orders, James consciously disregarded her fiduciary duties by failing to exercise oversight over Citigroup's regulatory compliance and by failing to act to ensure that Citigroup was prioritizing efforts to achieve compliance with past government orders and all relevant laws and regulations.

414.    In addition, James issued, caused to be issued, and participated in the issuance of the 2018, 2019, and 2020 Proxies and the 2017, 2018, and 2019 Form 10-Ks as described above. These filings misleadingly suggested that the Board maintained effective compliance risk management and omitted any disclosures regarding (i) Citigroup's ineffective internal and regulatory compliance controls; and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013.

415.    As a result, James faces a substantial likelihood of liability for her actions described herein, rendering any demand upon her futile.

### L.    Reiner Faces a Substantial Likelihood of Liability

416.    Reiner has served as a Director of Citigroup since 2013 and was Chair of the Operations and Technology Committee and a member of the Personnel and Compensation Committee.  Reiner also served as a Director of Citibank from 2013 to 2016.  He was, therefore, undeniably aware of the long history of Consent Orders and regulatory proceedings against the Company and its subsidiaries and of the urgent need for Citigroup to reform its internal systems and achieve compliance.  Reiner was a member of the Citigroup Board that authorized Citigroup's entry into the May 20, 2015 and October 7, 2020 Cease and Desist and Consent Orders with the Federal Reserve and, as a Citibank Director, signed the November 11, 2014 OCC Consent Order.

417.    As demonstrated by the October 2020 Consent Orders, Reiner consciously disregarded his fiduciary duties by failing to exercise oversight over Citigroup's regulatory

compliance and by failing to act to ensure that Citigroup was prioritizing efforts to achieve compliance with past government orders and all relevant laws and regulations.

418.    In addition, Reiner issued, caused to be issued, and participated in the issuance of the 2018, 2019, and 2020 Proxies and the 2017, 2018, and 2019 Form 10-Ks as described above. These filings misleadingly suggested that the Board maintained effective compliance risk management and omitted any disclosures regarding (i) Citigroup's ineffective internal and regulatory compliance controls; and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013.

419.    As a result, Reiner faces a substantial likelihood of liability for his actions described herein, rendering any demand upon him futile.

**M.    Taylor Faces a Substantial Likelihood of Liability**

420.    Taylor has served as a Director of Citigroup since 2009 and is Chair of the Nomination, Governance and Public Affairs Committee, and a member of the Personnel and Compensation Committee.  Taylor also served a Director of Citibank from 2013 to 2016 and is currently on the Citibank Board.  She was, therefore, undeniably aware of the long history of Consent Orders and regulatory proceedings against the Company and its subsidiaries and of the urgent need for Citigroup to reform its internal systems and achieve compliance.  Taylor was a member of the Citigroup Board that authorized Citigroup's entry into the May 20, 2015 and October 7, 2020 Cease and Desist and Consent Orders with the Federal Reserve and, as a Citibank Director, signed the November 11, 2014 OCC Consent Order.

421.    As demonstrated by the October 2020 Consent Orders, Taylor consciously disregarded her fiduciary duties by failing to exercise oversight over Citigroup's regulatory compliance and by failing to act to ensure that Citigroup was prioritizing efforts to achieve compliance with past government orders and all relevant laws and regulations.

422.     In addition, Taylor issued, caused to be issued, and participated in the issuance of the 2018, 2019, and 2020 Proxies and the 2017, 2018, and 2019 Form 10-Ks as described above. These filings misleadingly suggested that the Board maintained effective compliance risk management and omitted any disclosures regarding (i) Citigroup's ineffective internal and regulatory compliance controls; and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013.

423.     As a result, Taylor faces a substantial likelihood of liability for her actions described herein, rendering any demand upon her futile.

**N.     Turley Faces a Substantial Likelihood of Liability**

424.     Turley has served as a Director of Citigroup and a Director of Citibank since 2013 and is the Chair of the Audit Committee and a member of the Risk Management Committee.  He was, therefore, undeniably aware of the long history of Consent Orders and regulatory proceedings against the Company and its subsidiaries and of the urgent need for Citigroup to reform its internal systems and achieve compliance.  Turley was a member of the Citigroup Board that authorized Citigroup's entry into the May 20, 2015 and October 7, 2020 Cease and Desist and Consent Orders with the Federal Reserve and, as a Citibank Director, signed the November 11, 2014, December 27, 2017, March 19, 2019, October 11, 2019, January 17, 2020, and October 7, 2020 OCC Consent Orders.

425.     As demonstrated by the October 2020 Consent Orders, Taylor consciously disregarded his fiduciary duties by failing to exercise oversight over Citigroup's regulatory compliance and by failing to act to ensure that Citigroup was prioritizing efforts to achieve compliance with past government orders and all relevant laws and regulations.

426.     Moreover, Turley issued, caused to be issued, and participated in the issuance of the 2018, 2019, and 2020 Proxies and the 2017, 2018, and 2019 Form 10-Ks as described above.

These filings misleadingly suggested that the Board maintained effective compliance risk management and omitted any disclosures regarding (i) Citigroup's ineffective internal and regulatory compliance controls; and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013.

427.    As a result, Turley faces a substantial likelihood of liability for his actions described herein, rendering any demand upon him futile.

### O.    Wright Faces a Substantial Likelihood of Liability

428.    Wright has served as a Director of Citigroup since 2017 and is a member of the Audit Committee and the Ethics, Conduct and Culture Committee.  Wright also serves as a Director of Citibank.  She was, therefore, undeniably aware of the long history of Consent Orders and regulatory proceedings against the Company and its subsidiaries and of the urgent need for Citigroup to reform its internal systems and achieve compliance.  Wright was a member of the Citigroup Board that authorized Citigroup's entry into the October 7, 2020 Cease and Desist and Consent Order with the Federal Reserve and, as a Citibank Director, signed the October 11, 2019, January 17, 2020, and October 7, 2020 OCC Consent Orders.

429.    As demonstrated by the October 2020 Consent Orders, Wright consciously disregarded her fiduciary duties by failing to exercise oversight over Citigroup's regulatory compliance and by failing to act to ensure that Citigroup was prioritizing efforts to achieve compliance with past government orders and all relevant laws and regulations.

430.    In addition, Wright issued, caused to be issued, and participated in the issuance of the 2018, 2019, and 2020 Proxies and the 2017, 2018, and 2019 Form 10-Ks as described above. These filings misleadingly suggested that the Board maintained effective compliance risk management and omitted any disclosures regarding (i) Citigroup's ineffective internal and

regulatory compliance controls; and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013.

431.    As a result, Wright faces a substantial likelihood of liability for her actions described herein, rendering any demand upon her futile.

432.    Additionally, as discussed above, Wright and Henry overlapped in their tenure as Directors of Kraft Foods Inc., and Wright may have reason to act to protect Henry from the consequences of his misconduct alleged herein.

### P.    Wynaendts Faces a Substantial Likelihood of Liability

433.    Wynaendts has served as a Director of Citigroup since 2019 and is a member of the Risk Management Committee and the Personnel and Compensation Committee.  He was, therefore, undeniably aware of the long history of Consent Orders and regulatory proceedings against the Company and its subsidiaries and of the urgent need for Citigroup to reform its internal systems and achieve compliance.  Wynaendts was a member of the Citigroup Board that authorized Citigroup's entry into the October 7, 2020 Cease and Desist and Consent Order with the Federal Reserve.

434.    As demonstrated by the October 2020 Consent Orders, Wynaendts consciously disregarded his fiduciary duties by failing to exercise oversight over Citigroup's regulatory compliance and by failing to act to ensure that Citigroup was prioritizing efforts to achieve compliance with past government orders and all relevant laws and regulations.

435.    In addition, Wynaendts issued, caused to be issued, and participated in the issuance of the 2020 Proxy and the 2019 Form 10-K as described above.  These filings misleadingly suggested that the Board maintained effective compliance risk management and omitted any disclosures regarding (i) Citigroup's ineffective internal and regulatory compliance controls; and

(ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013.

436.    As a result, Wynaendts faces a substantial likelihood of liability for his actions described herein, rendering any demand upon him futile.

### Q.    Zedillo Faces a Substantial Likelihood of Liability

437.    Zedillo has served as a Director of Citigroup since 2010 and is a member of the Nomination, Governance and Public Affairs, Ethics, Conduct and Culture, and Risk Management Committees.  Zedillo also served as a Director of Citibank from 2010 to 2013.  He was, therefore, undeniably aware of the long history of Consent Orders and regulatory proceedings against the Company and its subsidiaries and of the urgent need for Citigroup to reform its internal systems and achieve compliance.  Zedillo was a member of the Citigroup Board that authorized Citigroup's entry into the March 21, 2013, May 20, 2015, and October 7, 2020 Cease and Desist and Consent Orders with the Federal Reserve and, as a Citibank Director, signed the April 5, 2012 OCC Consent Order.

438.    As demonstrated by the October 2020 Consent Orders, Zedillo consciously disregarded his fiduciary duties by failing to exercise oversight over Citigroup's regulatory compliance and by failing to act to ensure that Citigroup was prioritizing efforts to achieve compliance with past government orders and all relevant laws and regulations.

439.    In addition, Zedillo issued, caused to be issued, and participated in the issuance of the 2018, 2019, and 2020 Proxies and the 2017, 2018, and 2019 Form 10-Ks as described above. These filings misleadingly suggested that the Board maintained effective compliance risk management and omitted any disclosures regarding (i) Citigroup's ineffective internal and regulatory compliance controls; and (ii) the Board's failure to comply with commitments it had made to federal regulators to resolve enforcement proceedings since 2013.

440. As a result, Zedillo faces a substantial likelihood of liability for his actions described herein, rendering any demand upon him futile.

## IX. CLAIMS AGAINST DEFENDANTS

### COUNT I
### (Breach of Fiduciary Duty Against All Defendants)

441. Plaintiffs incorporate by reference and reallege each of the foregoing paragraphs as if fully set forth herein.

442. As directors of Citigroup, each of the Defendants owed and owe fiduciary duties to Citigroup and its stockholders. By reason of their fiduciary relationships, the Defendants specifically owed and owe Citigroup the highest obligation of loyalty, due care, good faith, fair dealing, and candor in the administration and management of the affairs of the Company.

443. Each of the Defendants consciously and deliberately breached their fiduciary duties to Citigroup by failing to exercise oversight over Citigroup's internal controls, risk-management systems, and regulatory compliance and by failing to act to ensure that Citigroup and its subsidiaries were prioritizing efforts to achieve compliance with past government orders and all relevant laws and regulations.

444. Defendants' failures did not result from a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

445. Additionally, the Defendants had and have specific fiduciary duties as defined by the Company's corporate governance documents, including the charters of various Board committees that, had they been discharged in accordance with the Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

446.    Accordingly, to the extent Citigroup's exculpatory provision applies to the Defendants' acts or omissions while acting in their capacities as directors, it cannot immunize them from (i) any non-monetary liability; (ii) monetary liability for breaches of the duty of loyalty; (iii) monetary liability for acts or omissions not in god faith or that involved intentional misconduct or a knowing violation of law; or (iv) monetary liability in connection with any transaction from which they derived an improper personal benefit.  As detailed in this Complaint, the Defendants' misconduct: (i) involved breaches of the duty of loyalty; and/or (ii) involved acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law.  Citigroup's exculpatory provision therefore cannot immunize the Defendants from liability for that misconduct.

447.    Plaintiffs and the Company have been harmed by Defendants' breaches of duty.

## COUNT II
### (Breach of Fiduciary Duty Against Defendants Corbat, Desoer, and Fraser)

448.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations in Paragraphs 1 through 440 as though fully set forth in this paragraph.

449.    Defendants Corbat, Desoer, and Fraser (the "Officer Defendants"), as officers of Citigroup and certain of its subsidiaries, owed and owe fiduciary duties to Citigroup and its stockholders.  By reason of their fiduciary relationships, the Officer Defendants specifically owed and owe Citigroup the highest obligation of loyalty, due care, good faith, fair dealing, and candor in the administration and management of the affairs of the Company.  Breaches of duty by the Officer Defendants, in their capacity as officers, cannot be exculpated.

450.    The Officer Defendants consciously and deliberately breached their fiduciary duties to Citigroup by mismanaging internal controls, risk-management systems, and regulatory

compliance affecting Citigroup and its subsidiaries and by failing to achieve compliance with past government orders and all relevant laws and regulations.

451.     The Officer Defendants' failures did not result from a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

452.     Plaintiffs and the Company have been harmed by Defendants' breaches of duty.

**COUNT III**
**(Unjust Enrichment Against All Defendants)**

453.     Plaintiffs incorporate by reference and reallege each of the foregoing allegations in Paragraphs 1 through 440 as though fully set forth in this paragraph.

454.     During the Relevant Period, Defendants received significant compensation from Citigroup that was unjust in light of Defendants' breaches of duty and bad faith conduct.

455.     Plaintiffs, as shareholders and representatives of Citigroup, seeks restitution from Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation—including any salary, options, performance-based compensation, and stock—obtained by Defendants due to their wrongful conduct alleged in this Complaint.

**COUNT IV**
**(Contribution and Indemnification Against All Defendants)**

456.     Plaintiffs incorporate by reference and realleges each of the foregoing allegations in Paragraphs 1 through 440 as though fully set forth herein.

457.     Citigroup is and/or is alleged to be liable to various persons, entities, agencies, and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to Defendants' liability to Citigroup.

458.     Citigroup's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of Defendants as alleged above, and Citigroup is entitled to

contribution and indemnification from each Defendant in connection with all such claims that have been, are or may in the future be asserted against, Citigroup by virtue of the Defendants' misconduct.

**COUNT V**
**(Violation of §10(b) of the Securities Exchange Act of 1934 and**
**Rule 10b-5 Against All Defendants)**

459.    Plaintiffs incorporate by reference and realleges each of the foregoing allegations in Paragraphs 1 through 440 as though fully set forth herein.

460.    During the Relevant Period, in connection with Citigroup's repurchases of Citigroup shares, Defendants disseminated or approved false or misleading statements about Citigroup as detailed above, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

461.    At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by Defendants, Defendants caused the Company to repurchase millions of shares of its own common stock at prices that were artificially inflated due to Defendants' false or misleading statements.  Defendants engaged in a scheme to defraud Citigroup by causing the Company to purchase millions of shares of Citigroup stock at artificially inflated prices, as detailed above.

462.    Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in

acts, practices, and a course of business that operated as a fraud or deceit upon Citigroup in connection with the Company's purchases of Citigroup stock during the Relevant Period.

463.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Citigroup stock, which were intended to, and did: (a) deceive Citigroup regarding, among other things, the Company's noncompliance with regulators, the Company's inadequate risk management and internal controls, and the Company's financial statements; (b) artificially inflate and maintain the market price of Citigroup stock; and (c) cause Citigroup to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known.  Throughout the Relevant Period, Defendants were in possession of material, adverse non-public information regarding the Company's noncompliance with regulators.

464.    Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made, as alleged above.

465.    As described above, Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misstatements and omissions of material facts set forth in this Complaint were either known to Defendants or were so obvious that Defendants should have been aware of them.

Throughout the Relevant Period, Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

466.    Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock.

467.    As a result of Defendants' misconduct, Citigroup has and will suffer damages in that it paid artificially inflated prices for Citigroup common stock purchased as part of the repurchase program and suffered losses when the previously undisclosed facts relating to the Company's ongoing regulatory noncompliance was disclosed beginning in September 2020. Citigroup would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by Defendants' false or misleading statements.

468.    As a direct and proximate result of Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Citigroup stock during the Relevant Period. By reason of such conduct, Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

469.    Plaintiffs brings this claim within two years of the discovery of the violation and within five years of the violation.

### COUNT VI
### (Violation of §14(A) of the Exchange Act and SEC Rule 14a-9
### Against All Defendants)

470.    Plaintiffs incorporate by reference and realleges each of the foregoing allegations in Paragraphs 1 through 440 as though fully set forth herein.

471.    This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Defendants. Plaintiffs specifically disclaims any

allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

472.   SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

473.   Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to shareholders which were contained in the 2018, 2019, and 2020 Proxies.  These Proxies contained proposals to Citigroup shareholders urging them to elect and re-elect members of the Board and provide advisory votes on issues relating to executive compensation. The Proxy Statements, however, misstated or failed to disclose deficiencies in Citigroup's internal and disclosure controls that were known to the Board when the Proxy Statements were filed.

474.   By reason of this conduct, Defendants violated Section 14(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Citigroup mislead and/or deceived its shareholders by making misleading statements that were an essential link in shareholders heeding Citigroup's recommendations to re-elect and elect the current Board and provide advisory votes on executive compensation.

475.   The false and misleading information contained in the Proxies was material to Citigroup's shareholders in determining whether to re-elect and elect the current Board and provide advisory votes on executive compensation.  This information was also material to the

integrity of the directors who were proposed for election to the Board. Plaintiffs, on behalf of Citigroup, thereby seek relief for damages inflicted upon the Company based upon the misleading Proxy Statements in connection with the improper election and reelection of the members of the Board, and advisory votes on executive compensation.

476.    This action was timely commenced within three years of the date of each Proxy Statement and within one year from the time Plaintiffs discovered or reasonably could have discovered the facts on which this claim is based.

## X.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgement as follows:

A.    A determination that this action is a proper derivative action maintainable under the law and that demand was excused as futile;

B.    Declaring that Defendants breached their fiduciary duties to Citigroup and committed other violations of state and federal law;

C.    Determining and awarding Citigroup the damages sustained because of the violations set forth above from each Defendant, jointly and severally, together with prejudgment and post-judgment interest thereon;

D.    Directing Citigroup to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with all applicable laws and regulations and to protect the Company and its stockholders from a continuation and/or repeat of the damaging failures described in this Complaint, including putting forward for a stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other actions as may be necessary;

E.     Extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to ensure that Plaintiffs, on behalf of Citigroup, have an effective remedy;

F.     Awarding to Citigroup restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants as a result of their misconduct alleged herein;

G.     Ordering an accounting of all compensation awarded to the Defendants during the Relevant Period;

H.     Awarding to Plaintiffs costs and disbursements related to this action, including reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

I.     Granting such other and further relief as the Court deems just and proper.

## XI.    **JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated:  December 24, 2020

Respectfully submitted,

**SAXENA WHITE P.A.**

 */s/   Steven B. Singer* 
Steven B. Singer
Scott Koren
10 Bank Street, 8th Floor
White Plains, NY 10606
Phone: (914) 437-8551
Fax: (888) 631-3611

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III
Adam D. Warden
Dianne Pitre
Jonathan D. Lamet
Mario Alvite
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Phone: (561) 934-3399
Fax: (561) 394-3382

**SAXENA WHITE P.A.**
Thomas Curry
1000 N. West St.
Suite 1200, Office 1265
Wilmington, DE 19801
Phone: (302) 485-0480
Fax: (888) 424-8566

**BERMAN TABACCO**
Leslie R. Stern
Nathaniel L. Orenstein
Steven Groopman
M. Dalton Rodriguez
One Liberty Square
Boston, MA 02109
Phone: (617) 542-8300

*Co-Lead Counsel for Plaintiffs*

**GLANCY PRONGAY & MURRAY LLP**
Benjamin I. Sachs-Michaels
Matthew M. Houston
712 Fifth Avenue
New York, New York 10019
Phone: (212) 935-7400

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Phone: (310) 201-9150

**BERGER MONTAGUE PC**
Sherrie R. Savett
Michael Dell'Angelo
Barbara A. Podell
Andrew Abramowitz
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Phone: (215) 875-3000

*Additional Counsel for Plaintiffs*

## **VERIFICATION**

I, Amy L. Crane, being duly sworn, declare as follows:

I am General Counsel for the Office of the General Treasurer of the State of Rhode Island and I am authorized to act on behalf of the Employees' Retirement System of the State of Rhode Island ("Rhode Island") with respect to this litigation and the filing of the Verified Consolidated Shareholder Derivative Complaint ("Complaint"). Rhode Island is a shareholder of Citigroup Inc. (the "Company") and has been throughout the relevant period defined in the Complaint. Rhode Island has retained competent counsel and is ready, willing, and able to pursue this action vigorously on behalf of the Company. I have reviewed the Complaint, and based upon discussions with and reliance upon counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

December 23 2020

Amy L. Crane, General Counsel
The State of Rhode Island, Office of the General Treasurer,
on behalf of the Employees' Retirement System of the
State of Rhode Island

## VERIFICATION

I, Jeffrey Dana, being duly sworn, declare as follows:

I am City Solicitor for the City of Providence, Rhode Island, and I am authorized to act on behalf of The Employee Retirement System of the City of Providence ("Providence") with respect to this litigation and the filing of the Verified Consolidated Shareholder Derivative Complaint ("Complaint"). Providence is a shareholder of Citigroup Inc. (the "Company") and has been throughout the relevant period defined in the Complaint. Providence further intends to hold Citi common stock until at least the resolution of this action. Providence has retained competent counsel and is ready, willing, and able to pursue this action vigorously on behalf of the Company.

I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge I believe those allegations to be true and correct. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and believe them to be true and correct. Having received a copy of this Complaint and having had the opportunity to review it with my counsel, I hereby authorize its filing on behalf of Providence.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

December 23, 2020

_____
Jeffrey Dana
City Solicitor for the City of Providence, Rhode Island
on behalf of The Employee Retirement System of the City of
Providence

**CERTIFICATE OF SERVICE**

I hereby certify that on December 24, 2020, I caused to be filed a true and correct copy of

the foregoing with the Clerk of Court via CM/ECF.  Notice of this filing will be sent electronically

to all registered parties by operation of the Court's electronic filing system.

*/s/ Steven B. Singer*

Steven B. Singer